UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
L.S., on behalf of D.P.,

                Plaintiff,

        -against-

THE UNION FREE SCHOOL DISTRICT OF THE
TARRYTOWNS, also known as PUBLIC
SCHOOLS OF THE TARRYTOWNS, PUBLIC
SCHOOLS OF THE TARRYTOWNS' BOARD OF
EDUCATION, and CHRISTOPHER BORSARI, in
his official capacity as Superintendent of Public
Schools of the Tarrytowns,

                Defendants.

------------------------------------------------------------------------ X

Index No. 22 CIV 10835 (CS)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
# FOR SUMMARY JUDGMENT

**KEANE & BEANE, P.C.**
Attorneys for Defendants
445 HAMILTON AVENUE, 15TH FLOOR
WHITE PLAINS, NEW YORK 10601
(914) 946-4777

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   STATEMENT OF FACTS ...................................................................... 2

III.  STANDARD OF REVIEW ..................................................................... 2

IV.   ARGUMENT ............................................................................................ 4

      POINT I
      THE SRO'S DECISION MERITS DUE
      DEFERENCE ............................................................................................ 6

   A.  The SRO Correctly Held that the District Offered D.P.
       a FAPE For The 2018-2019 School Year and Therefore, Plaintiff
       Is Not Entitled To Tuition Reimbursement For that Year ............................... 6

   B.  The SRO Correctly Held That the District Offered D.P.
       a FAPE For The 2019-202020 School Year and Therefore,
       Plaintiff Is Not Entitled To Tuition Reimbursement.................................... 16

V.    CONCLUSION...................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. ex rel. M.C.,*
  553 F.3d 165 (2d Cir. 2009)...........................................................................................4

*A.S. ex rel S. v. Norwalk Bd. of Educ.,*
  183 F.Supp.2d 534 (D.Conn. 2002) ...............................................................................2

*Adrianne v. Lakeland Cent. Sch. Dist.,*
  686 F.Supp.2d 361 [S.D.N.Y. 2010].............................................................................4

*Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.,*
  281 F.Supp.2d 710 (S.D.N.Y. 2003) .............................................................................2

*Board of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley,*
  458 U.S. 176 (1982) ....................................................................................................3, 4

*C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.,*
  2005 WL 1388964 (E.D.N.Y. June 10, 2005)...............................................................2

*Carlisle Area Sch. v. Scott P.,*
  62 F.3d 520 (3d Cir. 1995)............................................................................................5

*Connor v. New York City Dep't. of Educ.,*
  2009 WL 3335760 (S.D.N.Y. Oct. 13, 2009) ...............................................................3

*Endrew F. v. Douglas Cty. Sch. Dist. RE-1,*
  580 U.S. 386 (2017) ...................................................................................................5, 6

*Forest Grove Sch. Dist. v. T.A.,*
  557 U.S. 230 (2009) .......................................................................................................4

*Gagliardo v. Arlington Cent. Sch. Dist.,*
  489 F.3d 105 (2d Cir. 2007)........................................................................................3, 4

*J.R. and B.R. v. Bd. of Educ. of the City of Rye Sch. Dist.,*
  345 F.Supp.2d 386 (S.D.N.Y. 2004) .............................................................................3

*Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.,*
  397 F.3d 77 (2d Cir. 2005) ............................................................................................2

*M.H. and E.K., individually and collectively on behalf of P.H. v. New York City Dep't of Educ.,*
  685 F.3d 217 (2d Cir. 2012)...........................................................................................3

*M.R. on behalf of S.T. v. South Orangetown Cent. Sch. Dist.,*
  2011 WL 6307563 (S.D.N.Y. Dec. 16, 2011)...............................................................3

*M.W. ex rel. S.W. v. New York City Dep't of Educ.,*
  725 F.3d 131 (2d Cir. 2013)...........................................................................................6

*P. v. Newington Bd. of Educ.*,
    546 F.3d 111 (2d Cir. 2008) ............................................................................ 5, 6

*R.E. v. New York City Dep't of Educ.*,
    694 F.3d 167 (2d Cir. 2012) ................................................................................. 4

*Tucker v. Bay Shore Union Free Sch. Dist.*,
    873 F.2d 563 (2d Cir. 1989) ................................................................................. 4

*Walczak v. Florida Union Free Sch. Dist.*,
    142 F.3d 119 (2d Cir. 1998) .............................................................................. 3, 4

*Weaver v. Millbrook Cent. Sch. Dist.*,
    812 F. Supp. 2d 514 (S.D.N.Y. 2011) ................................................................. 4

**Statutes**

20 U.S.C. §1401(d)(1)(A) ......................................................................................... 4

20 U.S.C. §1401(d)(1)(B) ......................................................................................... 4

20 U.S.C. §1412(a)(5)(A) ......................................................................................... 5

20 U.S.C. §1414(d)(1)(A)(i)(IV)(bb) ....................................................................... 6

20 U.S.C. §1415, *et seq.* ........................................................................................... 1

20 U.S.C. §1415(i)(3)(B) ........................................................................................ 25

**Rules**

Fed. R. Civ. P. 56 ................................................................................................... 25

**Regulations**

8 N.Y.C.R.R. 200.4(d)(4)(ii)(b) ............................................................................. 24

8 N.Y.C.R.R. 200.6(a)(1) ......................................................................................... 5

34 C.F.R. 300.114(a)(2)(i) ........................................................................................ 5

34 C.F.R. 300.116(a)(2) ........................................................................................... 5

## I.    PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Defendants, UNION FREE SCHOOL DISTRICT OF THE TARRYTOWNS, also known as PUBLIC SCHOOLS OF THE TARRYTOWNS, PUBLIC SCHOOLS OF THE TARRYTOWNS' BOARD OF EDUCATION, formally known as the BOARD OF EDUCATION OF THE UNION FREE SCHOOL DISTRICT OF THE TARRYTOWNS and CHRISTOPHER BORSARI, in his official capacity as Superintendent of Public Schools of the Tarrytowns (hereinafter, collectively the "District") in support of its motion for summary judgment dismissing the Amended Complaint filed by Plaintiff L.S. (hereinafter, "Plaintiff") on behalf of D.P., under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1415, *et seq.*, its implementing regulations, the New York State Constitution and the New York State Education Law and regulations.

