**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

L.S., individually,
and on behalf of **D.P.**,

                              Plaintiffs,


           - against -                              **Case No. 22-Civ-10835 (CS)**


**UNION FREE SCHOOL DISTRICT OF THE**
**TARRYTOWNS**, also known as **PUBLIC SCHOOLS**
**OF THE TARRYTOWNS, PUBLIC SCHOOLS OF**
**THE TARRYTOWNS' BOARD OF EDUCATION,**
**CHRISTOPHER BORSARI**, in his official capacity as
Superintendent of Public Schools of the Tarrytowns,

                              Defendants.


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY AND IN SUPPORT OF**
**PLAINTIFF'S CROSS -MOTION FOR SUMMARY JUDGMENT**


KRISTEN MARIE CHAMBERS (5414800)
Law Offices of Lauren A. Baum, P.C.
171 Madison Avenue, Suite 300
New York, New York 10016
(212) 644-4414
kchambers@nyspecialedlaw.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

STATUTORY FRAMEWORK, BURDEN OF PROOF, AND STANDARD OF REVIEW .........2

STATEMENT OF FACTS ......................................................................5

PROCEDURAL HISTORY.......................................................................6

ARGUMENT ................................................................................7

I.      NO DEFERENCE IS DUE TO THE DECISIONS OF SRO II, IHO II, AND SRO I .....................................................................9

        A.      SRO II AND IHO II ERRED IN FINDING THAT THE DISTRICT OFFERED D.P. A FAPE FOR THE 2018-2019 AND 2019-2020 SCHOOL YEARS ........................................................9

                1.      D.P. was denied a FAPE for the 2018-2019 School Year .............10

                        a.      SRO II and IHO II erroneously determined that the proposed June 2018 IEP was appropriate based on D.P.'s inflated and inaccurate progress reports from the 2017-2018 school year .........................................10

                        b.      SRO II AND IHO II incorrectly concluded that the CSE had sufficient evaluative information to support its recommendations for D.P. for the 2018-2019 school year 16

                2.      D.P. Was Denied FAPE for the 2019-2020 School Year..............25

                        a.      SRO II and IHO II Incorrectly Concluded That the CSE Had, Reviewed, and Considered Sufficient Evaluative Information To Support its Recommendations .................26

                        b.      SRO II and IHO II Erroneously Determined that the June 2019 Recommendations Provided D.P. the Least Restrictive Environment ...................................31

II.   SRO II AND IHO II FAILED TO ISSUE A DETERMINATION REGARDING
      THE APPROPRIATENESS OF PALS ............................................................... 33

III.  SRO II AND IHO II FAILED TO ISSUE A DETERMINATION REGARDING
      EQUITABLE CONSIDERATIONS ................................................................. 34

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

A.D. and M.D. v. Board of Educ. of the City Sch. Dist.,22 of the City of N.Y., 690 F. Supp.2d 193 (S.D.N.Y. 2010) ...................................................................................................... 18, 29, 34

Adrianne D. v. Lakeland Central Sch. Dist., 686 F.Supp.2d 361 (S.D.N.Y. 2010) ..................... 11

Application of the N.Y.C. Dep't of Education, Appeal No. 14-034 ............................................. 32

Board of Educ. of the Hendrick Hudson Schools District v. Rowley, 458 U.S. 176 (1982) ..................................................................................................................... 5, 13, 29

Board of Educ. v. Rowley, 458 U.S. 176 (1982) ........................................................................ 8

B.R. v. N.Y.C. Dep't of Educ., 910 F. Supp.2d 670, 675(S.D.N.Y. 2012) ............................... 5, 35

C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68,73 (2d Cir. 2014).................................................. 3, 27

C.L. v. Scarsdale Union Free Schools Dist., 744 F.3d 826 (2d Cir. 2014) . . . . . . . . . . . . . . . . .  5

C.U. v. N.Y.C. Dep't of Educ., 23 F.3d 210 (S.D.N.Y. May 27, 2014) . . . . . . . . . . . . . . . . . . .  5

D.C. v. N.Y.C. Dep't of Educ., 950 F. Supp.2d 494, 519 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . .  5

D.A.B.v. N.Y.C. Department of Educ ., 973 F. Supp.2d 344 (S.D.N.Y. 2013) . . . . . . . . . . . . .  5

D.N. v. Board of Educ. Of Center Moriches Union Free Sch. Dist., 2015 U.S. Dist. LEXIS 138272 (E.D.N.Y. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

E.M. v. NYC Department of Educ ., 758 F.3d 442 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . .  3

Endrew F. v. Douglas Cty. Schools District RE-1, 137 Southern Ct. 988 (2017) ............. 9, 28, 31

Florence County Sch. Dist. 4 v. Carter, 510 U.S. 7 (1993) ......................................................... 34

F.O. v. N.Y.C. Dep't of Educ., 976 F.Supp.2d 499 (S.D.N.Y. 2013) ................................... 3, 5, 22

Forest Grove Sch. Dist. v. T.A., 557 U.S. 230 (2009) ................................................................ 3

Frank G. v. Board of Educ.al of Hyde Park, 459 F.3d 356 (2d Cir. 2006)........................ 3, 33, 34

G.B. v. Tuxedo Union Free School Dist., 751 F. Supp.2d 552 (S.D.N.Y. 2010), aff'd 486 Federal Appx. 954 (2d Cir. 2012) .......................................................................................... 5

H.C. v. Katonah-Lewisboro Union Free Sch. Dist., 528 Fed. App'x 64 (2d Cir. 2013) ............... 11

Honig v. Doe, 484 U.S. 305 (1988) ........................................................................................ 9

J.D. v.  Pawlet Sch. Dist., 224 F.3d 60 (2d Cir. 2000) ................................................................ 4

K.R. v. N.Y. City Dep't of Educ., 107 F. Supp.3d 295, 309, n. 120 (S.D.N.Y. 2015) ................. 27

Lillibask v. State of Conn., Dep't of Educ., 397 F.3d 77 (2d Cir. 2005) ....................................... 4

Mackey v.  Board of Educ.al for the Arlington Central Schools Dist., 386 F.3d 158 (2d Cir. 2004)

.................................................................................................................................... 30

M.H. and E.K. v. N.Y.C. Dep't of Educ., 685 F.3d 217 (2d Cir. 2012) ................... 3, 4, 5, 8, 9, 29

M.H. and E.K. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125 (S.D.N.Y. 2010), aff'd 685 F.3d 217 (2d Cir. 2012) ................................................................................................. 9, 10, 24


Mr. and Mrs. A. v. N.Y.C. Dep't of Educ.., 769 F.Supp. 2d 403 (S.D.N.Y. 2011) ................. 3, 35

Mrs. B. v. Milford Bd. of Educ.,103 F.3d 1114 (2d Cir. 1997) ..................................................... 4

Murphy v. Arlington Central Schools District Board of Educ., 297 F.3d 195 (2d Cir. 2002) . .  30

N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202,1210 (9th Cir. 2008) ............................. 17

N.R. v. Dep't of Educ. of City Sch. Dist. of City of N.Y., Number 07 Cv. 9468 (BSJ), 2009 WL 874061 .......................................................................................................................... 6

P. v. Newington Bd of Educ., 546 F 3d 111 (2d Cir 2008) ......................................................... 32

Pawling Cen. Sch. Dist. v. N.Y. State Educ. Dep't ., 771 N.Y.S.2d 572 (N.Y. App. Division 2004) ............................................................................................................................ 30

Polera v.  Board of Educ.., 288 F.3d 478 (2d Cir. 2002) ............................................................. 32

R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167 (2d Cir.2012) ....................... 4, 5, 8, 9, 10,11, 29, 34

iv

R.G. v. N.Y.C. Dep't of Educ., 980 F. Supp.2d 345 (E.D.N.Y. 2013) ........................... 8

Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176 (1982) . .  12

S.B. v. N.Y.C. Department of Educ., Number 15-CV-1869, 2017 WL 4326502 ....................... 5, 6

School Comm. Of Burlington v. Dep't of Educ., 471 U.S. 359 (1985) .................................... 3, 33

Schied v.  Board of Educ. of Penfield Central School Dist., Number 05-CV-6255 CJS(P), 2006
       WL 2927875 ................................................................................................................... 4

Schreiber v. East Ramapo Central Sch. Dist., 700 F. Supp. 2d 529 (S.D.N.Y. 2010) ................... 5
Scott v. N.Y. City Dep't of Educ., 6 F. Supp. 424 (S.D.N.Y. 2014) .......................................... 27

T.K. v. NYC. Dep't of Educ., 32 F. Supp.3d 405 (E.D.N.Y. 2014), aff'd 810 F.3d 869 ............... 5

V.S. v. N.Y.C. Dep't of Educ, 25 F. Supp. 3d 295 (E.D.N.Y. 2014) .................................... 5, 8, 16

Walczak v. Florida Union Free Schools District, 142 F.3d 119 (2d Cir. 1998) ....................... 4, 24

**STATUTES**

Individuals with Disabilities Education Improvement Act, 20 U.S.C.A. § 1415(f)(3)(E)(ii) . . .  26

20 U.S.C. §1400(d)(1)(A) ....................................................................................................... 2

20 U.S.C. § 1401(a)(20) ........................................................................................................ 24

20 U.S.C. 1401(8) ................................................................................................................. 31

20 U.S.C. 1411(a)(1) ............................................................................................................ 31

20 U.S.C. 1412(a)(5)(A) ....................................................................................................... 31

20 U.S.C. § 1414(d)(1)(A) ................................................................................................. 9, 31

20 U.S.C. § 1414(d)(1)(A)(i)(I) ............................................................................................ 30

20 U.S.C. § 1415(i)(2) ............................................................................................................ 3

20 U.S.C. § 1415(i)(2)(C)(iii) ................................................................................................. 3