By the Amended Complaint, Plaintiff seeks review of the August 22, 2022 Decision of the New York State Education Department State Review Officer (hereinafter, the "SRO"), which upheld the May 6, 2022 Findings of Fact and Decision of Impartial Hearing Officer Jeanne M. Keefe[1] and thereby denied Plaintiff's request for tuition reimbursement, and other relief, for

---

[1] The District's recommendations for D.P. for the 2018-2019 and 2019-2020 school years were originally challenged by Plaintiff by Due Process Requests dated September 27, 2019 and January 17, 2020. These requests were consolidated into one impartial hearing, which was held over ten days between April 14, 2020 and August 6, 2020. By her Findings of Fact and Order, dated November 5, 2020, IHO Audrey Daniel (hereinafter, "IHO 1") found in favor of Plaintiff and, among other relief, awarded Plaintiff tuition reimbursement for D.P.'s unilateral placement. By Request for Review, dated December 15, 2020, the District initiated an appeal to the SRO. By Decision dated March 31, 2021, titled *Application of the Bd. of Educ.,* Appeal No. 20-190, the SRO found IHO 1 made certain errors and remanded the matter. IHO Keefe (hereinafter, "IHO 2") was appointed to hear the matter on remand, and found in favor of the District, dismissing Plaintiff's Due Process Requests. By a Request for Review, dated June 15, 2022, Plaintiff appealed IHO 2's decision to the SRO, who upheld IHO 2's decision. This SRO decision, dated August 22, 2022, *Application of the Bd. of Educ.*, Appeal No. 22-077, is on appeal to this Court.

Plaintiff's unilateral placement of D.P. at a private school known as Carmel Academy located in Greenwich, Connecticut (hereinafter, "Carmel"), during the 2018-2019 and 2019-2020 school years. The District submits that the SRO's findings and Decision merit due deference from this Court. Accordingly, the District respectfully requests that this Court dismiss the Amended Complaint in its entirety.

## II.    STATEMENT OF FACTS

The District respectfully refers the Court to the District's Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated April 13, 2023, for a full recitation of the undisputed facts relevant to this motion.

## III.    STANDARD OF REVIEW

Where an action is brought under the IDEA to appeal a final decision of the SRO, the United States Court of Appeals for the Second Circuit recognizes summary judgment as the procedural mechanism for reviewing such administrative decisions. *Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F.Supp.2d 710, 714 (S.D.N.Y. 2003). A motion for summary judgment is a "pragmatic procedural mechanism" for reviewing a state's compliance with the procedures set forth in the IDEA. *Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, *fn. 3* (2d Cir. 2005). A motion for summary judgment turns on "whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." *Antonaccio,* 281 F.Supp.2d at 714 (S.D.N.Y. 2003) *quoting A.S. ex rel S. v. Norwalk Bd. of Educ.*, 183 F.Supp.2d 534, 539 (D.Conn. 2002).

In deciding the motion, this Court conducts what "has been characterized as a modified de novo review." *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, 2005 WL 1388964 at *12 (E.D.N.Y

June 10, 2005; *see also, M.R. on behalf of S.T. v. South Orangetown Cent. Sch. Dist.*, 2011 WL 6307563 at \*6 (S.D.N.Y. Dec. 16, 2011). "The district court must engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence, but its review of state administrative decisions is limited." *M.R. on behalf of S.T.*, 2011 WL 6307563 at \*6, *citing Board of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 205-06 (1982), *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration in original) *as quoted in M.R. on behalf of S.T.*, 2011 WL 6307563 at \*6. *See also M.H. and E.K., individually and collectively on behalf of P.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012). In applying this standard in *J.R. and B.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F.Supp.2d 386 (S.D.N.Y. 2004), the District Court explained that "[w]e conclude that the SRO properly upheld the IHO's determination that the…IEP was reasonably calculated to confer an educational benefit…In so concluding, we give the requisite weight to the decisions of impartial state education officers who are far better versed in educational policy and practice than this Court, and therefore, better suited to the difficult task of evaluating…progress under the previous and proposed IEP's." *Id.* at 398. *See also, Connor v. New York City Dep't. of Educ.*, 2009 WL 3335760 (S.D.N.Y. Oct. 13, 2009) at \*3, *citing Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007). Put more simply, reviewing courts must be mindful that they are not "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, *as quoted in M.R. on behalf of S.T.*, 2011 WL 6307563 at \*6.

Indeed, while "[a] court should defer to the SRO's final decision, even in a case of conflict between the IHO's and SRO's decision" (*Adrianne v. Lakeland Cent. Sch. Dist.*, 686 F.Supp.2d 361, 367 [S.D.N.Y. 2010] *citing A.C. ex rel. M.C.*, 553 F.3d 165, 171 [2d Cir. 2009]), "[d]eference is particularly appropriate when the [SRO's] review 'has been thorough and careful.'" *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012), *quoting Walczak*, 142 F.3d at 129. Furthermore, "where an SRO decision 'is reasoned and supported by the record' the district court should not disturb it." *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 521 (S.D.N.Y. 2011), *citing Gagliardo*, 489 F.3d at 114.

## IV.    ARGUMENT

The purposes of the IDEA are: (1) to ensure that students with disabilities have available to them a Free Appropriate Public Education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected. 20 U.S.C. §§ 1401(d)(1)(A)-(B); see *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009); *Rowley*, 458 U.S. at 206-07.  A school district offers a student FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." *Walczak*, 142 F.3d at 130. The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents." *Id.* at 132, *quoting Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989)(citations omitted). Additionally, school districts are not required to "maximize" the potential of students with disabilities.  *Rowley*, 458 U.S. at 189; *Walczak*, 142 F.3d at 132. Ultimately, the IEP must be

"reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). As the Supreme Court held, "for most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." 580 U.S. at 401.

The IDEA also provides that the FAPE the District is required to offer be in the least restrictive environment ("LRE"). 20 U.S.C. §1412(a)(5)(A); 34 C.F.R. 300.114(a)(2)(i), 300.116(a)(2); 8 N.Y.C.R.R. 200.6(a)(1). A LRE is "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995). The "tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow" dictates a "case-by-case analysis in reviewing whether both of those goals have been optimally accommodated under particular circumstances." *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008) (internal marks and citations omitted).