N.Y. EDUC. LAW § 2590 ......................................................................................2

N.Y. EDUC. LAW § 2590-g(4) ..............................................................................2

N.Y. EDUC. LAW §4401 .......................................................................................2

N.Y. EDUC. LAW §4404(1)( c) .........................................................................3, 34

N.Y. EDUC. LAW §4404(1)( c) ...............................................................................3

N.Y. EDUC. LAW § 4404(3)(a) ..............................................................................1

## REGULATIONS

34 C.F.R. § 300.4 ................................................................................................16

34 C.F.R. § 300.114(a)(2)(I) ...............................................................................32

34 C.F.R. § 300.116(a)(2) ...................................................................................32

34 C.F.R. § 300.305 ............................................................................................16

34 C.F.R. § 300.305(c) ........................................................................................18

34 C.F.R. § 300.320(a)(2)-(4) .............................................................................13

34 C.F.R. § 300.324 ............................................................................................16

34 C.F.R. § 300.324(a) ...................................................................................16, 17

34 C.F.R. § 300.347(a)(2) ...................................................................................24

34 C.F.R. § 300.347(a)(7) ...................................................................................24

8 N.Y.C.R.R. § 200.1(cc) ....................................................................................32

8 N.Y.C.R.R. § 200.4(b) ......................................................................................16

8 N.Y.C.R.R. § 200.4(b)(6)(vii) ............................................................................ 18

8 N.Y.C.R.R. § 200.4(d)(2) ........................................................................ 16, 17, 24

8 N.Y.C.R.R. § 200.4(d)(2)(i) .............................................................................. 30

8 N.Y.C.R.R. § 200.4(f)(1) .................................................................................. 16


8 N.Y.C.R.R. § 200.6(a)(1) .................................................................................. 32

## PRELIMINARY STATEMENT

Plaintiff L.S. ("Plaintiff" or "L.S."), on behalf of her minor child, D.P., submits this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment. L.S. seeks reversal of the erroneous decision of the New York State Education Review Office's ("SRO") first decision regarding L.S.'s education for the 2018-2019 school year ("SY") and 2019-2020 school year (collective "SYs"), *Application of the Bd. Of Educ.*, Appeal No. 20-190 ("SRO I"), dated March 31, 2021, which vacated and remanded the thorough and well-reasoned decision of the first Impartial Hearing Officer ("IHO I") assigned to hear L.S.'s case for the same period. IHO I found that Union Free School District of the Tarrytowns/Public Schools of the Tarrytowns ("the "district" or "the Defendants") failed to offer D.P. a free, appropriate public education ("FAPE") for both SYs and granted Plaintiff's claim for reimbursement for the costs of her son's enrollment in Carmel Academy's Providing Alternative Learning Strategies ("PALS" or "Carmel") program for the SYs.[1] SRO I did not remand IHO I's previous findings on the appropriateness of Carmel, equitable considerations, or compensatory education. SRO I Dec.12, 14,16-17, 22.[2]

Plaintiff further seeks reversal of the second erroneous decision of the SRO, *Application of the Bd. Of Educ.*, Appeal No. 22-077, dated August 22, 2022 ("SRO II"), upholding a similarly flawed decision of Impartial Hearing Officer II ("IHO II"), finding that the Defendants provided D.P. a FAPE for the SYs, and denying Plaintiff's request for tuition reimbursement, as well as all

---

[1] The Parties entered into an agreement to toll the (4) months Statue of Limitations specified in N.Y. EDUC. LAW § 4404(3)(a) to appeal the final determination from the SRO, dated March 31, 2021, until such a date that the issues on remand were decided and the SRO issues a decision in that matter. (Appendix A).

[2] [²] Reference to IHO I's Decision will be cited as "IHO I. Dec.,[page #]." Reference to IHO II's Decision will be cited as "IHO II. Dec.,[page #]." Reference to SRO I's Decision will be cited as "SRO I. Dec.,[page #]." Reference to SRO II's Decision will be cited as "SRO II. Dec.,[page #]." The Hearing Transcript will be cited hereinafter as "T. [page number(s)]." Parent Exhibits will be cited hereinafter as " Ex. [Exhibit letter]." District Exhibits will be cited hereinafter as :"Ex. -[Exhibit number]." Impartial Hearing Officer Exhibits will be cited hereinafter as "I"[exhibit number ¶ [number]."

other relief, for D.P.'s enrollment in PALS for the SYs.

SRO I, IHO II, and SRO II issued erroneous decisions that misapplied law and facts, and failed to carefully weigh all evidence in the record, leading to wholly unsupported conclusions. SRO II rubber-stamped many of IHO II's findings without analysis, and issued an inadequately reasoned decision that failed to correctly review the record, apply relevant law, or set forth sufficiently-supported conclusions of law and fact. The findings of SRO I, IHO II, and SRO II thus do not warrant deference. Rather, a review of the record shows that SRO I, IHO II, and SRO II erroneously held that the district provided D.P. FAPE for the SYs. A careful review of the administrative record shows that Defendants failed to develop a procedurally or substantively appropriate Individualized Education Program ("IEP") for D.P. for the 2018-19 and 2019-20 SYs and failed to recommend an appropriate program reasonably calculated to enable D.P. to make progress in light of his circumstances. The record further shows that Carmel appropriately addressed D.P.'s needs for the SYs and that equitable factors support Plaintiff's claim for reimbursement. Therefore, Defendants are not entitled to judgment as a matter of law and their Motion should be denied.

## STATUTORY FRAMEWORK, BURDEN OF PROOF, AND STANDARD OF REVIEW

The Individuals with Disabilities Education Improvement Act ("IDEA") was enacted to "ensure that all children with disabilities have available to them...a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); see also N.Y. EDUC. LAW. § 4401. Pursuant to New York state law and regulations, Defendant is responsible for providing a FAPE to all students residing within its borders, between the ages of 3 and 21, who have been classified as students with disabilities. N.Y. EDUC. LAW §§ 2590, 2590-g(4). If a school district fails to provide a FAPE to a student with a disability, the parents may enroll their child in a private school and seek

reimbursement for the cost of the program. *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 453 (2d Cir. 2014); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006); *Mr. and Mrs. A. v. N.Y.C. Dep't of Educ.*, 769 F.Supp. 2d 403, 427 (S.D.N.Y. 2011). A three-prong test, often referred to as the *"Burlington/Carter"* analysis, applies to determine whether parents are entitled to funding/reimbursement for their child's unilateral placement: (1) was the educational program proposed by the school district appropriate for the student; (2) was the private placement appropriate to meet the student's needs; and (3) whether equitable considerations support the parties' claims. *C.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68,73 (2d Cir. 2014); *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 372 (1985); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009). In New York, Defendant has the burden of proof on the first prong, whereas Plaintiff has the burden of proof on the second prong. N.Y. EDUC. LAW §4404(1)(c); *C.F.* 746 F.3d at 76.

When an aggrieved party appeals the decision of the state administrative agency, the IDEA provides that "the district court shall receive the records of the administrative proceedings and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). Unlike the substantial evidence standard used in most appeals from an administrative decision, the IDEA requires a district court to conduct an independent review of the record to determine if the requirements of the IDEA have been met based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 242 (2d Cir. 2012). Thus, district courts "do not simply rubber stamp administrative decisions," and are free to overrule the findings below if warranted. *R.E. v. N.Y.C. Dept. of Educ.*, 694 F.3d 167, 184 (2d Cir.2012); *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp.2d 499, 511 (S.D.N.Y. 2013). The legal conclusions of the IHO and SRO are subject to *de novo* review, with no deference afforded to any conclusions of law relating to the proper interpretation

of the federal statute and its requirements. *Lillibask v. State of Conn., Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)). Furthermore, questions of whether the IDEA's statutory and regulatory provisions were correctly applied to the facts of a particular case is a mixed question of law and fact, which must also be reviewed *de novo. J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 64 (2d Cir. 2000). The district court also reviews *de novo* the ultimate determinations of the appropriateness of the educational program. *Schied v. Bd. of Educ. of Penfield Cent. Sch. Dist.*, No. 05-CV-6255CJS(P), 2006 WL 2927875, at *4 (W.D.N.Y. Oct. 12, 2006).

Under the IDEA's standard of modified *de novo* review, the issue often arises of what level of deference should be provided to the lower administrative tribunals. While the rulings of the IHO and SRO are "subject to independent judicial review...[n]onetheless, the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *M.H.,* 685 F. 3d at 240 (citations omitted); see also *F.O. v. NYC Dep't of Educ.,* 976 F. Supp.2d at 511)("In reviewing a dispute over an IEP, the district court occupies the paradoxical position of [being] both an independent fact finder and a judicial body bound to review and give deference to the findings of an administrative agency.")(citations omitted). In enacting the IDEA, Congress "expressly rejected provisions" that would have "made state administrative findings conclusive if supported by substantial evidence." *Bd. of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley,* 458 U.S. 176, 205 (1982). Instead, Congress empowered courts to make "independent decisions based on a preponderance of the evidence." *Id.* (citations omitted); see also *M.H.,* 685 F.3d 239-40; *Walczak v. Fl. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998) (noting that district court's "initial procedural inquiry is no mere formality" and that courts should not "simply rubber stamp administrative decisions").

Thus, the degree of deference owed to the agency's determinations below depends upon

both the issue decided and "the quality of [the] opinion." *F.O.*, 976 F. Supp.2d at 511 (quoting *R.E.*, 694 F.3d at 189). The level of deference due generally "hinge[s] on the kinds of considerations that normally determine whether any particular judgment is persuasive…whether the decision being reviewed is well-reasoned, and whether it was based upon substantially greater familiarity with the evidence and the witnesses than the reviewing court." *C.U. v. N.Y.C. Dep't of Educ.*, 23 F.3d 210, 223 (S.D.N.Y. May 27, 2014) (citing *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 838 (2d Cir. 2014) (citation omitted)). A reviewing "[c]ourt may reject factual findings that are unsupported…or are controverted by the record." *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 547 (S.D.N.Y. 2010) (citations omitted); see also, *e.g., R.E.*, 694 F.3d at 194; *M.H.*, 685 F.3d at 241; *S.B. v. NYC Dep't of Educ.*, No. 15-CV-1869, 2017 WL 4326502, at *9 (E.D.N.Y. Sept. 28, 2017); *T.K. v. N.Y.C. Dep't of Educ.*, 32 F. Supp.3d 405, 427 (E.D.N.Y. 2014), aff'd 810 F.3d 869; *V.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp.3d 295, 302 (E.D.N.Y. 2014); *D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp.2d 344, 350 (S.D.N.Y. 2013); *D.C. v. N.Y.C. Dep't of Educ.*, 950 F. Supp.2d 494, 519 (S.D.N.Y. 2013); *B.R. v. N.Y.C. Dep't of Educ.*, 910 F. Supp.2d 670, 675(S.D.N.Y. 2012); *G.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp.2d 552, 581 (S.D.N.Y. 2010), aff'd 486 Fed. Appx. 954 (2d Cir. 2012); *N.R. v. Dep't of Educ. of City Sch. Dist. of City of N.Y.*, No. 07 Cv. 9468 (BSJ), 2009 WL 874061, at *8 (S.D.N.Y. Mar. 31, 2009). Deference is not inherently warranted if both the IHO and SRO reach the same conclusion. Rather "the Court need not uphold consistent decisions by the IHO and SRO when they are both "poorly reasoned and unsupported by the record." *S.B.*, 2017 WL 4326502, at *9.