The Second Circuit uses a two-pronged test to determine whether a school district has met the LRE mandate. First, the Court inquires whether the student can "be satisfactorily educated in the regular classroom, with the use of supplemental aids and services." *P. v. Newington,* 546 F.3d at 121. To answer that question, the Court considers: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects

of the inclusion of the child on the education of the other students." *Id.* at 120.  If the program in question does recommend the student be placed into a special education class or classes, the Court then considers "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *P. v. Newington,* 546 F.3d at 120, *as cited in M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013) (internal quotations omitted). The ultimate goal, as the Supreme Court noted, is the development of a program "with an eye toward 'progress in the general education curriculum." *Andrew F.,* 580 U.S. at 401, *citing* 20 U.S.C. §1414(d)(1)(A)(i)(IV)(bb).

## POINT I

### THE SRO'S DECISION MERITS DUE DEFERENCE

**A. The SRO Correctly Held that the District Offered D.P. a FAPE For The 2018-2019 School Year and Therefore, Plaintiff Is Not Entitled To Tuition Reimbursement For that Year**

The SRO, in a well-reasoned, fully detailed decision, determined that IHO 2 correctly found that the District offered D.P. a FAPE in the 2018-2019 school year. As the SRO summarized:

> IHO 2 accurately recounted the facts of the case, addressed all of the specific issues identified on remand, set forth the proper legal standard to determine whether the district offered the student a FAPE for the 2018-2019 school year, and applied that standard to the facts at hand. The decision shows that IHO 2 carefully considered the testimonial and documentary evidence presented by both parties and, further, that she weighed the evidence and properly supported her conclusions. Furthermore, an independent review of the entire hearing record reveals that the impartial hearing was conducted in a manner consistent with the requirements of due process and that there is not a sufficient basis presented on appeal to modify the determination of IHO 2.

SRO Dec. II, p. 10.[2] The District submits, for the reasons set forth herein, that the Court should similarly determine that the SRO's decision was carefully considered and reached in accordance with applicable law and precedent, thereby leading to a conclusion that the SRO's decision should not be disturbed. In making his considered decision, the SRO reviewed IHO 2's decision and also conducted his own review of the record. In that review, the SRO addressed each argument put forth by Plaintiff to support her appeal and properly rejected each of them.

Initially, the SRO examined and rejected the argument that D.P. did not make progress during his 6th grade year (the 2017-2018 school year) and that the District's CSE ignored the lack of progress in developing the IEP for the 2018-2019 school year. SRO Dec. II, pp. 10-11. Based upon the record submitted, the SRO determined that there was sufficient evidence to find that D.P. actually made progress. For D.P.'s core academic subjects, he began the 2017-2018 year in Special Class) Math, Special Class, English Language Arts, ("ELA"), Integrated Co-Teaching ("ICT") Science and ICT Social Studies.[3] The recommendation for Special Class Math was made by the CSE with the explicit proviso that D.P.'s placement would be reviewed after the first progress report. D-6; IHO-I, ¶21.[4] In September of 2017, the 6th grade Special Class math was made up of

---

[2] The second SRO Decision, dated August 22, 2022, titled *Application of the Bd. of Educ.*, Appeal No. 22-077, which is on appeal to this Court, will be cited hereinafter as "SRO Dec. II, p. [page number]."

[3] At Sleepy Hollow Middle School (hereinafter, "SHMS"), the ICT model includes 2 certified teachers in the class, a general education and a special education teacher. IHO-IV, ¶6. An ICT class follows the state mandated general education curriculum, and the special education teacher's role in the classroom is to modify the lessons, assignments and other materials for the classified students pursuant to their IEPs. IHO-IV, ¶6.

[4] All hearing evidence will be cited in accordance with the citation format set forth in the Certification of Record on Review to the State Review Officer. Accordingly, witness affidavits will be cited hereinafter as "IHO-[relevant numeral], ¶[relevant paragraph number]"; District Exhibits will be cited hereinafter as "D-[relevant number]"; Plaintiff Exhibits will be cited hereinafter as "P-[relevant letter]"; and the transcript of testimony in the underlying evidentiary hearing will be cited hereinafter as "T. [page number(s)]."

9 special education students, all of whom struggled with aspects of the math curriculum. IHO-III, ¶9. According to Megan Lasky, D.P.'s special education math teacher for this class, D.P. "excelled"— he consistently received high scores on all practice and worksheets. IHO-III, ¶10. Although D.P. did appear distracted in class, he was easily redirected by Ms. Lasky. *Id.* As early as September of 2017, in recognition of D.P.'s competence in the special class curriculum, Ms. Lasky communicated with Katelynn DeGregorio, the ICT math teacher for 6th grade to obtain the ICT curriculum in order to provide it to D.P. IHO-III, ¶11. In October 2017, at Ms. Lasky's recommendation, D.P. was "trialed" in Ms. DeGregorio' s 6th grade ICT math class. IHO-III, ¶12.

For D.P.'s 1st quarter grade, which was an average of his grades in the special class with the grades he received for the work he completed for the remainder of the quarter in the ICT class, he received a 93. T. 413-14; IHO-III, ¶13, P-AA.  Upon D.P.'s transition into the ICT Math class, Ms. DeGregorio noted his strong foundational skills, including in addition, subtraction and multiplication, though D.P. did show difficulties with division.  IHO-IV, ¶12. Ms. DeGregorio also noted D.P.'s issues with focus, requiring redirection and prompts, regardless of the size of the group in which he worked. IHO-IV, ¶¶9, 13; T. 473-75.  In ICT Math, D.P. received grades of 81 in the 2nd quarter, 73 in the 3rd quarter, and 73 in the 4th quarter. P-AA.

Throughout the 2017-2018 school year, Ms. DeGregorio was responsible for reporting D.P.'s progress toward his math goals.  IHO-IV, ¶22; D-47. D.P. achieved his goal to complete single step word problems, as demonstrated through classroom worksheets. IHO-IV, ¶22; D-47; *see also* D-55 through D-58. D.P. made expected progress toward his 2nd IEP goal, multiplying fractions and mixed numbers with unlike denominators, although he did not achieve the goal before the class began focusing on statistics in the 4th quarter. IHO-IV, ¶23; D-47. D.P. made gradual progress on his 3rd and 4th math goals, relating to dividing fractions and mixed numbers

with unlike denominators and solving multi-step word problems, respectively. IHO-IV, ¶¶24-25.