## STATEMENT OF FACTS

For a complete and full statement of the facts, the Court is respectfully referred to Plaintiff's Local Civil Rule 56.1(b) Response to Defendant's Statement of Undisputed Fact, dated July 17, 2023.

## PROCEDURAL HISTORY

On September 27, 2019, Plaintiff filed a due process complaint alleging that Defendant filed to provide D.P. a FAPE for the 2018-2019 SY and seeking reimbursement for the costs of D.P.'s enrollment in the PALS program. Ex. A On January 17, 2020, Plaintiff filed a due process complaint alleging that Defendants failed to provide D.P. FAPE for the 2019-2020 SY and seeking reimbursement for the costs of D.P.'s enrollment in the PALS program. Ex. B The September 2019 and January 2020 due process complaints were consolidated in April 2020. IHO I Dec.1The underlying impartial hearing occurred over ten (10) days. IHO I Dec. 1-3 On November 5, 2020, IHO I issued a Findings of Fact and Decision determining that Defendant failed to offer D.P. a FAPE for the school years; that PALS was an appropriate placement for the 2018-2019 and 2019-2020 SY; and that equitable considerations weighed in favor of reimbursement to Plaintiff. IHO I Dec. 48.

Defendants appealed IHO I's decision to SRO I, who found that IHO I's findings of a denial of FAPE for the school years "were based on faulty premises". SRO I then remanded IHO I's findings and dismissed Plaintiff's cross-appeal. *See generally* SRO Dec. I, 21 SRO I ordered IHO I to reconvene and issue a determination on the parent's claim's related to the 2018-2019 and 2019-2020 SY, specifically: to assess sufficiency of the evaluative information the district's CSE had at the time it developed D.P.'s IEP for the 2018-2019 SY, including the information considered during an IEP review held in June 2018, and to address Plaintiff's allegations related to the 2018-2019 SY without reliance on information not available to the district; and to assess the sufficiency of the information available and considered as part of an IEP review held in June 2019, and the appropriateness of the proposed program for D.P. without the recommendation of related services, including speech-language therapy ("SLT") and occupational therapy ("OT"). SRO Dec. I, 12, 17, 19 SRO I's decision was wrong as a matter of law, not well-reasoned, not supported by the record,

and should not be entitled to deference.

Following the SRO's decision, IHO I recused, and IHO II was appointed on September 23, 2021 to conduct a hearing, on remand, pursuant to the IDEA.IHO II Dec. 3 A pre-hearing conference was held on October 4, 2021, and two additional conferences were eld on November 22, 2021 and March 16, 2022. IHO II Dec. 4 The Parties submitted letter briefs addressing the issues raised for remand by SRO I and agreed that the record did not require additional testimony or evidence. IHO II Dec. 1-3 In a Findings of Fact and Decision dated May 6, 2022, IHO II found that Defendants had offered D.P. a FAPE for the SYs, and dismissed Plaintiff's due process complaint. IHO II Dec. 32.

L.S. then initiated a *pro se* appeal of IHO II's decision to the SRO. SRO II Dec. 1 SRO II ultimately found that IHO II "correctly reached the conclusion" that the district offered D.P. a FAPE for the SYs and that IHO II's decision was supported by the evidence in the hearing record. SRO II Dec. 10 The SRO rubber-stamped many of IHO II's findings without analysis, and issued an inadequately reasoned decision that failed to correctly review the record, apply relevant law, or set forth sufficiently-supported conclusions of law and fact.

On December 22, 2022, Plaintiff initiated the instant appeal, by filing a summons and complaint, seeking: (1) a final order and judgment finding that Defendants failed to offer D.P. a FAPE for the SYs; (2) reimbursement for the costs of D.P.'s placement in PALS; and (3) costs and fees. On February 22,2023, Plaintiff filed an Amended Complaint seeking the same relief.

## ARGUMENT

## I. NO DEFERENCE IS DUE TO THE DECISIONS OF SRO II, IHO II, AND SRO I.

Defendant argues that SRO II's decision was well-reasoned, fully detailed and based on a thorough and careful review of the record, and, thus, should be entitled to deference; however, a review of the record belies these contentions. Neither SRO II, nor IHO II, carefully weighed the

record, correctly applied relevant law, or appropriately supported their findings; rather, the record dictates contrary conclusions and the Court should reverse those findings. *See M.H.,* 685 F.3d at 241; *R.E.,* 694 F.3d 167 at 189; *V.S.,* 25 F. Supp.3d at 299-301. In the instant case, SRO II's analysis repeated many of the errors of IHO II, whose decision was neither well-reasoned nor supported by the record, and omitted critical evidence to determine whether the District offered D.P. FAPE. *Compare* IHO II Dec. *with* SRO II Dec. Notably, IHO II's decision relies extensively on the district's exhibits and ignores testimony and evidence, specifically the Plaintiff's evidence, that overwhelming supports the denial of FAPE. Accordingly, since precedent and a review of the record compel contrary conclusions, the Court should defer to neither decision. *See,* e.g., *D.N. Board of Educ. Of Center Moriches U.F.S.D..,* 2015 U.S. Dist. LEXIS 138272 (E.D.N.Y. 2015), at *26-27 (finding the IHO made conclusory findings and misstated evidence and that the SRO "merely repeated the same conclusions – and the same mistakes," rendering their decisions not entitled to deference). The district courts *can* reject any conclusions by the IHO or SRO that are not supported by a preponderance of the evidence. *See e.g., Id.* at 248; *R.G. v. N.Y. City Dep't of Educ.,* 980 F. Supp.2d 345, 360 (E.D.N.Y. 2013). Thus, district courts "do not simply rubber stamp administrative decisions," and are free to overrule the findings below if warranted. *R.E.,* 694 F.3d at 18; *F.O.,* 976 F. Supp.2d at 511.

Defendant's Motion for Summary Judgment fails to address SRO I's decision's which vacated and remanded the thorough and well-reasoned decision of IHO I. *See, generally,* Def. Mot.*; see also* IHO I Dec. SRO I's decision was arbitrary, an abuse of discretion, and unsupported by the record. SRO I should not have remanded IHO I's decision as it was well-reasoned, thorough, and based upon relative law and legal standards, and should not have been vacated. IHO I Dec. The Second Circuit has held that it is appropriate for a reviewing court to "consider the IHO's analysis" where a determination is made that the SRO's analysis was "insufficiently

8

reasoned to merit deference," *see R.E.*, 694 F.3d at 189 (quoting *M.H.*, 685 F.3d at 246) Since SRO

II, IHO II, and SRO I issued erroneous decisions that failed to carefully weigh all evidence in the

record, either misconstrued or failed to consider and/or apply all applicable law, and provided

wholly unsupported conclusions, the Court should consider and award deference to IHO I's

decision. *Compare* SRO II Dec. with IHO II Dec. with SRO II, see also IHO I Dec.

### A. SRO II AND IHO II ERRED IN FINDING THAT THE DISTRICT OFFERED D.P. A FAPE FOR THE 2018-2019 AND 2019-2020 SCHOOL YEARS.

In assessing the appropriateness of an IEP developed for a student, a reviewing court

must consider "(1) whether the [school board] complied with the procedural requirements of the

IDEA, and (2) whether the I.E.P. was 'reasonably calculated to enable the child to receive

educational benefits.'" *M.H.*, 712 F. Supp. 2d 125, 129-30 (S.D.N.Y. 2010), aff'd 685 F.3d 217 (2d

Cir. 2012) (citations omitted). A review of the record shows that neither the IHO II nor SRO II

carefully weighed the record, correctly applied relevant law, or appropriately supported their

findings that the IDEA's procedural and substantive requirements had been met. *See M.H.*, 685

F.3d at 246; *R.E.*, 694 F.3d at 189. Thus, Defendant's motion for summary judgment, predicated

on the validity of these decisions, should be denied.

The IEP is "[t]he centerpiece of the IDEA's educational delivery system." *Endrew F. v.*

*Douglas Cty, Sch. District RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305,

311 (1988)); *see also* 20 U.S.C. § 1414(d)(1)(A). In order to provide a FAPE, the school district

must offer special education and related services that are "reasonably calculated to enable a child

to make progress appropriate in light of the child's circumstances." *Endrew F* a137 S. Ct. 988 at

999, 1001. This includes the provision of "personalized instruction with sufficient support services

to permit the child to benefit educationally from that instruction," and "must: afford [] the student

with an opportunity greater than 'trivial advancement.'" *Bd. of Educ. v. Rowley*, 458 U.S. 176, 203

(1982). The IEP must also "set out the child's present educational performance, establish[] annual

and short-term objectives for improvements in that performance, and describe the specially designed instruction and services that will enable that child to meet those objectives." *M.H. and E.K. v. N.Y.C. Dep't of Educ.*, 712 F. Supp.2d 125, 130 (*citation omitted*). In evaluating the reasonableness of an IEP's recommendations, a court "should also use evidence acquired subsequently to the creation of an IEP." *R.E.*, 694 F.3d 167, 186 (finding that a court should use such evidence "to evaluate the reasonableness of the school district's decisions at the time they were made").

### 1. D.P. was denied a FAPE for the 2018-2019 School Year.

SRO II and IHO II incorrectly concluded that the hearing record established that the 2018-2019 CSE review teams had sufficient information to develop D.P.'s IEP; that the district provided D.P. FAPE; and that the June 2018 IEP recommending D.P. attend an Integrated Co-teaching (ICT)program[3] for all ELA, Math, Science, and Social Studies were reasonably calculated to confer an educational benefit to D.P. for the 2018-19 SY. Contrary to SRO II and Defendants' assertions that IHO II's decision was carefully considered the testimonial and documentary evidence presented by both parties, IHO II's decision does not fully consider the testimonial and documentary evidence presented by both parties, as IHO II relied exclusively on the district's testimonial and documentary evidence, despite such evidence containing a plethora of inconsistent, contradictory, and unsubstantiated statements, and failed to consider the evidence presented by the parents that clearly established Defendants' failure to provide D.P. with a FAPE for the 2018-19 SY.SRO II Dec. pg. 10, *see generally* IHO II Dec; Tr. 323-7, 361-5, 512-3, 562-3, 597-602, 1362-3; Ex. 44, 47, 48, 50,51, 52,72, 73, 74,75,76, 78, I, L, Y, Z, AA, CC, DD, EE, FF, GG, LL, MM, NN,SS, AAA, BBB, CCC, DDD, EEE, FFF, GGG.