Ms. DeGregorio was also D.P.'s ICT Science teacher during the 2017-2018 year. In science class, D.P. needed consistent refocusing and redirection, which Ms. DeGregorio would provide by tapping his desk or kneeling by his desk. IHO-IV, ¶9. D.P. also utilized movement breaks for refocusing. *Id.* D.P. required assistance with organizing his work. IHO-IV, ¶10. To assist D.P., Ms. DeGregorio would make sure he wrote down any homework assignments in his planner and checked his binder to make sure he was taking home the right materials. IHO-IV, ¶10. D.P. received an 88 in the 1st quarter, a 79 in the 2nd quarter, an 87 in the 3rd quarter, and a 66 in the 4th quarter. *Id.* Ms. DeGregorio testified that D.P.'s 4th quarter grades were very scattered, with his assessment grade a 62, his final lab grade 61, and his homework grade was 100. *Id.*

D.P.'s 2017-2018 program included Special Class ELA, which met daily for 2 periods, or over 80 minutes. IHO-V, ¶5. The class had 12 students, including D.P., all of whom had learning deficits which impacted their ability to read and write. IHO-V, ¶4. According to Christine Markey-Jones, his special class ELA teacher, D.P. was one of two students in the class reading at a 5th grade level — the other students were reading at levels between 1st and 4th grades. IHO-V, ¶4. Based upon D.P.'s performance on a baseline assessment, she determined to use Read 180, a structured reading and ELA skills program for D.P. IHO-V, ¶5. D.P. needed teacher support in managing his materials, which was provided by either Ms. Markey-Jones or the teaching assistant. IHO-V, ¶¶11-12.

D.P. benefited from the program modifications on his IEP, including graphic organizers and use of word processors and speech to text applications. IHO-V, ¶¶15-17. D.P.'s grades in ELA were as follows: 92 in the 1st quarter, 90 in the 2nd quarter, 87 in the 3rd quarter and 81 in the 4th quarter. IHO-V, ¶17. In terms of his IEP goals, as measured through the data provided by the Read

180 program, D.P. achieved both of his reading goals. IHO-V, ¶19; D-47. Based upon D.P.'s work samples, Ms. Markey-Jones determined that he achieved his writing goal to write and edit a one-paragraph essay, and that he was progressing gradually on the goal relating to editing his written work for punctuation, capitalization and grammar. IHO-V, ¶19.

After reviewing evidence of D.P.'s progress, the SRO next examined and rejected Plaintiff's argument that there was not sufficient evaluative data to support the CSE's recommendation for the 2018-2019 school year. The SRO properly concluded that IHO 2 identified, in detail, the evaluative assessments and reports relating to D.P.'s needs that such assessments and reports supported the recommendation of the CSE which provided D.P. with a FAPE. SRO Dec. II, pp. 12-18. IHO 2 found that the following evaluative reports were before the CSE in making its determination for the 2018-2019 recommendation: oral reports from Plaintiff; oral reports from D.P.'s teachers; the January 11, 2018 sensory profile (D-32); the January 10, 2018 occupational therapy revaluation (D-31); the December 1, 2017 academic evaluation (D-29); the psychological evaluation dated April 13, 2016 (D-22); the April 13, 2016 educational evaluation (D-23); the March 22, 2016 speech and language evaluation (D-20); and teacher reports from April and May 2018 (D-49; D-53). The SRO also determined that the CSE reviewed Aimsweb data for math and D.P.'s Lexile scores on the Read 180 program, informal assessments the District administered to D.P. to track progress. SRO Dec. II, p. 13

In his considered decision, the SRO extensively detailed what specific information the CSE gathered from each of these assessments. The SRO reviewed the then-current cognitive testing which reflected the fact that D.P.'s overall general intelligence ability was in the low average range, though given the scatter of his scores across the evaluation, the general intellectual ability score was to be considered with caution. SRO Dec. II, p. 14; D-22, p. 2. On the comprehension

cluster, D.P. was in the average range on one subtest and the low average range on another. SRO Dec. II, p. 14; D-22, p. 3.  On the long-term retrieval cluster, D.P. was in the low average range on both subtests. *Id.* On the visual processing cluster, D.P. was in the average range on both subtests. *Id.* As it related to the auditory processing cluster, D.P.'s scores were in the average range for three of the subtests, and the low average range on one subtest. *Id.* It was noted that on the cognitive processing speed cluster, D.P. "performed in the average range on the pair cancellation subtest, but very low on the letter pattern matching due to his slower response style." SRO Dec. II, p. 14, *citing,* D-22, p. 4. The SRO noted that D.P. scored in the average range on all of the short-term working memory subtests. SRO Dec. II, p. 14; D-22, p. 4.

In terms of the academic achievement testing, the SRO discussed in detail the scores D.P. achieved on the Woodcock-Johnson IV Test of Achievement. SRO Dec. II, p. 15. The SRO recognized that D.P. had reading comprehension scores in the average range, but that his basic reading skills scores were in the low average range due to D.P.'s weak sight word skills. SRO Dec. II, p. 15; D-23, p. 3. Reading fluency was noted as a particular issue. *Id.* D.P.'s math calculation skills were in the average range, though the timed fluency assessment scores were lower due to his slow response style. *Id.* The written expression testing was in the low average range, with the timed subtest in the very low average range, again due to D.P.'s speed of work. *Id.* D.P.'s general academic skills relating to the broad topics of science and social students were in the average range, while his skills related to art, music and literature were in the low average range. SRO Dec. II, p. 15; D-23, p. 4.