### a. SRO II and IHO II erroneously determined that the proposed June 2018

---

[3] An integrated co-teaching class is a class of with two teachers (one general education teacher, one special education teacher), with approximate 20-25 students. IHO I-IV ¶5,7.

**IEP was appropriate based on D.P.'s inflated and inaccurate progress reports from the 2017-2018 school year.**

Defendants argue that "based upon the record submitted, the SRO determined that there was sufficient evidence to find that D.P. "actually made progress" during the 2017-2018 SY (Def. Memo 7) However, the factual conclusions regarding D.P.'s progress were not sufficiently well-reasoned, not supported by the record, and, thus, are not entitled to deference. SRO II and IHO II incorrectly determined that there was sufficient evidence to determine that D.P. made progress.

A student's progress under a prior IEP is a relevant area of inquiry for purposes of determining whether an IEP for the year at issue has been appropriately developed, particularly if the parents express concern with respect to the student's rate of progress. See *H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, 528 Fed. App'x 64, 66-67 (2d Cir. 2013); *Adrianne D. v. Lakeland Cent. Sch. Dist.*, 686 F.Supp.2d 361, 368 (S.D.N.Y. 2010). D.P.'s academic progress, or lack thereof, during the 2017-18 SY is thus crucial to assessing the appropriateness of the district's program recommendation for D.P. for the 2018-19 SY. Tr.488-9, 498-99, 525-6., I-IV ¶ 23-5, D Ex. 5-11, 41, 44, 47; Ex. C, Y, Z, AA, BB, DD-GG,LL At the beginning of the 1718 SY, D.P. attended a 15:1 special class for Math and ELA and ICT classes for Science and Social Studies. Tr. 1502; I-III ¶7-12, I.-XVI ¶ 35-6, 41; Ex. 6. In October 2017 D.P. was transferred to an ICT class for Math. Tr. 498-501, 551,1502-4; I-I ¶ 26-8, I-IV ¶ 20, I-XVI ¶ 34, 37, 41, 42, 44,-47; Ex. 4-7, 28, 34, 71, p.9; Ex. C Through the 2017-18 school year, D.P.'s grades in ELA, Math, and Science significantly declined. SRO II Dec. 11; Def. Memo 9; Tr.514-6; I-IV ¶ 14, I-XVI ¶ 49, 60; Ex. 44; Ex. AA. While the SRO II acknowledged that D.P.'s grades declined during the 2017- 2018 SY II failed to appropriately consider the impact of the declining grades.[4] However,

---

[4] Specifically, SRO II noted that, in English Language Arts ("ELA"), D.P. 's received "a first quarter grade of 92 and a fourth quarter grade of 73, in math 6 a first quarter grade of 93 and a fourth quarter grade of 73, and in science, he received a first quarter grade of 88 and a fourth quarter grade of 66…" SRO II Dec, 11

SRO II then erroneously and inexplicably determined that D.P.'s declining grades were not counter-indicative of progress, as D.P. still passed his courses. SRO II Dec.11, Ex. 44 However, this reasoning is flawed as a matter of law, as the fact a student received passing grades in each course, and was able to advance from grade level to another, does not automatically establish a program was appropriate and that progress was made. (*Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 203 n. 25*).

Rather, SRO II ignored testimony and evidence that indicated that D.P.'s grades during the 2017-2018 SY should be reviewed with caution, as the grades reflected tests, quizzes, class work, and homework assignments. I-III¶ 13, I VI ¶ 14, I-V5 ¶ 17 For example, SRO II ignored that, in Math, D.P.'s grades did not accurately reflect his knowledge and performance; rather, D.P. was allowed to retake quizzes multiple times just to achieve a passing grade. Tr. 476-94 Moreover, Ms. DeGregorio, D.P.'s math and science teacher, admitted that homework and classwork scores reflected the completed the work, but did not reflect whether the work was accurate and that D.P was failing. Tr. 467 489-90; Ex. Z, AA Therefore, SRO II inappropriately relied on D.P.'s grades to support that D.P. made progress during the 2017-2018 school year and, thus, it was appropriate for the district to continue to recommend that D.P. attend the ICT program for 2018-2019 SY.

Moreover, contrary to the record, SRO II asserts that D.P. made progress on his goals during the 2017-2018 SY. SRO II Dec. 11-12 This conclusion is not sufficiently well-reasoned and not supported by the record, and thus should not be entitled to deference. The District did not: (1) adhere to New York's Best Practices for creating, monitoring, and reporting goal progress and regression; (2) collect objective data to systematically determine if D.P. was making progress towards his goals (*i.e.* starting with a baseline and monitoring progress periodically), and in compliance with the IEP in terms of the criteria, method, and schedule of goal assessment; and (3) make the goal progress-regression data available for the Parent and the CSE review team to

determine whether appropriate progress was being made and allow the CSE review team to make recommendations for intervention or change in program and services. 34 C.F.R. § 300.320(a)(2)-(4); Ex. 7-12, 47.

The record is completely devoid of objective data to determine D.P.'s progress on his goals during the 2017-2018 SY, despite the district's reliance (and subsequently, IHO II and SRO II's reliance) on D.P.'s supposed progress during the 2017-2018 SY when making recommendations for the 2018-2019 SY. Federal regulations require that the district issue IEP progress reports, including data that supports the degree of progress or lack progress, and an explanation as to why progress was or was not made. 34 C.F.R. § 300.320(a)(2)-(4). During the 2017-2018 SY, Plaintiff sought clarification regarding the progress report codes (PI: progressing inconsistently; PG: progressing gradually; PS: progressing satisfactorily; SC: "not yet started"), as there were no meaningful comments or summaries regarding whether D.P. was making progress towards meeting his goals next to the codes, or how close he was to mastering the goal based on the objective assessments and schedule delineated in the IEP for each quarter of the school year. (IHO-XVI ¶38-39, 40, Ex.6, 46, 47, Ex. R, p. 10) Rather, in response, Plaintiff was inaccurately advised by Mr. Dorn, Director of Pupil Personnel, that that the District did "not require a comment on every goal," despite federal regulations to the contrary. I-XVI ¶38-39, 40; D-46, D-71, p. 2,14. Rather, despite the IDEA's requirement that progress reports be issued to inform parents of their children's progress towards their annual goals, a review of D.P.'s progress reports show comments and information about his progress were not being included regularly, and that there was no objective data used in assessing his progress. Ex.D-45, D-46. Notably, at hearing, the District's witnesses did not so much as know who made the determinations for goal progress reports. (I Ex. XVI ¶51-67; Tr. 459-64,557-63,583-4,604; 47). Rather, as Ms. DeGregorio testified, there was not a specific data point that corresponded to the codes PS, PG, or PI (Tr. 494) She further explained that

"progressing satisfactorily would be that the child, essentially, is moving towards the goal at a rate that we feel that they will...eventually, hopefully achieve it" and "at rate that is expected." *Id.* Ms. DeGregorio testified that it is a qualitative assessment, not quantitative because "It's not asking you for exact data in these [reports]" Tr. 496.

Moreover, the progress reports are inconsistent. D.P. did not achieve his goal of editing for capitalization, punctuation, and grammar; yet, he achieved his goal of writing and editing a one paragraph essay. Ex. 47 Even the assertion that the goal of writing and editing a one paragraph essay is dubious, as the record further supports that D.P. did not in fact achieve this goal. Rather, as Ms. Cifre-Kerekes, school psychologist who administered the Educational Evaluation - Writing Subtests, reported in December 2017, D.P. could not write a 30-word essay and was only capable of listing 4 items in response to an essay prompt. Ex. 29 While Ms. Markey-Jones, D.P.'s English teacher, reported in January 2018 that D.P. is able to utilize a graphic organizer and then take the information and write a paragraph with minimal support, and that "D.P. requires minimal support to create a topic sentence and a conclusion," she subsequently advised the parent in March 2018 that D.P. was struggling with writing. Ex. 16 ¶ 66, Ex. 29, 47, 71.

However, both IHO II and SRO II ignored the evidence demonstrated that D.P.'s progress was inflated on his progress reports. In fact, throughout the 2017-2018 SY, D.P.'s teachers expressed concerns about his writing, reporting that his responses lacked detail and lacked correct spelling, punctuation, and capitalization. (Ex. 28) Ms. Markey-Jones' report shows that D.P. made little to no progress after November 2017, as he was only able to write simple sentences and could correct punctuation and grammar only when he took his time. (Ex. 28, 4) IHO II and SRO II further failed to consider that D.P. did not master his writing goals, had significant issues with focusing and attention (including requiring 1:1 support from a teacher to focus and prompt him to write and edit), when determining that Ms. Markey-Jones (and the CSE review team's) recommendation that

D.P. attend an ICT ELA class during the 2018-2019 SY was appropriate. (Tr. 611-4; I Ex. 5 ¶ 36; Ex. 10, 28, 47).