The SRO next considered what the CSE gleaned from the writing assessment administered by the District on December 1, 2017. SRO Dec. II, p. 15; D-29. It was noted that during this administration, D.P. worked "inordinately slowly and was notably distracted, however, he was

easily redirected." SRO Dec. II, p. 15; D-29, pp. 1-2. On the WIAT-III writing subtests, D.P. scored within the average range on sentence composition and sentence building subtests, though D.P. did omit punctuation at times, used inconsistent capitalization, and had awkward sentence structure. SRO Dec. II, p. 15; D-29, p. 2. Again, on the timed subtests, D.P. struggled to complete the tasks required in the time allotted. *Id.*

The SRO's detailed review of the evaluative materials before the CSE contained a review of speech and language testing. As the SRO noted, D.P. "scored in the above average to average range on subtests of core language abilities . . . and his score indicated that there were no deficits in his general language abilities." SRO Dec. II, p. 13. From both a receptive and expressive language standpoint, D.P. did not exhibit any difficulties. SRO Dec. II, p. 13; D-20, pp. 2-5. Despite his scores being in the average range, the evaluator noted that D.P. needed assistance during testing in terms of understanding the directions and that he was frustrated by the testing. SRO Dec. II, p. 13; D-20, pp. 4-6. The SRO recognized that the testing before the CSE showed that D.P. had deficiencies in his pragmatic language skills. SRO Dec. II, p. 13; D-20, pp. 2, 6.

The SRO considered both the occupational therapy reevaluation and the sensory profile assessment that were before the CSE, to determine what information the CSE considered in developing the 2018-2019 IEP. SRO Dec. II, p. 16, D-31, 32. From an occupational therapy standpoint, the SRO found that the "report indicated that, overall, [D.P.] exhibited age-appropriate skills in the area of OT but presented with some inattentive and impulsive behaviors which impacted his performance." SRO Dec. II, p. 16; D-31, pp. 3-4. The results of sensory profile assessment resulted in an understanding that D.P. had sensory issues that would require accommodations and modifications to his program.

The SRO spent a great deal of his decision reviewing the informal testing and teacher

reports from D.P.'s sixth grade year, so as to determine whether D.P.'s recommended program for seventh grade could allow him to make appropriate progress. SRO Dec. II, pp. 16-18. In terms of informal assessments, D.P.'s teachers administered tests that allowed the CSE to measure D.P.'s progress in both math and reading. D.P. was administered the Aimsweb, a standardized assessment given to all 6th grade students in September of 2018 to provide a baseline for his math proficiency. D.P. scored the highest of all the students in the special class, with a composite score of 206, in the 33rd percentile, which is the average range for 6th graders nationally. IHO-III, ¶15. When he was administered the Aimsweb in the Spring 2018, D.P. scored in the 27th percentile, in the average range nationally for his grade.[5]

For reading, D.P.'s results on a number of different assessments, including Read 180, Aimsweb and the CBM reading assessment, support the conclusion that D.P. made progress during his sixth-grade year. When D.P. was first assessed in September 2017 through the Read 180 program, he achieved a 957 Lexile level, which is considered proficient. IHO-V, ¶21. On the second assessment Read 180 assessment, administered in November 2017, D.P. measured at a Lexile level of 920, which was at the proficiency level. IHO-V, ¶23; D-59. On the third assessment, administered to D.P. on February 2, 2018, D.P. was measured to have a Lexile level of 877, which was below proficiency. IHO-V, ¶24. Ms. Markey-Jones noted at the time of administration that D.P. rushed through the assessment. IHO-V, ¶24. On his last administration of the Read 180 assessment, D.P. scored in the proficient level again, with a Lexile level of 920. IHO-V, ¶25; D-59. While Ms. Markey-Jones admitted that she would have liked to see "more progress,"

---

[5] D.P. was also assessed with the CBM in mathematics. The mathematics CBM was administered on a similar timeline as the ELA CBM, with administrations on December 20, 2017, January 11, 2018, February 16, 2018, and March 12, 2018. D-55. The data did not present with the need for extended meetings.

D.P. ended the year reading on grade level, which was "significant." IHO-V, ¶25.  On the Aimsweb assessment, which requires a student to remain focused for longer periods of time and required reading stamina, D.P. began the year scoring in the 10th percentile nationally (score of 409), which is considered well below average. IHO-V, ¶27. Even though D.P.'s attention difficulties made this test particularly difficult for him, when D.P. was assessed with the Aimsweb in the Spring of 2018, he attained a score of 442, which was still below average, but in the 22nd percentile nationally. *Id.*; D-50, 51. D.P. was also assessed using the CBM to determine whether he could recoup his reading skills after school breaks.  IHO-V, ¶28; D-81, pp.42-43. Despite his reluctance in taking the CBM, D.P. consistently scored well: December 2017—70th percentile; January 2018—80th percentile; February 2018—60th percentile; March 2018—70th percentile; late March 2018—75th percentile; April 2018—70th percentile.  IHO-V, ¶29; D-77.

The SRO credited Ms. Markey-Jones' teacher report, wherein she reported that D.P. made gains in reading and that he was on grade level in reading as measured by his Lexile level. SRO Dec. II, p. 16; D-49, p. 2. However, there was a recognition that D.P. still required support to assist him with inferential reading skills and making connections between texts. *Id.* Similarly, for writing, Ms. Markey-Jones' report that D.P. could write simple sentences independently, and longer sentences with supports was noted. SRO Dec. II, p. 17; D-49, p. 2. Importantly, the teacher report noted, and the SRO determined that, when D.P. took his time, his writing mechanics, such as punctuation and grammar improved. *Id.* D.P.'s classroom management needs and study skills were also examined and the SRO detailed the information that the CSE had before it to assist with developing the 2018-2019 IEP. *Id.*

A second teacher report from Ms. Markey-Jones was completed on May 18, 2019, and the SRO reviewed the contents of this report in detail. SRO Dec. II, p. 17; D-53. The report did

recognize that D.P.'s classroom performance showed difficulties, however, the SRO credited the teacher's report relating to consistent reading skills, writing skills, and study skills. *Id.* Even though D.P.'s Lexile level declined from the previous report, D.P. was still ready on grade level. *Id.* The SRO reviewed the writing section of the teacher report and, again, noted the progress D.P. made based upon the information therein. *Id.*

As the SRO found, the "June 2018 IEP reflected the scores from the evaluations and reports reviewed by the CSE while the narrative section of the present levels of performance reflected information provided by the student's teachers." SRO Dec. II, p. 18. The SRO next reviewed whether the program recommendation made by the CSE was appropriate for D.P.  Based upon testimony and evidence presented, the SRO determined that the record supported the program recommendation of ICT classes for D.P., "given the improvement in [D.P.'s] reading skills" and the support D.P. would receive in writing from the special education teacher in his English Language Arts class. SRO II, Dec., p. 19.  The daily resource room program additionally would address D.P.'s noted needs in organization, study skills, and writing, as well as re-teaching of concepts learned in his content area classes.