D.P. also failed to make sufficient progress in math during the 2017-2018 SY. D.P.'s IEP listed four Math goals and both the documentary evidence and the testimony provided by Ms. DeGregorio show that D.P. only achieved one goal (the first Math goal listed on the IEP,) and, even then, D.P. did not complete all components of the goal. I- XVI ¶ 60; D Ex. 5-8 Ms. DeGregorio's testimony contradicted itself, stating that during the April 27, 2018 CSE meeting, "I reported that D.P. has mastered multiplication facts up to 12 but he did not know his division facts. Due to that, any one step problem that required division, D.P. would convert to a multiplication problem to get the answer. . .". I-IV ¶ 21 Yet, in the very next paragraph, she stated that by January 2018 D.P. mastered the goal, "By January when given single-step word problems involving four operations, D.P. will solve the problems correctly." (I-IV ¶ 22; Ex. 55-58). According to Ms. DeGregorio although D.P. could not divide, he achieved the goal because 100% success was not required. Tr. 512-3. In other words, it did not matter that D.P. did not have the basic foundational division skills, it just mattered that the answer was correct Tr. 513Ms. DeGregorio further testified that D.P. did not achieve his second or third Math goal involving fractions and mDixed numbers as the class had moved onto a different topic and essentially stopped working on the goal at the conclusion of the third quarter. IHO IV ¶23-4, IHO XVI ¶ 59, 60; Tr. 513-15.  D.P. also did not achieve the goal "By June, when given modified, multistep word problems, D.P. will solve 4 out of 5 problems correctly." Tr.514-5; IHO IV ¶ 25; Ex. 47. Yet, again, despite this lack of progress in math during the 2017-2018 SY, the district again recommending that D.P. attend an ICT class for math for the 2018-2019 SY. I-XVI- 60 D Ex. 5-8, 47And, also yet again, both IHO II and SRO II failed to consider this evidence when determining that this recommendation was appropriate for D.P. for the 2018-2019 SY. IHO Dec.7-8, 11, SRO II Dec. 10-11The totality of the evidence before IHO II and SRO II (as articulated by SRO II itself)

demonstrates not only that D.P. did not make linear progress during the 2017-2018 SY, but that he did not make any meaningful progress while attending the district's program (which was more supportive than the CSE's recommendations for the 2018-19 SY). SRO II Dec, p. 19, Tr. 498-501, 551,1502-4; IHO I ¶ 26-8, IHO IV ¶ 20, IHO XVI ¶ 34, 37, 41, 42, 44, 47; Ex. 4-7, 28, 34, 71, p.9; Ex. C. Indeed, the only evidence pointed to by Defendants (as well as IHO II) to support their argument are D.P.'s declining (albeit passing) grades, and the subjective progress reports by the district witnesses'. (Def. Mem. p.8-10, Tr. 496, Ex. 46). Rather, IHO II and SRO II ignored both D.P.'s lack of progress and that the district failed to meet its obligation to appropriately track D.P.'s progress, instead summarily concluding that D.P. made linear progress, against the totality of the Record. SRO II Dec.19 Such conclusory, unsupported determinations are not deserving of deference.

**b. SRO II and IHO II incorrectly concluded that the CSE had sufficient evaluative information to support its recommendations for D.P. for the 2018-2019 school year.**

An IEP must be based upon a complete assessment of a student's abilities and needs. 34 C.F.R. §§ 300.4, 300.305, 300.324; 8 N.Y.C.R.R. § 200.4(b), (f)(1). In developing an IEP, a CSE must consider a student's initial or most recent evaluations; current assessments; strengths; and his academic, developmental, and functional needs, in addition to parental concerns. 34 C.F.R. § 300.324; 8 N.Y.C.R.R. § 200.4(f)(1). While the law may not mandate that the information used to develop a student's IEP come from a particular source, the CSE is nonetheless required to ensure that it has sufficient evaluative and documentary material to justify its recommendations and goals. *See* 34 C.F.R. § 300.324(a); 8 N.Y.C.R.R. § 200.4(d)(2). Here, a review of the record shows that SRO II and IHO II erred in finding that there was sufficient evidence to determine that the May and June 2018 CSEs had sufficient information before them in developing D.P.'s June 2018 IEP, warranting reversal. *See V.S.*, 25 F. Supp. 3d at 299-301.

At the time of the May and June 2018 CSE Meetings, the district had previously conducted

a Speech and Language Evaluation, dated March 22, 2016; Psychological Evaluation, dated April 13, 2016; an Education Evaluation, dated April 13, 2016; a Social History Report, dated April 13, 2016; an Educational Evaluation - Writing Subtests, dated December 1, 2017; Assistive Technology Evaluation, dated January 3, 2018; an Occupational Therapy Re-evaluation, dated January 10, 2018; and a Sensory Profile Assessment, dated January 11, 2018. Ex. 9, 10, 11, 20, 22, 23, 24, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 41Defendant argues that SRO II properly concluded that IHO II "identified, in detail, the evaluative assessments and reports relating to D.P.'s needs that such assessments and reports supported the recommendation of the CSE which provided D.P. with a FAPE." Def. Memo 10, SRO II Dec. 12-18 While IHO II and SRO II list the evaluative documentation available and allegedly relied upon during the May and June 2018 CSEs, both fail to analyze the sufficiency and appropriateness of the evaluative material and whether the evaluative and documentary material was sufficient to justify its recommendations. SRO Dec. II, pp. 12-16, IHO Dec., pp. 9-10, 12, 21, *See* 34 C.F.R. § 300.324(a); 8 N.Y.C.R.R. § 200.4(d)(2).

Notably, the District did not provide any testimony regarding the sufficiency of the evaluations and does not point to any case law in its motion to support that the evaluations were sufficient. Def. Memo. Both IHO II and SRO II ignore the overwhelming evidence that the district conducted evaluations failed to assess D.P. in all areas of his suspected disability and that the district did not conduct sufficient evaluations prior to the 2018-19 SY to identify his specific learning needs as necessary or as needed to recommend appropriate special education programs and services for D.P.

The failure of the district to obtain critical information about a child's disability renders achievement of FAPE impossible, as the CSE cannot create an IEP that addresses a child's needs without fully understanding them. *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202,1210 (9th Cir. 2008). The IDEA explicitly requires that a "child must be assessed in all areas of suspected disability" ("including, where appropriate, . . . general intelligence . . . communicative status and

motor abilities") by evaluations that are tailored to the student. 34 C.F.R.§ 300.305 (c); 8 N.Y.C.R.R. § 200.4(b)(6)(vii). Moreover, courts have consistently held that districts, not parents, have the duty to do what is necessary to determine a student's needs prior to developing educational recommendations for a child, including obtaining expert input. *A.D. and M.D. v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 690 F. Supp 2d 193 (S.D.N.Y. 2010).

The record demonstrates that D.P. was identified by the district as a student with a generic learning disability for several years, a broad term that did not specifically identify the nature, severity, or extent of his learning disability and his neurological deficits. I XIV ¶7; D Ex. 34. At the time of the 2019 review, D.P. was struggling to make progress in his then-current program of a special class for ELA and ICT classes for Math, Science, and Social Studies. Ex. 44, 47, 53 Thus, the district had the obligation to review D.P.'s progress and assessments prior to the review meetings to determine whether they had sufficient appropriate evaluations to draft the IEP. *A.D. and M.D. v. Bd. of Educ. of the City Sch. Dist. of N.Y.* 690 F. Supp 2d 193 (S.D.N.Y. 2010). Moreover, Dr. Jane Brown, Psy.D., who the district contracted with in the summer of 2018,"to provide a more comprehensive evaluation than D.P. had previously, because they had not actually pinpointed his specific learning disabilities," opined that D.P. would not have been able to manage an ICT class of 20-25 students with two teachers and resource room support, as he struggled to manage in a class of four students with two teachers and required constant prompting and redirection (I Ex. 14 ¶1-7, 39, Ex. 34).

While IHO II and SRO II copied the titles and dates of the evaluations available at the May and June 2018 meetings, they did not carefully review the evaluations as part of their determination. IHO II Dec. 9-10, SRO II Dec. 12-18 As a result, IHO II and SRO II ignored the overwhelming testimony and evidence that the district failed to obtain critical information regarding D.P.'s needs through the 2016 Psychological Evaluation and Education Evaluation and agreed that D.P.'s specific learning

disabilities had not been pinpointed, as well as testimony and evidence that, as a result, the district, saw the need for the independent educational evaluation in the summer of 2018. (Tr. 232, I Ex. 1 ¶49, I Ex. 14 ¶1-7, I Ex. 16 ¶68) The 2016 Psychological Evaluation and Education Evaluation were insufficient and inadequate as the tests administered did not target D.P.'s underlying issues or identify where the breakdown in his nervous system was actually occurring and why he was not making appropriate progress in the various district programs. Tr. 1995-6. The evaluations were also extremely cursory, focusing only on surface issues, like executive functioning and behavioral needs, while ignoring D.P.'s serious underlying neurological disabilities, which affect his ability to learn. Tr. 1193-6, 1200-2. As a result, the interventions created based on the district's cursory evaluation could not target his learning needs. I Ex. 14 ¶4.

The district was not unaware of the flaws within its own evaluations. The evaluator, Mr. Sean Dolinar M.A., Psy.S., NCSP, noted in the 2016 Education Evaluation that D.P. struggled during the assessment, worked very slowly, "found writing task very laborious and effort and motivation decreased on these tasks," would often ask when the they would be done, and put his head on the desk. Ex. 23. IHO II does not even address the sufficiency of the evaluations, but simply lists the evaluations from the IEP. IHO II Dec. 23, Ex. 11-13While SRO II acknowledged that Mr. Dolinar noted that "due to these observed behaviors the following assessment results may be an underestimate of [D.P.]'s true academic skill levels and potential," it failed to consider that this evaluation was thus not sufficient to base educational recommendations on.  SRO II Dec. p. 15, Ex. 23.

SRO II and IHO II incorrectly found that the Educational Evaluation - Writing Subtest was sufficient; however, this conclusion is belied by the record. Rather, the Educational Evaluation – Writing Subtest is grossly insufficient as it did not target D.P.'s writing needs, including, but not limited to, his written language skills, motor planning, or writing fluency, and did not provide any

grade level equivalency of D.P.'s writing skills, despite the fact that the WIAT does produce a grade equivalent. Tr. 328, D Ex. 29. Moreover, Ms. Cifre-Kerekes, the school psychologist who conducted the evaluation, testified that she did not review any classroom writing samples and did not compare what D.P. could produce in a quiet 1:1 environment to what he produced in his then current class setting of 12 students, 1 teacher, and teaching assistant. The report does not provide a comparison of D.P.'s writing to that of his grade level peers. (Tr. 327, D Ex. 29) Ms. Cifre-Kerekes reported that D.P. exhibited significant distractibility and required frequent redirection throughout the assessment. I Ex 2 ¶ 9. In addition, D.P. was unable to write a 30-word essay and only produced a list of four items, an insufficient number of words to score the Essay Composition subtest. (Tr. 323-7) SRO II's decision omits the fact that D.P. could only lists four items. Ex. 29 As a result of the insufficient assessments conducted by the district, the recommendations contained in the Educational Evaluation were completely inappropriate, failing to address D.P.'s need for remediation and recommending only assistive technology/accommodations; the use of a graphic organizer; access to a word processor; and the use of speech-to-text software. Tr. 330-2, I Ex.2 ¶9; Ex. 29.