The SRO ultimately held that:

> Although [D.P.] was not making linear progress throughout the 2017-2018 school year leading up to the recommended programming for the 2018-2019 school year, the hearing record supports finding that the June 2018 CSE reviewed extensive information regarding the student's needs, accurately described his present levels of performance in the June 2018 IEP, formulated annual goals to address his needs, and offered placement in general education class with the support of ICT services and a resource room. Overall, based on the information available to the June 2018 CSE, the recommended program was reasonably calculated to have provided the student with a FAPE in the LRE.

SRO Dec. II, pp. 19-20.  The District respectfully requests that the Court apply the appropriate deference standard and not disturb this well-considered, detailed decision.

**B.  The SRO Correctly Held That the District Offered D.P. a FAPE For The 2019-2020 School Year and Therefore, Plaintiff Is Not Entitled To Tuition Reimbursement**

In considering the IHO's determination that the 2019-2020 IEP developed by the District was appropriate for D.P., the SRO set out to "conduct a review of the information available to the June 2019 CSE, including the [private neuropsychological evaluation] report and the recommendations made by the neuropsychologist, and based on that information determine if the recommendations made by the June 2019 CSE were appropriate to address the student's needs." SRO Dec. II, p. 21. Over the next seven (7) single-spaced pages of the Decision, the SRO carefully: (1) set forth the information considered by the District in developing the 2019-2020 IEP; (2) reviewed witness testimony; (3) reviewed the private neuropsychological evaluation and set forth its various recommendations; (4) examined the June 2019-2020 IEP's then-present levels of performance in study skills, reading, writing, mathematics, social development and management needs; (5) examined the District's program recommendation for D.P. for the 2019-2020 school year, including related services, supplementary aids and services, program modification and testing accommodations; (6) considered the thirteen annual goals described in the 2019-2020 IEP; and (7) considered all of the evidence before the IHO regarding whether D.P. required Occupational Therapy or Speech Language Therapy services in the 2019-2020 school year.  After undertaking this review, the SRO found that the hearing record supports the IHO's decision that the District provided D.P. with a FAPE in the 2019-2020 school year.  It is evident that the SRO's review was thorough, careful, well-reasoned and supported by the record.

The 2019-2020 IEP was developed by the CSE at meetings which took place on May 28, 2019 and June 19, 2019.  D-12; D-13.  Over the course of both meetings, the CSE considered an occupational therapy ("OT") progress summary, parent report and observations, a speech-language

progress summary, teacher reports, classroom observation, social history update and a June 2019 OT evaluation. D-12, D-13. The private psychologist, Dr. Jane Brown was present at the June 19, 2019 meeting *via* telephone and presented the findings of her report to the CSE. IHO-I, ¶¶59, 60, IHO-II ¶14. Mario Pellegrino, the District's occupational therapist, reported on his OT evaluation and report. IHO-I, ¶61.

In his decision, the SRO closely examined the evidence in the record regarding the development of the 2019-2020 IEP, beginning with the Dr. Brown's "17 academic recommendations, nine recommended strategies to employ in the classroom, and recommendations for providing language support during learning as well as support during instruction in reading and writing, and during testing." SRO Dec. II, pp. 22-23. In her evaluation, Dr. Brown administered fifteen tests/subtests to D.P., including the Wechsler Intelligence Scales for Children – Fifth Edition ("WISC-V"); the WIAT-III; the Beck Inventories II; and the Beery Test of Visual Motor Integration. D-34. On the WISC-V, D.P. exhibited high average Verbal Comprehension skills, average Visual Spatial and Fluid Reasoning abilities, low average Working Memory skills, and borderline Processing Speed. IHO-II, ¶16; D-34. While his overall Full Scale IQ was in the average range, there was significant scatter between and among the subtests; accordingly, D.P.'s full scale IQ score is not considered to be the most accurate measure of his overall cognitive abilities. *Id.* On the WIAT-III, D.P.'s academic skills showed wide variation from the deficient range to the average range. IHO-II, ¶17; D-34. The majority of the scores were in the low average range, however, both reading accuracy and overall math fluency fell in the borderline range. *Id.* The Beery Test of Visual Motor Integration assesses a student's visual perception and motor skills. IHO-II, ¶18; D-34. D.P. was administered the Test of Motor Coordination, which measures fine motor control. His standard score was in the average range, however, it was reported

that D.P. required twice the amount of time to complete the task as compared to his same age peers. *Id.* The Beck Inventories-II are a set of criterion referenced tests that measure anxiety, anger, depression, disruptive behaviors, and self-concept. IHO-II, ¶19; D-34. D.P. was administered the Anxiety, Depression, and Self Concept inventories. The results of the inventories administered indicated no reported concerns regarding anxiety, mildly elevated depression symptoms, and that D.P.'s self-concept was below peer and expectation. *Id.* Overall, Dr. Brown's findings were generally consistent with what the CSE knew of D.P., although Dr. Brown's testing revealed that, as assessed, D.P.'s academic skills were weaker than what he displayed in the classroom.    IHO-I, ¶60

The SRO also set forth D.P.'s then-present levels of performance which were provided to the CSE for consideration by staff from Carmel. SRO Dec. II, pp. 23-24; IHO-I, ¶51; D-12. Carmel informed the CSE that D.P.'s reading proficiency level was a Fountas and Pinnell level W, which was a 6th grade level, however his comprehension level was at the 9th grade level. IHO-I, ¶51; D-12. Carmel reported that D.P. continued to need support in writing, specifically with regard to organizing his thoughts and ideas prior to the completion of the assignment. D-12. The reports from Carmel also noted that D.P.'s limited ability to focus impacts his ability to stay on task and to work consistently. D-12. In math, D.P. was working on grade level, with a modified curriculum and teacher supports, along with testing accommodations. D-12. Learning new concepts was difficult for him and he needed to continue to work on abstract concepts. D-12. Carmel noted that D.P. required a lot of 1:1 attention across all classes. *Id.* Carmel reported that D.P. required consistent redirection to stay on task, and to address his focusing issues, Carmel provided D.P. with a behavior plan. D-12. In the plan, he was required to be ready to learn after 1 to 2 prompts. D-12. While he was able to refocus back to work after these prompts, Carmel noted that D.P. was

not always consistent. D-12.  As noted by the SRO, "[c]onsistent with the previous school year, the IEP noted that the student continued to have a 'significant delay in writing, attention, and organizational skills which inhibit[ed] progress in general education without support.'" SRO Dec. II, p. 24 (internal citations omitted).