Furthermore, prior to the 2018 meetings, the CSE failed to conduct an updated speech language evaluation to determine whether D.P. required SLT, despite the fact that D.P. was diagnosed with Dyslexia, had significant deficits in pragmatic and written language skills, and difficulty with short-term memory retrieval – all of which, per the district's own witness, are issues that speech-language therapy could address. (Tr. 169; I Ex. 14 ¶12, 16) The 2016 Speech Language Evaluation utilized by June 2018 CSE was insufficient, as it inaccurately described D.P.'s disability as Speech Language Impaired, and failed to make any modifications or recommendations to address D.P.'s language deficits. (Ex. 20). The assessment conducted assessed D.P.'s general language skills, articulation, and pragmatic language skills; the evaluation

did not examine how D.P.'s struggles with communication, auditory language processing, and writing affected his learning in the classroom. Ex. 20. The evaluator also did not consider how DP's needs in the 1:1 environment—repetition of directions and orally presented information; slower presentation of information to improve his understanding; and directions repeated before and during performing tasks—would be greater inside the classroom, nor did the evaluator conduct a classroom observation to assess D.P. speech-language needs in a larger setting. (Ex. 20).

Moreover, SRO II and IHO II ignored the inadequacies and inconsistencies in the ELA assessments, Math assessments, and teacher reports conducted and completed during the 2017-2018 SY and relied upon during the May and June 2018 CSEs. The ELA assessments were insufficient, as these assessments did not accurately reflect D.P.'s present levels of performance. D.P. was assessed using both the Read 180 Program and the Aimsweb Plus. (I Ex. 5 ¶ 5, 21-7, D Ex. 50) D.P. received a Lexile score of 957 on the Read 180 Program assessment, which was considered proficient. I Ex. 5 ¶ 21. However, Lexile scores reflect the difficulty of the material to read, but not necessarily D.P.'s ability to understand the material or complexity of the themes. Tr. 590-4. Thus, there was no appropriate baseline assessment of D.P.'s reading comprehension or decoding skills in September 2017 or throughout the school year.  Moreover, while Ms. Markey-Jones testified that the Read 180 Program is "designed to improve reading and English language art skills for students who struggle with these skills," there is no evidence to support that the Read 180 Program is effective for students with learning disabilities or, more specifically, D.P.  I Ex. 5 ¶ 5, 19; Ex. 34, Ex. RR. Rather, the Read 180 Program is a reading program not specifically designed for students with Dyslexia, but designed for students in grades 3-12 whose reading achieve is *below proficient levels*. Ex. RR.

In contrast, on the Aimsweb Plus, D.P. attained a score of 409, indicating that he was well *below* average in reading skills (in contrast to the Read 180 Program assessment). I Ex. 5 ¶ 27, Ex.

72. Ms. Markey-Jones could not explain the discrepancies in the scores and simply relied on the Lexile score in assessing D.P.'s progress during the 2017-2018 SY. Tr. 597- 602; I Ex. 16 ¶ 61. Notably, the Aimsweb raw scores provide measures to indicate the level of text difficulty and reading ability; therefore, both the Read 180 Program assessment and the Aimsweb should have reported similar scores in D.P.'s reading and reading comprehension skills. XVI ¶ 61, Ex. JJ However, the Read 180 Program indicated that D.P., was "proficient" or functioning at grade level in the Fall and Spring, while the Aimsweb D.P. results showed that D.P. was functioning *well below* average in reading skills and that he was "at high risk for not making progress in reading by the of the year" in the Fall, and below average in the Spring. I Ex. 5 ¶ 27, I Ex. 16 ¶ 61; Ex. JJ. Ms. Markey-Jones testified that she knew the scores and conclusions from the two assessments were discrepant, but did not follow-up to determine which was the accurate assessment. (Tr. 601-3). Moreover, despite these discrepancies, the CSE review team inappropriately relied solely on the Lexile scores from the Read 180 Program assessment to determine D.P.'s then-current functioning level, specifically that D.P. was functioning at grade level. Tr. 190-1; I Ex. 16 ¶ 55; Ex. 9,10. Similarly, SRO II and IHO II ignored the discrepancies and determined that there was sufficient evaluative material considered at the May and June CSE reviews.

Given both administrative officers' failures to grapple with any conflicting evidence regarding D.P.'s the assessments used to determine D.P.s' then-current levels performance, their rushed conclusion is wholly unworthy of this Court's deference, despite Defendants' assertions to the contrary. *See F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 514-515 (S.D.N.Y. 2013).

Ms. Markey-Jones testified that she did not do any baseline assessments to determine D.P.'s grade equivalent writing skills by which to assess his progress on through the 2017-2018 SY, despite the fact that D.P. has been diagnosed with Dysgraphia and that at the end of the 2016-2017 SY D.P. was only able to write an opinion essay at a second-grade equivalence. (Tr. 562-3;

Ex. 16 ¶ 62) Contrary to IHO II's and SRO II's determination that the CSEs had sufficient evaluative data, the record supports a finding to the contrary, as the district provided inconsistent data regarding D.P.'s writing progress during the 2017-2018 SY and subsequently inappropriately relied on this data to develop goals and make program recommendations for D.P. for 1819 SY.

IHO II and SRO II further inappropriately credited the testimony of the district's witnesses regarding D.P.'s progress during the 2017-18 SY and the progress reports submitted for the May and June 2018 CSE reviews. IHO II Dec. 5, 9, 11SRO II Dec., 16. As discussed *supra* (pp.11-17), the progress reports include several misrepresentations regarding D.P.'s functioning level and progress. Ex. 49 For example, D.P.'s ELA teacher report from April 2018, states that D.P. "has made gains in the area of reading this year...his lexile level is 920 which is on grade level," yet, failed to indicate that D.P.'s Lexile score was 920 in November 2017. (Tr. 597-602; I Ex. V¶ 22-7, I Ex. 16 ¶ 55-6, Ex. 9, 49) The assessments regarding the Lexile scores indicate that D.P. did not make appropriate progress in his reading skills, despite the teacher report.(Ex. 9, 49; IHO-V ¶22 )) During her testimony, Ms. Markey-Jones further acknowledged that had she written her report two weeks earlier, prior to the April 17, 2018, when D.P.'s Lexile was 877, she would have reported to the CSE that his reading comprehension was "below grade" (Tr. 608). Thus, the evidence clearly demonstrates that the reports are inappropriate, insufficient, and unreliable.

The record clearly demonstrates that to that CSE's recommendation were inappropriate for D.P. for the 2018-19 SY, despite SRO II and IHO II's findings. SRO II simply rubber-stamped IHO's findings without analysis, and failed to correctly review the record, apply relevant law, or set forth sufficiently-supported conclusions of law and fact. These findings, thus, do not warrant deference. The record establishes that at the time of CSE review meeting, D.P. was

struggling to make progress in his then-current program of a special class for ELA and ICT classes for math, science, and social studies; without any documentation to support that D.P.'s needs could be appropriately addressed in a larger, less supportive environment, the CSE recommended less restrictive, full-time ICT program and Resource Room (5:1) for D.P. for the 1819 SY. (Ex. 9-11) Moreover, Dr. Jane Brown, Psy.D., who the district contracted with in the summer of 2018,"to provide a more comprehensive evaluation than D.P. had previously, because they had not actually pinpointed his specific learning disabilities," opined that D.P. would not have been able to manage an ICT class of 20-25 students with two teachers and resource room support, as he struggled to manage in a class of four students with two teachers and required constant prompting and redirection (I Ex. 14 ¶1-7, 39, Ex. 34) Though the SRO has indicated that Dr. Brown's report should not be considered, as it was not available to the CSE at time of the May and June meetings, her opinion regarding the appropriateness of the program remains valid, as these impressions were based upon her review of D.P.'s prior evaluations, progress reports, and teachers reports, as well as conversations with D.P.'s prior Tarrytown District teachers and his then-current PALS teachers. Ex.34.

SRO II and IHO II failed to assess and discuss the appropriateness of the goals included in the IEP. The goals included in an IEP must be aligned with a child's needs, but also must include sufficient information to enable measurement of the child's progress towards the specific goals during the school year. See M.H., 712 F. Supp.2d at 155-56 (quoting 8 N.Y.C.R.R. § 200.4(d)(2)); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citing 20 U.S.C. § 1401(a)(20)); 34C.F.R. § 300.347(a)(2), (7).

The IEP goals and objectives fail to meet this standard. The 2018-19 IEPS failed to include appropriate    goals    to    address    D.P.'s    academic,    social/emotional,    executive

functioning/organizational, and attentional needs. The goals listed in the IEPs are inappropriate, insufficient, immeasurable, compounded, and fail to indicate the level and type of support Derek requires to master the goals. Ex. 9-11. For example, "D.P. will write a formal argument, of up to 2 paragraphs, with 2 examples of evidence and reasons to support his claim, using language that relates the claims and reasons and a logical closing statement. "*Id.* The record demonstrates that this goal was not appropriate for D.P. At the time of the meeting, D.P. could only write complex sentences with support and required prompting to expand on ideas. I V ¶32; Ex. 47, 49, LL. In addition, the IEP simply indicates that D.P. has significant issues with organization, but the goals failed to appropriately target and address those issues; and, the goals do not specifically address D.P.'s lack of study skills. The IEP also failed to address D.P.'s significant handwriting issues, and is devoid of any goals to address this need.

The totality of the evidence before IHO II and SRO II demonstrates that the May and June 2018 CSE teams did not have sufficient, evaluative material in developing D..P.'s IEP. Based upon the information available to the CSE at the time of the May and June 2018 meetings, the district failed to develop a program that conformed to the *Endrew F.* standard and did not develop a program that was reasonably calculated to enable D.P. to make progress appropriate in light of his circumstances for the 1819 SY, as the overwhelming evidence supports that the documentary materials and evaluations relied upon were insufficient to identify and target D.P.'s needs and that the District did not truly understand the nature and extent of D.P.'s disability; thus, it was impossible for the District to develop an appropriate program for D.P. for the 1819 SY.