In his decision, the SRO reviewed the 13 annual goals developed for D.P. for the 2019-2020 school year, as follows:

> [O]ne study skills goal that targeted his ability to learn and demonstrate new learning strategies; two reading goals that targeted the student's ability to provide examples of explicit text based evidence to support inferences and analysis, and to state the theme of a text using key details for support, five writing goals that targeted the student's ability to write sentences with appropriate grammar and syntax, use correction punctuation and capitalization in writing assignments, spell selected words correctly in writing assignments, and write a paragraph with evidence to support his claim, two math goals that targeted the student's ability to show all work involved in solving equations and solve two-step equations using one of the four basic operations, and three social/emotional/behavioral goals that targeted the student's ability to accept or politely decline assistance, remain focused for 10 minutes using self-regulation strategies and self-monitoring checklists, and display assertive communication skills to express his need for assistance.

SRO Dec. II, pp. 24-25, citing D-13, at pp. 6-7.

Based upon D.P.'s needs, as set forth by Carmel, and the goals as set forth above, the CSE recommended a special class program for D.P. for the 2019-2020 school year. D-12. D.P.'s program would include the following: Special Class (5:1) Reading, daily for 45 minutes, Special Class (15:1) Math, daily for 45 minutes, Special Class (15:1) Science, daily 45 minutes, Special Class (15:1) Social Students, daily for 45 minutes, and Special Class (15:1) ELA, daily for 45 minutes. D-12.  In addition, D.P. would receive Resource Room (5:1) daily for 45 minutes. The CSE also recommended that D.P. receive the related service of counseling two times monthly for 30 minutes. D-12. The CSE continued the 2018-2019 IEP's recommendations for D.P.'s program

modifications, and added check for understanding. *Compare* D-11, D-12. Similarly, the CSE continued to recommend all of the testing accommodations previously recommended for D.P., and added in an accommodation for method of presentation on all math tests, except as prohibited by New York State. *Id.* The CSE made this recommendation because the reports from the Carmel staff and Dr. Brown's testing presented a picture of D.P. needing more small class supports than was demonstrated by his performance at Sleepy Hollow Middle School, IHO-I, ¶57. Dr. Cifre-Kerekes concurred with this recommendation, opining "given [D.P.'s] profile and what [she] heard from Dr. Brown, the CSE's recommendation of a full schedule of self-contained content area classes with resource room and a special class for reading could meet D.P.'s needs." IHO-II, ¶21.

As for the CSE's program recommendation for the 2019-2020 school year, the SRO compared the recommendations of the neuropsychologist (which the Plaintiff heavily relies upon at each level of her legal challenges) with the District's recommended program and found the following:

> The June 2019 CSE recommended that the student attend a 5:1 special class for reading daily; 15:1 special classes for math, science, social studies, and ELA daily; and a 5:1 resource room program daily (Dist. Ex. 13 at pp. 1, 8). While the neuropsychologist recommended that the student attend a "small class," she did not specify a recommended number of students or class ratio, accordingly, the CSE's recommendations appear to comport with her report. In addition, similar to the neuropsychologist's recommendation that the student receive direct instruction to improve his ability to self-reflect and self-monitor, the CSE recommended that the student receive two 30-minute sessions of counseling per month to work on "self-regulation strategies and self-monitoring checklists" (id. at pp. 7-8). Furthermore, many of the supplementary aids and services, program modifications, and accommodations recommended by the June 2019 CSE were the same or similar to those recommended by the neuropsychologist; they included: additional time to complete assignments and double class time for writing assignments; breakdown of assignments into smaller, more manageable parts including scaffolding; refocusing and redirection during instruction and for assignments; copy of class

> notes; access to word processor with text-to-speech software;
> organizational skills support; directions repeated with access to
> book share; check for understanding to ensure the student is
> attending; frequent breaks – three minute break for every 20 minutes
> of class work; directions repeated to ensure understanding; use of
> graphic organizer; and pre-teaching and reteaching of new concepts
> and skills (id. at pp. 8-10).  The June 2019 CSE also recommended
> access to a computer during writing assignments with Google Read
> and Write (id. at p. 10).  Lastly, the June 2019 CSE recommended
> testing accommodations, including: extended time for all tests, use
> of break periods for all tests, on-task focusing prompts for all tests,
> direction read for all tests, flexible schedule for all tests, use of
> computer to record responses for all tests, use of text-to-speech
> software, revised test format for fill in the blank assessments, test
> administration in setting with minimal distractions, and modified
> method of presentation of test questions (Dist. Ex. 13 at p 11).

SRO Dec. II, p. 24.  After reviewing all of the foregoing, the SRO found that "the June 2019 CSE's

recommendation—for placement of [D.P.] in a 5:1 special class for reading, a 15:1 special class

for math, science, social studies, and ELA, and a 5:1 resource room—was appropriate to meet the

student's needs for the 2019-2020 school year." SRO Dec. II, p. 25.

Throughout this proceeding, and again to this Court, Plaintiff has continually claimed that

the District "did not appropriately assess D.P. [*sic*] needs to determine that he did not require

O[ccupational] T[herapy] and S[peech] L[anguage] therapy". In his Decision, the SRO examined,

at length, the evidence considered by the CSE regarding OT and speech language therapy service

recommendations for D.P.  SRO Dec. II, pp. 25-28.  As set forth in D.P.'s June 19, 2019 IEP (D-

13), the CSE considered the following evaluation results regarding speech language and OT

services: OT Evaluation, dated June 18, 2019 (D-41); OT Progress Summary, dated May 31, 2019;

Speech/Language Progress Summary, dated May 31, 2019.

Regarding speech and language services and OT, D.P.'s providers at Carmel presented

narrative summaries of D.P.'s progress at the school. P-Q.  Each provider indicated that while D.P.

made progress, it was their recommendation that D.P. continue to receive speech language and OT

services for the 2019-2020 school year. However, Carmel submitted no assessment or evaluative data in support of this conclusion. Indeed, at the time of the June 19, 2019 CSE meeting, the District's most recent speech language testing showed that D.P. did not demonstrate any needs that required direct speech language services. D-5; IHO-I, ¶18.