**2. D.P. Was Denied FAPE for the 2019-2020 School Year.**

Defendants argue that SRO II and IHO II correctly held that the District provided D.P. FAPE for the 2019-2020 School Year, specifically, that the program recommendation, Special Class 15:1 Class for Math, Science, Social Studies, and Language Arts, a 5:1 Class for Reading and Resource

Room, was reasonably calculated to provide D.P. with an educational benefit (D Ex. 12, 13, SRO II Dec. p. 21, 25, 28) However, a review of the record shows that neither SRO II nor IHO II correctly applied relevant law or appropriately supported their findings, considered relevant evidence, and that the record, in fact, dictates contrary conclusions. *See M.H.*, 685 F.3d at 246; *R.E.*, 694 F.3d at 189. Moreover, SRO I inappropriately remanded the matter to "consider the appropriateness of the 2019-20 recommendations absent these services [SLT and OT]," SRO I Dec., p 19, as IHO I correctly determined, in a well-reasoned decision supported by the record, among other things, that the program without SLT and OT did not confer FAPE to D.P. for the 2019-2020 school year. HO I Dec., pp 20, 32, 34,37-38 Accordingly, the Court should reverse the findings of SRO II, IHO II, and SRO I. See *V.S.*, 25 F. Supp. 3d at 299-301.

### a. SRO II and IHO II Incorrectly Concluded that the CSE had, Reviewed, and Considered Sufficient Evaluative Information to Support its Recommendations.

Despite their repeated assertions to the contrary, Defendants failed to comply with the procedural requirements set forth by the IDEA, guiding the creation of an IEP. Def. Memo 16-23 The United States Supreme Court has long held that the IDEA's procedural safeguards are a critical component to ensure that a student with a disability is provided with a substantively appropriate education. *Rowley,* 458 U.S. 176, 205-06 (1982) (citations omitted). The 2004 IDEA amendments state that a procedural inadequacy rises to the level of a denial of a free, appropriate public education when it (1) impedes the child's right to a free, appropriate public education; (2) significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a free, appropriate public education; or (3) causes a deprivation of educational benefits. *Individuals with Disabilities Education Improvement Act,* 20 U.S.C.A. § 1415(f)(3)(E)(ii) (West 2015). Moreover, "[p]arents need not allege any substantive harm...as a result of the procedural violation...if it significantly impedes [their] opportunity to participate in the decision-making process..." as this is a *per se* denial of a free, appropriate public education.

*K.R. v. N.Y. City Dep't of Educ.,* 107 F. Supp.3d 295, 309, n. 120 (S.D.N.Y. 2015).

Moreover, when reviewing the effects of the District's failure to comply with the IDEA's procedural requirements, it is important to look at the cumulative impact of a school district's failures. *Scott v. N.Y. City Dep't of Educ.,* 6 F. Supp. 424, 440 (S.D.N.Y. 2014) (citations omitted). *See e.g., C.F. v. N.Y. City Dep't of Educ.*, 746 F.3d 68, 80-1 (2d Cir. 2014). Notably, both the SRO II and IHO II failed to consider the cumulative effects of the Defendants' errors. In fact, the cumulative impact of the Defendant's various abdications of their procedural responsibilities, on their own, denied D.P. a free, appropriate public education.

The District's failure to comply with the IDEA's procedural requirements began when it failed a to appropriately and timely evaluate D.P.'s language prior to the development of 2019-2020 IEPs. *Supra*, 18 SRO II, IHO II, and SRO I ignored Defendant's failure to evaluate D.P. in all areas of suspected disability, specifically, speech and language and occupational therapy. IHO II incorrectly stated "a speech evaluation was not able to be completed due to the unavailability of D.P." IHO II Dec. 31 The District never completed the speech- language evaluation that was supposed to be conducted after the parent returned consent to evaluate D.P. in June 2019. I Ex. 16¶ 85. The speech language evaluator administered the Clinical Evaluation of Language Fundamentals (CELF), but did not complete the testing, and advised the parent that testing would be completed in the Fall 2019; however, the testing was never completed. I Ex. 16 ¶ 85. The District did not reconvene to discuss D.P.'s language needs or the findings of the CELF. I Ex. 16 ¶ 85. The failure to complete the evaluation and to assess D.P.'s language needs resulted in the denial of FAPE, as the CSE dismissed the reports and discussions provided by D.P.'s then-current providers, and then failed to complete the evaluation it insisted on to recommend related services. SRO II acknowledged in passing that the June CSE was waiting for the completion of a speech-language

evaluation; SRO II failed to address the lack of the evaluation and its impact on develop an appropriate program for D.P. for the 2019-2020 school year. SRO II 28.

The CSE failed to conduct an updated speech language evaluation to determine whether D.P. required speech and language therapy, despite the fact that D.P. was diagnosed with Dyslexia, had significant deficits in pragmatic and written language skills, and difficulty with short-term memory retrieval; issues that speech-language therapy could address. Tr. 169; I Ex. XVI ¶12, 16.

The totality of the evidence before IHO II and SRO II demonstrates that June 2019 CSE teams did not have and failed to consider sufficient, evaluative material in developing D.P.'s IEP. Based upon the information available to the CSE at the time of the May and June 2018 meetings, the district failed to develop a program that conformed to the *Endrew F.* standard and did not develop a program that was reasonably calculated to enable D.P. to make progress appropriate in light of his circumstances for the 1819 SY, as the overwhelming evidence supports that the documentary materials and evaluations relied upon were insufficient to identify and target D.P.'s needs and that the District did not truly understand the nature and extent of D.P.'s disability; thus, it was impossible for the District to develop an appropriate program for D.P. for the 1819 SY.

The District continued to violate D.P.'s procedural rights when it failed to appropriately review Dr. Brown's evaluation and the Carmel Progress reports, specifically for SPL and OT. Both SRO II and IHO II inappropriately concluded that the June 2019 CSE reviewed and considered sufficient documentary evidence to support its recommendation. SRO II and IHO II erroneously concluded that CSE appropriately considered Dr. Brown's evaluation in developing D.P.'s IEP for the 2019-20 school year. The evidence and testimony clearly demonstrate that the June 2019 did not review or consider Dr. Brown's report and did not adopt any of her recommendations. (Tr. 246-8, 361-5, 388; *compare* Ex. 8, 8-11, Ex. 9, 7-9, Ex. 12, 5-11 with D

Ex. 13, 5-11 with D Ex. 34 , p. 29-36; ) While the district argues that SRO II "closely examined the evidence in the record regarding the development of the 2019-2020 IEP," a review of the record as a whole shows SRO II did not carefully review the record. II SRO Dec. 24, 27 Def. Memo 17. SRO II inaccurately states that "IHO 2 found that the hearing record demonstrated that the neuropsychological evaluation report was not available to the May 2019 CSE and was first discussed at the June 2019." SRO II Dec. 21 As correctly stated by IHO II, the district was in possession of the evaluations since 2019; however, the evaluation was not discussed or considered during the May 2019 meeting. IHO II Dec. 25, 27.

A review of the record shows that SRO II was aware that the June 2019 IEP failed to reflect the update evaluative information from Dr. Brown's report, stating, "The June 2019 IEP continued to reflect the same evaluative information as the student's May 2019 IEP, with the exception of including additional results from a June 2019 OT evaluation," yet, SRO II failed to consider the procedural implications this had on developing an appropriate program for D.P. The District must demonstrate that the information contained in the IEP is accurate, and substantively appropriate. *See, e.g., M.H. v. N.Y.C. Dep't of Educ.,*685 F.3d 217, 248-49 (2d Cir. 2012) (finding IEP goals to be insufficient when the record did not support that they were substantively appropriate for the student). It is the District's responsibility to obtain and report sufficient information in an IEP. *See A.D. and M.D. v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, 690 F. Supp. 2d 193, 208 (S.D.N.Y. 2010). The record overwhelmingly supports that the June CSE did not appropriately consider Dr. Brown's evaluation. The district's own witnesses admitted that despite regular procedure to list and describe the evaluation reports and test results that the team considered during the course of the meeting, Dr. Brown's test results are not listed, the IEP does not describe D.P.'s diagnoses, or mention that he requires multisensory instruction, including multisensory language instruction and curriculum to make progress. Tr. 248-9, 361-2,

364-5, 388.

Of the information that must be contained in an IEP, a detailed and accurate statement of the student's present levels of performance is one of the most important factors. The Second Circuit has repeatedly held that "[t]he centerpiece of the IDEA's education delivery system is the . . . IEP." *Mackey v. Bd. of Educ. for the Arlington Cent. Sch. Dist.*, 386 F.3d 158, 160 (2d Cir. 2004) (quoting *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)). *See also Pawling Cen. Sch. Dist. v. N.Y. State Educ. Dep't*, 771 N.Y.S.2d 572, 574 (N.Y. App. Div. 2004). Thus, the IEP acts as a "blueprint" for a child's education and, like any blueprint, if any key components are missing, the entire structure is compromised. "[A] statement of the child's present levels of academic achievement and functional performance" is thus needed to lay an appropriate foundation. 20 U.S.C. §1414(d)(1)(A)(i)(I); 8 N.Y.C.R.R. § 200.4(d)(2)(i). The evidence is overwhelming that the present levels of performance outlined in D.P.'s IEP were substantively lacking. Ex. 12, 13, 34 Dr. Brown administered fifteen tests/substest, yet, the June IEP continued to list and rely upon the grossly insufficient evaluations conducted by the district and did not even record the battery of tests and results Dr. Brown conducted. Ex. 13, 34

To allow the District's IEP to pass muster solely because the District had access to Dr. Brown's evaluation and D.P.'s progress reports is to allow one IDEA violation (the failure to conduct and consider adequate evaluations) to justify another (the failure to have adequate present levels of performance), without ever considering the cumulative impact of these failures or the substantive effect on D.P.'s education.

SRO II and Hearing IHO both erred in finding that D.P.'s did not require OT and SLT. SRO II Dec. 25-28, IHO II 29-30. Both administrative fact finders ignored the Carmel progress reports and Dr. Brown's evaluations that indicated a need for such services. Ex. 34, Q.

Contrary to IHO II and SRO II's findings, the June 2019 CSE incorrectly concluded that

OT services were not needed, as D.P.'s motor skills could be adequately addressed in the classroom. Ex. 70 The CSE ignored that OT services address D.P.'s needs in the areas of executive functioning, attention, and keyboarding needs in the classroom, all of which interfere with his ability to learn in the classroom. Ex. 37- 8, I Ex. XIII Based on evidence from different sources delineating the extent of D.P.'s deficits in attention, fine motor skills, and sensory integration, the district failed to explain how these concerns could be addressed appropriately addressed without the support of OT. SRO II and IHO II failed to appropriately consider the overwhelming evidence that demonstrates D.P. required such service to make appropriate progress. Ex. 34, I Ex. XIII.