In response to information presented by D.P.'s occupational therapist at Carmel during the first CSE meeting held to develop D.P.'s program for the 2019-2020 school year, the District performed an updated OT evaluation. D-41. This evaluation was presented to the second CSE team at its meeting on June 19, 2019 by Mario Pellegrino. The "Physical Development" portion of D.P.'s IEP was updated with Mr. Pellegrino's conclusions, including that D.P.: (1) demonstrates right hand dominance; (2) utilizes a dynamic tripod grasp to secure a pencil and a mature scissor grasp to secure scissors; (3) was able to adequately control his pencil through maze activities, color within the lines, fold paper and cut with scissors with good accuracy, coordination and control; (4) presented no difficulty copying various geometric shapes with fair accuracy; (5) has legible handwriting with good sizing and spacing; and (6) was able to place his fingers on the home row keys and type eight words per minute with 87 percent accuracy. D-13

With regard to speech language therapy, the Record reflects that D.P. was exited from direct speech language services by the CSE which met on March 16, 2017. D-5. As noted at that time, D.P. made noted improvements in social greetings and questioning, understanding of humor and figurative language. D-5. Although he still required frequent reminders to stay on topic, verbal prompts to return to and maintain attention and repetition of directions, the District's speech language therapist found direct, pull-out services no longer warranted and recommended a consultative model for D.P. D-5. The CSE determined that the speech language consultation was to be provided monthly to D.P.'s classroom teacher during the 2017-2018 school year. D-5. In

developing D.P.'s IEP for the 2018-2019 school year, the CSE recommended that the speech language consultation be removed from D.P.'s program.  D-9. At no time thereafter was the District presented with evaluative data which indicated that D.P. required direct speech language services.  In fact, Dr. Brown did not recommend speech and language services for D.P. in her evaluation. D-36.  The personnel from Carmel spoke to speech and language needs using only narrative statements from the progress notes and reports, without any evaluative or assessment data to support their conclusions. P-Q, P-PP, P-III.

Although Mr. Pellegrino's conclusions regarding OT varied from those reached by D.P.'s providers at Carmel (and Dr. Brown), the Parent did not seek an Independent Educational Evaluation ("IEE") in the area of occupational therapy.  The disagreement in conclusion in no way renders Mr. Pellegrino's evaluation inadequate. The CSE was free to rely on Mr. Pellegrino's evaluation, the most recent testing performed by a certified occupational therapist. Furthermore, with regard to speech language services, the record reflects that, by all formal assessments considered by the CSE for the 2019-202020 school year, including Dr. Brown's evaluation, as well as those assessment considered in previous school years, D.P. did not require direct speech language services. D-5; IHO-I, ¶18.  IHO 2 and the SRO agreed, finding that all evaluative data considered by the CSE supported the CSE's determination that D.P. did not require direct speech language services; in terms of occupational therapy services, the CSE's reliance on the most recent evaluation was appropriate. The SRO's thorough examination of the CSE's recommendations regarding OT and Speech Language Therapy services in the 2019-2020 school year must therefore be upheld by this Court.

As held by both the IHO and SRO, the Record supports D.P.'s program placement at Sleepy Hollow Middle School with special education programming, supports and modifications.

In all settings, D.P. would have been prompted to remain attentive to address his disabilities and given extended time and chunked assignments to address his processing speed and his disorganization. Special education teachers were in each of his classes to teach material to him given his disabilities.  In resource room, he would be pre-taught concepts and re-taught what he may have missed due to his inattention.  The special education teacher could make sure he was organized and learning strategies to complete assignments, projects and tests.

D.P. was academically progressing from grade to grade. He did have special education needs; needs which required the development of an IEP. The CSE identified those needs and crafted an IEP that addressed his deficits.  The fact that all of this could be done in a public school, with mainstream peers, is in keeping with the dictates of the IDEA. By providing for D.P.'s program recommendation to be within the Sleepy Hollow Middle School, and the opportunity for mainstreaming with his general education peers, the District's recommendation in each year was the appropriate placement in the LRE.  Unless the student's IEP requires some other arrangement, the student must be educated in the school he or she would have attended if not disabled. 8 N.Y.C.R.R. 200.4(d)(4)(ii)(b).  Based upon the extensive evidence within the hearing record, IHO 2 found the District's recommended program offered D.P. a FAPE in the 2019-2020 school year. The SRO upheld this determination after a thorough and careful review.  Accordingly, the SRO's determination merits deference by this Court.

## V.    CONCLUSION

Defendants, UNION FREE SCHOOL DISTRICT OF THE TARRYTOWNS, also known as PUBLIC SCHOOLS OF THE TARRYTOWNS, PUBLIC SCHOOLS OF THE TARRYTOWNS' BOARD OF EDUCATION, formally known as the BOARD OF EDUCATION OF THE UNION FREE SCHOOL DISTRICT OF THE TARRYTOWNS and CHRISTOPHER

BORSARI, in his official capacity as Superintendent of Public Schools of the Tarrytowns, based upon this Memorandum of Law in Support of the District's Motion for Summary Judgment, dated April 13, 2023, the District's Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated April 13, 2023, the documents contained in the Hearing Record and upon all the prior proceedings herein, respectfully requests that the Court issue an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, upholding the SRO's Decision, dated August 22, 2022, and awarding the District Summary Judgment dismissing the Plaintiff's Amended Complaint dated February 21, 2022, in its entirety; that the Court award reasonable attorneys' fees to the District as a prevailing party against the Plaintiff and/or their attorneys pursuant to IDEIA, 20 U.S.C. §1415(i)(3)(B); that the Court grant the District attorneys' fees, costs and disbursements in connection with this action; and that the Court grant such other and further relief as it may deem just and proper.

Dated:    White Plains, New York
          April 13, 2023

                              **KEANE & BEANE, P.C.**

                    By:    _Stephanie M Roebuck_
                           Stephanie M. Roebuck
                           Attorneys for Defendants
                           445 Hamilton Avenue, 15th Floor
                           White Plains, New York 10601
                           (914) 946-4777

On brief:    Suzanne E. Volpe, Esq.