Similarly, SRO II and IHO II determined that D.P. did not require SLT to address his needs, despite the overwhelming evidence to the contrary. II Dec. 25-28, IHO II 29-30 The evidence supports a finding that D.P. required SPL; D.P. is diagnosed with Dyslexia, has significant deficits in pragmatic and written language skills, and difficulty with short-term memory retrieval; issues that speech-language therapy could address. Tr. 169; I Ex. 14 ¶12, 16. Mr. Dorn, even admitted that while SLT could address the issues D.P. exhibited, SL therapy was not considered in his case. Tr. 169. Dr. Brown's evaluation also opined that D.P. required SLT, as he presented with significant language processing issues representative in students with brain injuries and neurological issues that impair his word retrieval and rapid naming ability. I Ex. 14 ¶ 34, Ex. 34. D.P. also received SL therapy at PALS during the 2018-19 and 2019-20 SY, and progress reports were submitted to the CSE demonstrating his continued need for SL therapy for the 1920 SY. Ex. F, Q.

### b. SRO II and IHO II Erroneously Determined that the June 2019 Recommendations Provided D.P. the Least Restrictive Environment.

Contrary to the Defendants assertions, the IHO II inappropriately determined that the June 2019 CSE's recommendation of a 15:1 special class for Math, Science, Social Studies, and ELA, along with daily Resource Room (5:1) and Reading (5:1) was appropriate in the least restrictive environment. Def Memo. 24, Ex. 12, 13 IHO II failed to apply the correct standard

to determine that the June 2019 program recommendations was in the LRE. While IHO II articulated the legal standard for LRE, IHO II failed to appropriately apply standard to the facts of this case. IHO II Dec. 29-30.

The legal standard for LRE requires that the district provide the least restrictive setting *appropriate* for a student. *See Polera v. Bd. of Educ.,* 288 F.3d 478 (2d Cir. 2002) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1401(8), 1411(a)(1) & 1412(a)(5)(A) (emphasis added). The IDEA requires that a student's recommended program must be provided in the LRE. 20 U.S.C. §1412(a)(5)(A), 34 C.F.R. §§ 300.114(a)(2)(I), 300.116(a)(2), 8 N.Y.C.R.R. §§ 200.1(cc), 200.6(a)(1). Students with disabilities must be educated with nondisabled students to the maximum extent necessary and should not be removed from general education classes unless the nature of the disability is such that education cannot be satisfactorily achieved with the use of supplementary aids and services. The Second Circuit test for determining whether an IEP places a student in the LRE considers 1) whether general education in the classroom can be satisfactorily achieved with supplemental aids and services, and if not, 2)whether the school has mainstreamed the student for the maximum extent possible. *P. v. Newington Bd of Educ.*, 546 F 3d 111, at 119-20 (2d Cir 2008); *Application of the N.Y.C. Dep't of Education*, Appeal No. 14-034.

In finding that the June 2019 program recommendations were the LRE IHO II failed "to consider whether general education can satisfactorily be achieved with supplemental aids" and services, and if not, whether the school has mainstreamed the student for the maximum extent possible." *Id.* IHO II focused on the Parent's rejection of a full-time ICT program for the 2018-19 SY and the CSE's belief that "transitioning back to middle school would be difficult in the ICT setting, since his class at Carmel were small." IHO II Dec. 30.

IHO II, as well as the June CSE, failed to consider that at the time of the June 2019 review, D.P.'s program at PALS consisted of a small, self-contained class for ELA and Math (4 students, 1 teacher), received co-taught Social Studies and Science (20 students, 2 teachers), and mainstream electives. IHO Ex. VI ¶ 24, 34,VII ¶ 6, VIII ¶ 7, IX ¶7, XI¶ 6. D.P. had contact with typically developing students during all co-taught integrated classes, mainstream classes, including all specials and electives and during lunch and recess. IHO Ex.VI ¶ 34; VII ¶ 19, VI ¶ 32, 44 D.P. demonstrated that with the appropriate supports and supplemental aids, he could participate in a mainstream environment. IHO-VIII ¶13-14, IHO-XV ¶49-50. Thus, the evidence clearly demonstrates that general education can satisfactorily be achieved, with the appropriate supports, as demonstrated by D.P.'s program in PALS during the 2018-19 SY. IHO-VIII ¶13-14, Ex. Q.

In addition, Defendant did not sustain its burden of proof in demonstrating that recommendation was the LRE, as it chose not to present any substantive evidence regarding the specific placement, 15:1 Special Class for ELA Math, Science, Social Studies and the 5:1 Special Class for Reading and Resource Room at Tarrytown Middle School, offered to D.P. for the 1920 SY. TUFSD failed to refute the Parent's allegations that D.P.'s IEP was substantively inappropriate and that the program and placement would not have provided D.P. with the appropriate level of 1:1 support and instruction that he requires throughout the school day in the least restrictive environment. *See* record *generally*. SRO II simply rubber-stamped IHO's findings without analysis regarding LRE, and failed to correctly review the record, apply relevant law, or set forth sufficiently-supported conclusions of law and fact. SRO II Dec. 22-5 These findings, thus, do not warrant deference.

## II.    SRO II AND IHO II FAILED TO ISSUE A DETERMINATION REGARDING THE APPROPRIATENESS OF PALS.

To demonstrate a student's private school placement is appropriate, parents must show that the private placement is "reasonably calculated to enable their child to receive an educational

benefit." *Frank G.*, 459 F.3d at 364 (2d Cir. 2006); see also *Burlington*, 471 U.S. at 370. The parents' chosen private school placement is not required to meet the IDEA's definition of a FAPE, creating a less stringent standard of review. *Frank G.,* 459 F.3d at 364; see also *R.E.,*694 F.3d at 187 n.3. For example, the parents' chosen private school need not provide every related service a child is mandated for, nor employ certified special education teachers or otherwise meet state educational standards. *Frank G.*, 459 F.3d. at 364; *Carter, 510 U.S. at 14 (1993).*

SRO II and IHO II erred in failing to reach the issue of whether PALS appropriately addressed D.P.'s needs for the 2018-19 and 2019-20 SYs. A review of the record shows that the PALS program was individually tailored to D.P.'s needs and addressed his needs appropriately such that Plaintiffs satisfied their burden of proof under prong II of the <u>Burlington/Carter</u> test. *See supra*, p. 3-4,  IHO-VI, IHO-VII, IHO-IX, IHO-XI, IHO-XV¶ 23, Ex. III, YYY. Indeed, fact that the CSE relied so heavily upon D.P.'s Carmel progress report in developing D.P.'s IEP for the 2019-20 SY also "weighs in favor" of Carmel's appropriateness." *A.D. and M.D. v. Bd. Of Educ. Of the City Sch. Dist. of N.Y.C.*, 690 F. Supp 2d 193, 208 (S.D.N.Y. 2010), *see also* Tr. 246. Plaintiff respectfully refers the Court to Parent's Corrected Closing Brief (p.21-9), dated October 22, 2020, that more fully articulates appropriateness of PALS for D.P. for the 2018-19 and 2019-20 Sys. On the contrary, IHO I did address the appropriateness of PALS and determined that the program did appropriately address D.P. needs during the 2018-19 and 2019- 20 SY. IHO I Dec. 18-19, 39-44. IHO I explained the relevant statutory law and regulations, reviewed the facts, and came to a well-reasoned conclusion. *Id.* As such, this determination deserves deference. *See e.g. B.R. v. N.Y.C. Dep't of Educ.,* 910 F. Supp. 2d 670, 679 (S.D.N.Y. 2012)

### III.     <u>SRO II AND IHO II FAILED TO ISSUE A DETERMINATION REGARDING EQUITABLE CONSIDERATIONS.</u>

While both SRO II and IHO II failed to reach the issue regarding whether equitable considerations support Plaintiff's claims, IHO correctly found that equities favored Plaintiff. IHO

I Dec., p. 19-21, 23, 32, 34, 37-9, 44-6. Defendants has the burden of proof with regards to equitable considerations, and in the absence of evidence demonstrating that the parents failed to cooperate in the development of the IEP or otherwise engaged in conduct that precluded the development of an appropriate IEP, there is no equitable bar to a recovery of tuition. N.Y. EDUC. LAW § 4404(1)(c) (McKinney 2007). *See Mr. and Mrs. A. v. N.Y.C. Dep't of Educ.,* 769 F. Supp. 2d 403, 419 (S.D.N.Y. 2011). In making her findings on the equities, the IHO I explained the relevant statutory law and regulations, reviewed the facts, and came to a well-reasoned conclusion. *Id.* As such, this determination deserves deference. *See e.g. B.R.,* 910 F. Supp. 2d at 679 (S.D.N.Y. 2012).

There is no evidence or claim that the parent interfered with or hindered the district in any way in its obligation to provide D.P. with a FAPE. To the contrary, and by the district's own admission, the parent repeatedly expressed her concerns to the district, requested IEP review meetings to address those concerns, and put the district on notice of her concerns regarding their recommendations. Tr. 57-58; Ex. C, J. Plaintiff respectfully refers the Court to Parent's Corrected Closing Brief (p. 29-30), dated October 22, 2020, that more fully articulates that equities favor Plaintiff.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Cross Motion for Summary Judgment, deny Defendant's Motion for Summary Judgment, and find that Defendant failed to offer D.P. a FAPE for the 2018-19 and 2019-20 school years; that PALS was an appropriate placement for D.P. for the 2018-19 school years; equitable considerations favor the plaintiff; and awarding reimbursement for amounts paid towards D.P.'s tuition for the same period in the amount of $63,041.00. Plaintiffs further ask that the Court award them judgment as a matter of law, reverse the IHO II's and SRO's decisions, direct Defendant to reimburse Plaintiffs for the cost of D.P.'s attendance at Carmel during the 2018-19 and 2019-20 SYs and award them costs and attorney's fees, as well as any other such relief that the Court deems appropriate.

Dated: New York, New York
      July 17, 2023

              Respectfully Submitted,

              *s/Kristen M. Chambers*

              KRISTEN M. CHAMERS (5414800)
              Law Offices of Lauren A. Baum, P.C.
              171 Madison Avenue, Suite 300
              New York, New York 10016
              Telephone: (212) 644-4414
              Email: kchambers@nyspecialedlaw.com
              *Counsel for Plaintiffs*