UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
L.S., individually and on behalf of D.P.,

                                        Plaintiff,

        - against -

UNION FREE SCHOOL DISTRICT OF THE            **OPINION & ORDER**
TARRYTOWNS, also known as PUBLIC
SCHOOLS OF THE TARRYTOWNS, PUBLIC            No. 22-CV-10835 (CS)
SCHOOLS OF THE TARRYTOWNS' BOARD
OF EDUCATION, and CHRISTOPHER
BORSARI, in his official capacity as
Superintendent of Public Schools of the
Tarrytowns,

                                        Defendants.
-------------------------------------------------------------x

Appearances:

Kristen M. Chambers
The Law Offices of Lauren A. Baum, P.C.
New York, New York
*Counsel for Plaintiff*

Stephanie M. Roebuck
Keane & Beane, P.C.
White Plains, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court are the cross-motions for summary judgment of Plaintiff L.S., acting

individually and on behalf of D.P., (ECF No. 56), and of Defendants Union Free School District

of the Tarrytowns (the "District"), Public Schools of the Tarrytowns' Board of Education, and

Superintendent Christopher Borsari, (ECF No. 57).  Plaintiff brings this case pursuant to the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482,[1] the federal regulations implementing the IDEA, 34 C.F.R. § 300, *et seq.*, Article 89 of the New York Education Law, N.Y. Educ. Law § 4401, *et seq.*, and Part 200 of the New York State Education Department Rules and Regulations, 8 N.Y.C.R.R. § 200.1, *et seq.* (*See* ECF No. 28 ("FAC") ¶¶ 1, 141-44, 146.)

For the following reasons, Plaintiff's motion is DENIED and Defendants' motion is GRANTED.

## I.   **BACKGROUND**

The following facts are based on the Defendants' Local Civil Rule ("LR") 56.1 Statement, (ECF No. 59 ("Ds' 56.1 Stmt.")), Plaintiff's responsive 56.1 Statement, (ECF No. 65 ("P's 56.1 Resp."))[2], Defendants' 56.1 Reply, (ECF No. 60 ("Ds' 56.1 Reply")), and the administrative record,[3] and are undisputed unless otherwise noted.[4]

---

[1] The IDEA was amended in 2004 by the Individuals with Disabilities Education Improvement Act, Pub. L. No. 108–446, 118 Stat. 2647, but cases discussing the IDEA remain authoritative.

[2] The Court disregards ECF No. 62, which appears to be an incomplete version of ECF No. 65 that was filed in error.

[3] The Office of State Review has provided the Court with the administrative decisions of the Impartial Hearing Officers (each individually an "IHO") and the State Review Officers (each individually an "SRO"), along with the certified record of the impartial hearing, including hearing transcripts ("Tr."), exhibits, and post-hearing briefs. The pages of the hearing transcripts are numbered sequentially. At the impartial hearing, exhibits offered by the District were identified by number and exhibits offered by Plaintiff were identified by letter. (*See* Tr. at 5:5-19, 31:23-32:4.) For purposes of this decision, I will refer to Plaintiff's exhibits as "P's Ex.," Defendants' exhibits as "Ds' Ex.," and the IHO's exhibits as "IHO Ex."

[4] As the Court explained in its Order dated August 30, 2023, (*see* ECF No. 52), because a summary judgment motion in an IDEA case is "a pragmatic procedural mechanism for reviewing administrative decisions," *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) – rather than a typical summary judgment motion – strict adherence to LR 56.1 is not necessarily required and the Court may consider Defendants' reply to Plaintiff's 56.1 response, (*see* ECF No. 52). (Unless otherwise indicated, case quotations omit

A. **Facts**

1. **2015-2016 and 2016-2017 School Years**

D.P. first entered the District's schools during the 2015-2016 school year, when he was in

the fourth grade.  (Ds' 56.1 Stmt. ¶ 4.)[5]  During the 2015-2016 and 2016-2017 school years, D.P.

was enrolled in a special class for English Language Arts ("ELA") and integrated co-teaching

("ICT") classes for all his other subjects, while also receiving speech and language therapy

("SLT"), occupational therapy ("OT"), and counseling.  (*Id.* ¶ 5.)  The ICT model used by the

District calls for two certified teachers, one of whom is a general education teacher and one of

_____

all internal citations, quotation marks, footnotes, and alterations.)  That being said, the utility of
the parties' 56.1 submissions would have been enhanced had each party been more thorough
about the inclusion of specific citations to record evidence which they believed controverted a
given fact or facts asserted by the other party.  (*See, e.g.*, P's 56.1 Resp. ¶ 4 (citing to entire
exhibits without page numbers and hearing transcript pages without page lines, "respectfully
refer[ring] the court to the record for a complete and accurate statement of [an exhibit's]
content," and including a "*See also*, record generally" citation); *id.* ¶ 5 (citing to three defense
exhibits without page numbers); *id.* ¶ 19 (citing to complete exhibits to dispute the "validity and
appropriateness of . . . evaluations" with no additional context); *id.* ¶ 28 (denying "the
appropriateness of the [IEP] goals" and citing to complete exhibits while "respectfully refer[ring]
the court to the record a [*sic*] complete and accurate statement of their content"); Ds' 56.1 Reply
¶ 13 ("respectfully refer[ring] the Court to the . . . evaluation . . . for its full meaning and import"
with no additional context); *id.* ¶ 21 (stating "[t]he Court is respectfully referred to the cited
assessments, the results therein, and the testimony of those educators who interpreted the results
for the CSE for their full meaning and import" with no citation to record evidence); *id.* ¶ 47
(stating "Defendants submit that Plaintiff's [*sic*] misconstrues Mr. Dorn's testimony regarding
Dr. Brown's findings and the Court is respectfully referred to Mr. Dorn's Testimony and Dr.
Brown's evaluation for their full meaning and import," with no citation to record evidence).

The parties' failure to fully include specific citations has forced the Court to
painstakingly review much of their submissions with minimal guidance.  *See Bryant v. S.
Country Cent. Sch. Dist.*, No. 14-CV-5621, 2017 WL 1216553, at *7 (E.D.N.Y. Mar. 31, 2017)
("[T]o specifically controvert a statement of material fact, a nonmovant is required to do so *with
specific citation* to admissible evidence.") (emphasis added).  Further, it would have been helpful
to the Court if the parties had submitted reply briefs, for which the briefing schedule allowed,
(*see* Minute Entry dated Feb. 23, 2023; ECF Nos. 33, 35, 36, 38, 46, 50, 54), but neither party
submitted any briefing after their opening briefs.

[5] At all relevant times, D.P. was classified by the District's Committee on Special
Education (the "CSE") as Learning Disabled.  (Ds' 56.1 Stmt. ¶ 3.)

whom is a special education teacher.  (*Id.* ¶ 6.)  The parties dispute whether "D.P. made meaningful progress" while primarily enrolled in the District's ICT classes.  (*See* P's 56.1 Resp. ¶ 7.)

On April 13, 2016, D.P. was administered the Woodcock-Johnson IV Test of Cognitive Abilities, on which his General Intellectual Ability was scored as 78, his Comprehension-Knowledge Cluster was scored as 91, his Long-Term Retrieval Cluster was scored as 77, his Visual Processing Cluster was scored as 97, his Auditory Processing Cluster was scored as 90, his Fluid Reasoning Cluster was scored as 92, his Cognitive Processing Cluster was scored as 63, and his Short-Term Working Memory Cluster was scored as 97.  (Ds' 56.1 Stmt. ¶ 8; Ds' Ex. 22 at 2.)  In summarizing these results, the evaluator noted that D.P. "displayed strengths in fund of general knowledge, visual processing, nonverbal reasoning, and short-term working memory," with "[r]elative weaknesses . . . in the ability to recall details from stories heard aloud; performing complex procedures after instructions; and aspects of cognitive processing speed." (Ds' Ex. 22 at 4.)

An educational evaluation was also administered to D.P. on April 13, 2016.  (Ds' 56.1 Stmt. ¶ 10.)  As part of the "Behavioral Observations and Student Interview" findings, the evaluator noted that "the . . . assessment results may be an underestimate of [D.P.'s] true academic skill levels and potential," due to D.P.'s "very slow" pace of work completion and decreased effort and motivation during writing tasks.  (Ds' Ex. 23 at 1; *see* P's 56.1 Resp. ¶ 10.) The Woodcock-Johnson IV-Test of Achievement was administered to D.P. during the educational evaluation, and his scores were 83 for Basic Reading Skills, 81 for Reading

Comprehension, 83 for Math Calculation Skills, 91 for Math Problem Solving and 74 for Written Expression.  (Ds' Ex. 23 at 2; Ds' 56.1 Stmt. ¶ 11.)[6]

D.P. was also administered speech and language testing in March 2016, including the Clinical Evaluation of Language Fundamentals-5, the Goldman Fristoe Test of Articulation-3, and the Test of Pragmatic Language-Second Edition.  (Ds' 56.1 Stmt. ¶ 12; *see* Ds' Ex. 20 at 2-6.)  In summarizing D.P.'s scores on those assessments, the Speech-Language Pathologist noted that "[o]verall, [D.P.] demonstrated a [*sic*] no deficits in general language abilities, with all scores for receptive and expressive language subtests falling within the Average to Above Average range," but that D.P. "required extended time to answer many test items, often asked for repetition/slow rate of presentation of directions and test items, and expressed frustration when no visuals were provided on subtests."  (Ds' Ex. 20 at 7; *see* Ds' 56.1 Stmt. ¶ 13.)[7]

## 2.    D.P.'s Performance During the 2017-2018 School Year

D.P. attended the Sleepy Hollow Middle School in the District for the 2017-2018 school year as a sixth-grader.  (Ds' 56.1 Stmt. ¶ 14.)  In preparation for that year, the CSE met on March

---

[6] Plaintiff does not dispute these scores, but notes that Defendants' presentation of them omits where these scores fall in national percentiles, and that those percentile ranks "must be used" to understand D.P.'s performance.  (P's 56.1 Resp. ¶ 11.)  Plaintiff maintains that of the academic skills assessed by the Woodcock-Johnson IV-Test of Achievement administered on April 13, 2016, "D.P. ranked at the same level or higher as 20 percent of the nation on 8 skills and as 30 percent on the other 2 skills."  (*Id.*)

[7] Plaintiff, in conclusory fashion, asserts that the Speech-Language Pathologist failed to consider how D.P.'s needs for extended time, repetition/slow rate of presentation, and frustration when no visuals were provided would be greater in a classroom setting, but offers no evidence as to whether such considerations are appropriate in the context of the assessments administered, or any other explanation as to the significance of this failure.  (P's 56.1 Resp. ¶ 13.)  Similarly, she contends that "[t]he summary should have indicated the impact of below average pragmatic language skills [on] D.P.'s learning," with no evidentiary support for that premise or explanation as to how the omission of such analysis affected the Speech-Language Pathologist's findings, if at all.  (*Id.*)

6, 2017 to develop an individualized educational program ("IEP") for D.P.  (*Id.*)  The meeting included a review of his performance levels and needs, and resulted in the development of goals in the areas of study skills, reading, writing, mathematics, coping skills, and motor skills.  (*Id.*)  The CSE recommended that D.P. be placed in a special class for ELA, with a student-to-teacher ratio of 15:1, for 90 minutes per day, and that he be placed in daily 45-minute ICT classes for his remaining core subjects.  (*Id.*; *see* Ds' Ex. 5 at 1.)  The CSE further recommended that D.P. receive counseling and OT in small group settings; replaced his direct speech and language counseling with a monthly consultation between a speech language therapist and his special education teacher, as he did not demonstrate the need to continue direct speech language services; recommended certain classroom modifications, including additional time to complete assignments, modified homework, chunking assignments, frequent breaks, repeated directions, a graphic organizer, and preferential seating; and recommended testing accommodations, including double time, the use of break periods, on-task focusing prompts, flexible seating, and directions read aloud.  (Ds' 56.1 Stmt. ¶ 14; Ds' Ex. 5 at 8-10.)  Plaintiff disagreed with these recommendations and requested a program review, which resulted in some goals being added to the IEP and others being modified, when the CSE reconvened on April 19, 2017.  (P's 56.1 Resp. ¶ 15; *see* Ds' Ex. 6 at 1-2, 8-11.)  The CSE also recommended that D.P. be placed in a small group special class for math, which would meet daily for 45 minutes.  (Ds' Ex. 6 at 2; *see* Ds' 56.1 Stmt. ¶ 15.)

Defendants maintain that D.P. "excelled in the special math class, consistently receiving high scores on assignments," and that although he "was distracted in class, he was easily redirected by his teacher," who believed he could handle ICT material.  (Ds' 56.1 Stmt. ¶ 16; P's 56.1 Resp. ¶ 16; *see* IHO Ex. III ¶ 10.)  Given that performance, D.P. was informally

recommended for a trial placement in the ICT math class, which commenced in October 2017. (Ds' 56.1 Stmt. ¶ 16.)  The sixth grade ICT math class had 23 students during the 2017-2018 school year, nine of whom were classified with IEPs.  (*Id.* ¶ 17.)  According to Plaintiff, there was no evidence or objective data to support the premise that "D.P. excelled in the special math class" and D.P.'s placement in the ICT math class – which was originally intended to be a two-week trial – was extended because the CSE postponed its program review to January 17, 2018. (P's 56.1 Resp. ¶ 16.)

Plaintiff used email to discuss goal progress and communicate concerns to D.P.'s teachers during the 2017-2018 school year, including issues as to daily and weekly classes and assignments, and the implementation of the IEP.  (P's 56.1 Resp. ¶ 18.)  Plaintiff also requested several different evaluations for D.P., including a writing assessment, which was administered on December 1, 2017; an assistive technology evaluation, which was administered on January 3, 2018; and an OT evaluation, which was conducted at some point in January 2018.  (Ds' 56.1 Stmt. ¶ 19.)  At Plaintiff's request, the CSE held a program review on January 17, 2018, at which D.P.'s IEP was modified.  (*Id.* ¶ 20; *see* Ds' Ex. 7 at 1.)  Those modifications included recommending that D.P. be placed in ICT math, the addition of two study skill goals, the revision of one writing goal, and the removal of one math goal and D.P.'s motor skill goals.  (Ds' 56.1 Stmt. ¶ 20; Ds' Ex. 7 at 1, 7-8.)  Certain program modifications were also added to the IEP to address D.P.'s writing needs, including incorporating the use of a graphic organizer to assist him with the writing process.  (Ds' Ex. 7 at 10.)  D.P. was also assigned a 1:1 aide after the January 17, 2018 CSE meeting, which prompted Plaintiff to email the District concerning the aide's responsibilities.  (P's 56.1 Resp. ¶ 22.)

In the first quarter of the 2017-2018 school year, D.P. received a 93 in math, which reflected an average of his grades in the special class and the ICT class.  (IHO Ex. III ¶¶ 9, 12-13; *see* Ds' 56.1 Stmt. ¶ 21.)  On the September 2017 administration of the Aimsweb, a standardized assessment taken by all sixth grade students, D.P. scored a 206, which placed him in the 33rd percentile nationally and which was the highest score of all students in the special class for math.  (Ds' 56.1 Stmt. ¶ 21.)  D.P.'s grades in the ICT math class were based on three components:  75% reflected his performance on tests and quizzes, 10% reflected binders, and 15% reflected homework.  (*Id.*)  Based on those components, D.P. received an 81 in the ICT math class in the second quarter, a 73 in the third quarter, and a 73 in the fourth quarter.  (*Id.*; IHO Ex. IV ¶ 14.)  Katelynn DeGregorio, a special education teacher who taught D.P.'s ICT science and math classes during the 2017-2018 school year, was responsible for reporting on his progress toward his math goals.  (IHO Ex. IV ¶¶ 3, 5, 22.)  She noted that he achieved his first math goal of completing single-step word problems, as demonstrated through his classroom worksheets, and that while he made expected progress toward his second goal of multiplying fractions and mixed numbers with unlike denominators, he did not achieve the goal before the class started working on statistics in the fourth quarter.  (IHO Ex. IV. ¶¶ 22-23; Ds' Ex. 47 at 4-5.)  D.P. also made gradual progress on his third and fourth math goals.  (IHO Ex. IV. ¶¶ 24-25; *see* Ds' 56.1 Stmt. ¶ 21.)  When administered the Aimsweb again in Spring 2018, D.P. scored in the 27th percentile.  (Ds' 56.1 Stmt. ¶ 21.)[8]

---

[8] Plaintiff does not dispute any of the grades D.P. received in math during the 2017-2018 school year, but maintains that "the grades themselves misrepresent D.P.'s learning of the curriculum" and did not justify D.P.'s placement in the ICT math class, as his scores "demonstrated little improvement across the year."  (P's 56.1 Resp. ¶ 21.)

She also claims that were his first quarter math grade calculated using the ICT class scoring system, he would have received a grade of 83, rather than 93, (*id.*), and that certain of

On April 27, 2018, at Plaintiff's request, another program review was held at which D.P.'s academic performance and his need for an aide were discussed.  (Ds' 56.1 Stmt. ¶ 23.) The CSE elected to remove the 1:1 aide from the IEP, after determining that D.P. was not comfortable with that level of support in his classes.  (IHO Ex. I ¶ 28.)  The CSE also recommended that D.P. attend an academic support special class (15:1), which met three times per six-day cycle for 45 minutes, and where he would receive various forms of support including re-teaching, pre-teaching, directed help on long-term assignments, and assistance preparing for examinations.  (Ds' Ex. 8 at 1; IHO Ex. I ¶ 28.)  Finally, the CSE added certain social and emotional goals, included access to a word processor with text-to-speech software as a program modification, and recommended access to a computer (specifically, a Chromebook) during instructional time as an assistive technology.  (Ds' Ex. 8 at 9-12; Ds' 56.1 Stmt. ¶ 23.)  Plaintiff maintains that the aide was removed without documentation or two months of data to support the lack of need, that certain organizational issues increased after the aide's removal, and that the academic support contemplated by the April 27 IEP was not "individualized" to D.P. but instead "viewed broadly," requiring him to go to office hours either before or after school, "extend[ing] his already long day."  (P's 56.1 Resp. ¶ 23.)

---

D.P.'s initial low scores on quizzes in the ICT class were not reported to the CSE and instead, he was allowed to retake at least one quiz "two additional times to raise his score," (*id.*).

    As to the former, Plaintiff's suggestion that applying a different weighting to D.P.'s first quarter math grade does not suggest that the special education teacher's assessment that D.P. was more capable than other students in the special math class was erroneous, (IHO Ex. III ¶ 10), and as to the latter, DeGregorio testified that it is District policy to allow all students to correct mistakes on tests or quizzes to improve their grade, and any such corrections result in an award of partial credit, *i.e.*, students are not allowed to retake tests and quizzes.  (IHO Ex. IV. ¶ 16; Tr. at 477:22-478:9, 485:19-486:5.)

### 3.     2018-2019 CSE Meetings and IEPs

An annual review was held on May 31, 2018 to plan a program for D.P.'s seventh grade year, at which D.P.'s teachers provided reports on his present levels of performance and his anticipated needs for the upcoming 2018-2019 school year.  (Ds' 56.1 Stmt. ¶¶ 24-25.)  D.P.'s ELA teacher, Christine Markey-Jones, reported that he was reading on grade level while also demonstrating the need for special education support in certain areas of reading and writing.  (Ds' 56.1 Stmt. ¶ 25; IHO Ex. V. ¶¶ 32-33.)[9]  As to math, it was reported that D.P. was "comfortable with the concrete notion of mathematics," could correctly solve one-step word problems, would "often make[] mistakes due to his focusing struggles" but would "usually catch[]" them when redirected and asked to check his work, and was testing at grade level.  (Ds' Ex. 9 at 4; IHO Ex. I ¶ 30.)

The CSE also discussed D.P.'s social and emotional needs, including support for completing less desirable tasks independently and assistance with personal boundaries when interacting with his peers, and his organizational issues, including the fact that he still required reminders to write down his homework in his planner even though he had otherwise progressed in his ability to bring home the correct materials for his homework and otherwise increased his independence.  (Ds' 56.1 Stmt. ¶ 27.)

Given these needs, the CSE created several goals for D.P., including two study skills goals focused on independently placing his notes and handouts in the correct sections of his binder and folder and coming to school prepared with the required materials for all his classes; two reading goals aimed at D.P.'s ability to identify the main idea and draw inferences from a

---

[9] Plaintiff does not dispute that this information was reported, but maintains that Markey-Jones's testimony as to D.P.'s reading ability was "inconsistent" and that the underlying test data does not support her opinion that D.P. was reading on grade level.  (P's 56.1 Resp. ¶ 25.)

text; four writing goals concerning proper capitalization and punctuation, persuasive writing, and planning and revising written work; two math goals concerning division and two-step word problems; and two behavioral goals. (Ds' 56.1 Stmt. ¶ 28; Ds' Ex. 9 at 6-7.)

For the 2017-2018 school year, D.P. was in a special class for ELA that met daily for over 80 minutes. (Ds' 56.1 Stmt. ¶ 29.) That class had 11 other students, all of whom had learning deficits affecting their ability to read and write. (*Id.*) D.P.'s teacher reported that he was one of two students in the class able to read at a fifth-grade level, with the remaining students reading at between first and fourth grade levels, and that while D.P. actively participated in lessons involving the entire group and acted as a leader in small groups, he needed teacher support to manage individual materials and assignments. (Ds' 56.1 Stmt. ¶ 29; *see* Tr. at 552:5-555:5.) The ELA class made use of graphic organizers, word processors and speech-to-text applications, as identified in the program modifications in D.P.'s IEP. (Ds' 56.1 Stmt. ¶ 30.) As to grades, D.P. received a 92 for the first quarter, a 90 for the second, an 87 for the third, and an 81 for the fourth. (*Id.*) In the progress report provided for D.P.'s ELA class, his teacher indicated that he achieved both of his reading goals and his writing goal of writing and editing a one-paragraph essay. (*Id.*; *see* Ds' Ex. 47 at 3-4.)[10] D.P.'s ELA teacher testified that she considered him to be a proficient reader, based on his results on several standardized assessments, including Read 180, Aimsweb, and the CBM reading assessment. (Ds' 56.1 Stmt. ¶ 31; IHO Ex. V ¶ 22.) D.P. was administered the Read 180 assessment four times and received the following Lexile level scores:  a 957 in September 2017, a 920 in November 2017, an 877 in

---

[10] Plaintiff does not dispute that this information was reported, but argues that D.P.'s "grades steadily declined throughout that year" and that she was not provided certain material underpinning the teacher reports, including "actual completed worksheets," as independent evidence that D.P. achieved the goals in question. (P's 56.1 Resp. ¶ 30.)

February 2018, and a 920 in April 2018.  (Ds' 56.1 Stmt. ¶ 31; Ds' Ex. 59 at 2.)  Because his

April 2018 Read 180 score was in the proficient level, it was reported that he ended the 2017-

2018 school year reading on grade level.  (Ds' 56.1 Stmt. ¶ 31; IHO Ex. V ¶ 25; Ds' Ex. 59 at 2.)

The Aimsweb assessment was administered to D.P. twice; in Fall 2017 he scored in the

10th percentile nationally (a score of 409), which is considered well below average, and he

scored in the 22nd percentile (a score of 442) when the assessment was readministered in Spring

2018.  (Ds' 56.1 Stmt. ¶ 32; IHO Ex. V ¶ 27.)[11]  On the CBM reading assessment, he scored in

the 70th percentile in December 2017, the 80th percentile in January 2018, the 60th percentile in

February 2018, the 70th percentile in mid-March 2018, the 75th percentile in late March 2018,

and the 70th percentile in April 2018.  (IHO Ex. V ¶ 29; *see* Ds' 56.1 Stmt. ¶ 32.)

In his science class during the 2017-2018 school year, D.P. needed consistent refocusing

and redirection, which his teacher could sometimes accomplish by tapping on his desk or

kneeling by it.  (Ds' 56.1 Stmt. ¶ 35; IHO Ex. IV ¶ 9.)  D.P. also took short breaks to refocus and

required assistance to organize his work, which his teacher provided by making sure that he

wrote down homework assignments in his planner and checking his binder to ensure he brought

the right materials home.  (Ds' 56.1 Stmt. ¶ 35; IHO Ex. IV ¶ 10.)  D.P.'s grades in the science

class were made up of three components – homework, labs and assignments, and assessments.

(Ds' 56.1 Stmt. ¶ 35.)  He received a grade of 88 in science during the first quarter, 79 in the

second quarter, 87 in the third quarter, and 66 in the fourth quarter.  (*Id.*)  D.P.'s fourth quarter

---

[11] According to Plaintiff, D.P.'s low scores on the Aimsweb militate against a finding that
he was reading at grade level.  (*See* P's 56.1 Resp. ¶ 31.)  Markey-Jones, who administered the
Aimsweb to D.P., opined that the test was "particularly difficult for him" given his "attention
difficulties," as "[t]he Aimsweb . . . requires a student to remain focused for longer periods of
time and required reading stamina."  (IHO Ex. V ¶ 26.)  It does not appear that D.P.'s Aimsweb
reading scores were reported at either the May or June 2018 CSE meetings.  (*See* Ds' Ex. 9 at 3-
4; Ds' Ex. 10 at 3-4.)

grade was comprised of a 62 for assessments, a 100 for homework, and a 61 for labs.  (*Id.*)  As Plaintiff points out, (*see* P's 56.1 Resp. ¶ 35), D.P.'s science teacher Katelynn DeGregorio testified that D.P.'s science work did not get significantly harder in the fourth quarter, (Tr. at 467:2-4).

The CSE met on May 31, 2018 to perform an annual review, and the resulting IEP recommended ICT classes for all of D.P.'s core subjects for the 2018-2019 school year.  (*See* Ds' Ex. 9; Ds' 56.1 Stmt. ¶ 37.)  While the ICT class for ELA provided less support than D.P.'s ELA class for the 2017-2018 school year, (IHO Ex. V. ¶ 36), the CSE determined that such a reduction in support was appropriate due to the improvement in D.P.'s reading skills, (IHO Ex. I ¶ 39).  The CSE also recommended a daily, 45 minute 5:1 resource room program, counseling in a small group once every six day cycle for 30 minutes, and various program modifications, including additional time to complete assignments, breaking down assignments into smaller and more manageable parts, refocusing and redirection, access to a word processor, scaffolded note sheets or copies of class notes, the use of a graphic organizer, an additional set of textbooks at home, frequent breaks, special seating arrangements, and repeated directions.  (*See* Ds' Ex. 9 at 1, 8-10.)  As to testing accommodations, the IEP recommended that D.P. receive double time, break periods, on-task focusing prompts, directions read to him, and a flexible schedule for all tests.  (*Id.* at 10-11.)

Plaintiff disagreed with these recommendations and a program review was held on June 7, 2018, at which the CSE added a study skills goal that required D.P. to independently check out at the end of the day and be prepared with all the materials required for homework and studying, (Ds' Ex. 10 at 6), but made no other changes to the IEP, (Ds' 56.1 Stmt. ¶ 38; Ds' Ex. 10; IHO Ex. I ¶ 43).  On June 13, 2018, Plaintiff notified the District that she was unilaterally placing

D.P. in the Providing Alternative Learning Strategies ("PALS") program at Carmel Academy, a religious private school, for the 2018-2019 school year.  (P's Ex. C at 1; *see* Ds' 56.1 Stmt. ¶¶ 39, 54.)

The CSE met again on September 21, 2018 to review the 2018-2019 IEP in response to requests from Plaintiff.  (Ds' 56.1 Stmt. ¶ 40; IHO Ex. I ¶ 47.)  At that meeting, the CSE added to D.P.'s IEP two additional study skills goals concerning test-taking abilities and made no other changes.  (Ds' 56.1 Stmt. ¶ 40.)

### 4.    2019-2020 CSE Meetings and IEPs

In advance of D.P.'s reevaluation during the 2018-2019 school year, Plaintiff requested that an independent educational evaluation ("IEE") be performed.  (P's 56.1 Resp. ¶ 41.)  The District complied and retained Dr. Jane Brown, who performed the testing and drafted a report which was submitted to the District for consideration at the annual review meeting held in spring 2019.  (*Id.*; Ds' 56.1 Stmt. ¶ 41.)  As part of her evaluation, Dr. Brown administered fifteen tests and subtests to D.P., including the Wechsler Intelligence Scales for Children – Fifth Edition ("WISC-V"), the WIATT-III, the Beck Inventories II, and the Beery Test of Visual Motor Integration.  (Ds' 56.1 Stmt. ¶ 42; *see* Ds' Ex. 34 ("Brown Evaluation").)

In administering the WISC-V, Dr. Brown found that D.P.'s Full Scale IQ "is not considered to be the most accurate or reliable measure of [his] intellectual abilities," and "[i]nstead, it is appropriate and most beneficial to examine [D.P.'s] pattern of strengths and weaknesses across all areas assessed."  (Brown Evaluation at 38.)  To that end, the WISC-V results indicated that D.P.'s Verbal Comprehension Index ranged from low average to high average across three subtests, that his Visual Spatial Index and Fluid Reasoning skills were average, that his Nonverbal Ability Index and Working Memory skills were low average, and

that his Processing Speed, Cognitive Processing Index, and Naming Speed were borderline. (Brown Evaluation at 38-39; *see id.* at 15 ("[D.P.'s] verbal intellectual abilities are solidly high average," "[D.P.] scored at the 75th percentile on measures of vocabulary and real-world knowledge and his higher order verbal reasoning skills appear to be even more robust," and "[D.P.] is recognized as bright and able to comprehend at a much higher level than he can demonstrate in writing.").)

In administering the WIAT-III, Dr. Brown determined that D.P.'s "current reading rate, accuracy, and fluency fall well below grade level" and that "his profile is consistent with a student with rather severe Dyslexia." (Brown Evaluation at 45.) The Beery Test of Visual Motor Integration, which "evaluate[s] different neurological processes related to visual perception and motor skills that can impact learning and academic performance" was also administered, and placed D.P. in the 52nd percentile, "[r]esults consistent with scores from previous testing of [his] fine motor coordination skills." (Brown Evaluation at 52.) Dr. Brown further opined that D.P. "took about twice as long to complete [the Beery task] as is typical for students his age." (*Id.*)

D.P. was also administered the Anxiety, Depression, and Self Concept components of the Beck Inventories-II, which "measure the number, intensity, and frequency of various symptoms, behaviors, thoughts and perceptions to determine whether concerns in each area are more similar to the typical/non-clinical population of individuals the same age as the client . . . or whether responses are more similar to same-aged individuals with clinically significant issues and established diagnoses." (*Id.*; *see* Ds' 56.1 Stmt. ¶ 46.) While D.P. reported "mild depressive symptoms" and did "not demonstrate the degree of positive feelings about himself and his capabilities that would be expected for a student his age," there was no indication that his

responses were akin to those of individuals with significant issues or established diagnoses, as none of his scores were elevated.  (Brown Evaluation at 52.)

The District maintains that Dr. Brown's findings were generally consistent with what the CSE already knew about D.P. as to his attentional needs, processing speed, full scale IQ cognitive range, and deficits in reading and writing, (IHO Ex. I ¶ 60), with the exception that her testing indicated that D.P.'s academic skills were weaker than what he demonstrated in a classroom setting, (Ds' 56.1 Stmt. ¶ 47).[12]

The CSE's first annual review meeting to plan for the 2019-2020 school year occurred on May 28, 2019.  (*Id.* ¶ 48.)  The CSE recommended several goals for D.P., including a study skills goal of learning three new strategies to help remember material and demonstrating those strategies when completing class assignments, projects, or tests, (Ds' Ex. 12 at 6), two reading goals focused on sixth grade level content, (*id.*), and five writing goals which concerned appropriate grammar, correct capitalization and punctuation, correct spelling, and the drafting of a one paragraph "formal argument," (*id.*; *see* Ds' 56.1 Stmt. ¶ 49).

The CSE recommended that D.P. be placed in special classes for the 2019-2020 school year, including:  Special Class (5:1) Reading, daily for 45 minutes; Special Class (15:1) Math,

---

[12] Plaintiff "strongly disputes" this claim as misstating the full extent of Dr. Brown's findings.  (P's 56.1 Resp. ¶ 47).  But in so doing, she primarily points to Dr. Brown's proposed interventions, (*see id.*), rather than her assessments of D.P.'s evaluation results and characteristics, which largely comport with the issues of which the District was aware.  In particular, Dr. Brown determined that D.P.'s "verbal intellectual abilities are solidly high average," (Brown Evaluation at 15); that his Full Scale IQ results were average, and "not considered to be the most accurate or reliable measure of [his] intellectual abilities," (Brown Evaluation at 38-39); that he exhibited "severe symptoms of 'ADHD,'" (Brown Evaluation at 19; *see id.* at 20-21); that his processing speed "was an area of relative weakness compared to his overall ability," (Brown Evaluation at 42); and that his reading and writing skills were below grade level, (Brown Evaluation at 44-46).  Such findings largely align with those identified by the District in its IEPs for the relevant school years.  (*See, e.g.*, Ds' Exs. 5-9.)

daily for 45 minutes; Special Class (15:1) Science, daily for 45 minutes, Special Class (15:1) Social Studies, daily for 45 minutes, and Special Class ELA (15:1), daily for 45 minutes.  (Ds' Ex. 12 at 1; *see* Ds' 56.1 Stmt. ¶ 50.)  The CSE also recommended a Resource Room Program (5:1), daily for 45 minutes, and that D.P. receive small group counseling twice a month for 30 minutes.  (Ds' Ex. 12 at 1.)  The CSE largely continued the 2018-2019 IEP's recommendations for D.P.'s program modifications, with the exception of an additional "Check for Understanding" modification.  (Ds' 56.1 Stmt. ¶ 50; Ds' Ex. 12 at 9; *see* Ds' Ex. 11 at 8-10.)  The CSE also elected to retain all of the testing accommodations previously recommended in the 2018-2019 IEP and added in a "Method of presentation" accommodation requiring one math problem per page for all math tests, except as prohibited by New York State.  (Ds' Ex. 12 at 10-11; *see* Ds' Ex. 11 at 11.)

The CSE held another meeting on June 19, 2019, at which Dr. Brown was present and reviewed her findings.  (Ds' 56.1 Stmt. ¶ 51; IHO Ex. I ¶ 59; Ds' Ex. 13 at 1.)  Occupational Therapist Mario Pellegrino was also present at the June 19 meeting and reported that D.P. did not have any physical or developmental needs, as his fine motor skills were average, his handwriting was legible, and his typing skills were sufficient.  (IHO Ex. I ¶ 61; Ds' Ex. 13 at 5; Ds' Ex. 41.)  Upon hearing these reports, the CSE finalized D.P.'s IEP for the 2019-2020 school year.  (*See generally* Ds' Ex. 13.)

On August 19, 2019, Plaintiff informed the District that she would be returning D.P. to Carmel Academy.  (P's Ex. J at 1; *see* Ds' 56.1 Stmt. ¶ 52.)

B. **Procedural History**

1. **Requests for Due Process**

On September 27, 2019, Plaintiff filed a Request for Due Process before an Impartial Hearing Officer ("IHO") alleging that the District did not offer D.P. a free and appropriate public education ("FAPE") for 2018-2019 because the CSE failed to (1) develop a procedurally and substantively appropriate IEP; (2) adequately review and consider sufficient and appropriate evaluative and documentary material to justify its recommendations; (3) provide Plaintiff with a full or meaningful opportunity to participate in the development of D.P.'s IEP; (4) evaluate D.P. in all areas of suspected disability; (5) adequately identify D.P.'s present levels of performance or deficit areas; (6) adequately identify and address D.P.'s learning and social-emotional issues and recommend appropriate interventions and services to address those issues; (7) adequately recommend appropriate, objectively measurable goals and short term objectives to assess D.P.'s progress; (8) adequately consider or recommend an appropriate program for D.P.; and (9) recommend a special education program and services tailored to D.P.'s needs.  (P's Ex. A at 1-2; *see* Ds' 56.1 Stmt. ¶ 57.)  Plaintiff sought a finding by the IHO that the District failed to provide D.P. with a FAPE for the 2018-2019 school year, as well as reimbursement for Carmel Academy tuition and related services and fees.  (P's Ex. A at 11.)

On January 17, 2020, Plaintiff filed a second Request for Due Process alleging that the District failed to offer D.P. a FAPE for 2019-2020, for substantially the same reasons set forth in her September 27, 2019 request, while also alleging that the CSE failed to provide Plaintiff and D.P.'s educators and school representatives from Carmel Academy with a meaningful opportunity to participate in the development of D.P.'s IEP, failed to consult them as to appropriate recommendations and goals for D.P., and failed to consider the concerns of Plaintiff

and individuals from Carmel Academy as to D.P.'s regression during breaks.  (P's Ex. B at 1.)
The January 17 Request for Due Process sought a finding from the IHO that the District failed to
provide D.P. a FAPE for the 2019-2020 school year and also requested reimbursement for
Carmel Academy tuition and related services and fees.  (*Id.* at 6.)

### 2.    First Impartial Hearing Officer Decision

The Requests for Due Process were consolidated into one hearing before IHO Audrey
Daniel ("IHO I"), who conducted the hearing across ten dates between April 14, 2020 and
August 6, 2020, (Ds' 56.1 Stmt. ¶ 57).

The IHO issued her lengthy Findings of Fact and Decision in favor of Plaintiff on
November 5, 2020.  (Ds' 56.1 Stmt. ¶ 58; Findings of Fact and Decision of IHO Audrey Daniel,
dated Nov. 5, 2020 ("IHO I Decision").)  She determined that "the [District] denied [D.P.] a
[FAPE] for the 2018-2019 and 2019-2020 school years" and ordered that the District reimburse
Plaintiff for the tuition and costs associated with D.P.'s enrollment at Carmel Academy – which
she held to be an appropriate placement – for those years.  (IHO I Decision at 44, 48.)  In so
ordering, she found that "the District failed to prove the appropriateness of the recommended
programs for the 2018-2019 and 2019[-2020] school years, as it failed to properly evaluate
[D.P.] in all areas of suspected disability and develop an appropriate IEP," that "the District did
little to satisfactorily dispute Dr. Brown's findings," and that "the District failed to provide
speech-language or occupational therapy, which, based on evidence from [D.P.'s] related service
providers, in addition to Dr. Brown's findings, was much needed to address [his] deficits."  (*Id.*
at 38-39; *see* Ds' 56.1 Stmt. ¶ 58.)[13]

---

[13] IHO I also determined that the District should have provided extended school year
("ESY") services to D.P. for the 2019-2020 school year.  (IHO I Decision at 28.)

### 3.   First State Review Officer Decision

The District appealed IHO I's decision to the New York State Education Department's State Review Office, contending that IHO I:  (1) incorrectly held that the District failed to evaluate D.P. in all areas of suspected disability; (2) incorrectly found that the CSE failed to appropriately review and consider an independent neuropsychological evaluation; (3) incorrectly held that the goals developed by the CSE for the 2018-2019 school year were not appropriate for D.P.; (4) incorrectly found that the District failed to prove that its recommended programs for the 2018-2019 and 2019-2020 school years were appropriate for D.P.; (5) repeatedly and inappropriately relied on Dr. Brown's evaluation and testimony, even in connection with determinations or decisions made by the CSE when it did not have access to Dr. Brown's evaluation, and inappropriately called for the District to invalidate Dr. Brown's conclusions to justify its failure to adopt all of the recommendations in Dr. Brown's evaluation; (6) improperly discounted the District's obligation to educate D.P. in the least restrictive environment ("LRE"); (7) incorrectly found that the District's recommendation not to provide ESY services for D.P. for the 2019-2020 school year was not reasonable; (8) incorrectly held that Carmel Academy was an appropriate placement for the 2018-2019 and 2019-2020 school years, as Carmel did not provide instruction tailored to D.P.'s needs and D.P. did not demonstrate sufficient progress at Carmel; and (9) incorrectly awarded tuition reimbursement to Plaintiff, in violation of equitable considerations.  (Amended Request for Review, IHO Case No. 531901 at 2-3; *see* Ds' 56.1 Stmt. ¶ 59.)

Plaintiff responded by submitting a Verified Answer and Cross Appeal, in which she argued that IHO I's decision was correct as to her findings of fact and conclusions of law establishing that the District denied D.P. a FAPE for the 2018-2019 and 2019-2020 school years

and requested that the SRO deny the District's appeal with prejudice and sustain her cross-appeal.  (Verified Answer & Cross Appeal, IHO Case No. 531901 at 1-2; *see* Ds' 56.1 Stmt. ¶ 59.)

The first SRO ("SRO I") sustained the District's appeal in part and denied Plaintiff's cross-appeal in a 21-page, single-spaced decision.  (*See* Decision of a State Review Officer No. 20-190, dated Mar. 31, 2021 ("SRO I Decision").)  SRO I determined that IHO I failed to assess the adequacy of the evaluative information available to the June 2018 CSE and instead, relied on unavailable evaluation results – including Dr. Brown's and reports from Carmel Academy – "to retroactively make findings regarding the sufficiency of the then available evaluative information and the program the CSE recommended for [D.P.]," such that IHO I's determinations as to the CSE's development of the 2018-2019 IEP "must be overturned and an assessment must be made as to the sufficiency of the information the June 2018 CSE had at the time it developed [D.P.'s] IEP for the 2018-19 school year."  (SRO I Decision at 12.)  SRO I also found that "[d]ue to the IHO's improper reliance on [Dr. Brown's] neuropsychological evaluation and Carmel reports that were not available to the June 2018 CSE, and the overlooked manner in which exhibits were dated, remand of this matter to determine what evaluative information the June 2018 CSE considered and to address the parent's allegations related to the 2018-19 . . . school year programing without reliance on information not available to the [D]istrict at the time of the CSE meetings is appropriate."  (*Id.*)

SRO I then determined that IHO I made a factual error in concluding that the District did not adopt any of the recommendations contained in Dr. Brown's evaluation when developing D.P.'s 2019-2020 IEP, as a review of the record evidence showed that the CSE "did in fact include some of the recommendations . . . albeit not verbatim, such as that [D.P.] receive specific

reading instruction, and small, special class placements for all academic areas of instruction and to address executive functioning deficits." (*Id.* at 16.) SRO I noted that other recommendations made by Dr. Brown were similarly included in the IEP, including verbal redirection; a reduction in the length of writing assignments; fewer problems on math assignments; breaking down assignments into smaller, more manageable parts with all assignments scaffolded; access to technology (namely a Chromebook with "Google Read and Write" software); and various modifications to testing, among other things. (*Id.*) As such, SRO I found that the June 2019 IEP "included a number of [Dr. Brown's] recommendations . . . and while the CSE may not have adopted all of [her] recommendations, the evidence in the hearing record . . . provides ample support showing that her report was considered by the CSE." (*Id.* at 17.)[14]

As to related services, including SLT and OT, SRO I determined that the record was unclear as to what information the June 2019 CSE had available to it concerning D.P.'s speech-language skills and needs, and remanded the issue to the IHO to determine what information was available and the appropriateness of the CSE's recommendations for the 2019-2020 school year absent those services. (*Id.* at 19.) SRO I also found that the June 2019 CSE's determination that

---

[14] In a footnote, SRO I indicated that he "could understand if a CSE was skeptical of some [of Dr. Brown's] conclusions," as certain phrasing used in her report was "tantamount to almost no one can educate [D.P.]," a position which SRO I "d[id] not believe . . . is realistic." (SRO I Decision at 17 n.13.) SRO I further noted that "while [Dr. Brown] offered additional insight as to the underlying causes of [D.P.'s] deficits, some aspects of her report were over the top to the point of indicating that only certain teachers could be successful in educating [him]" and that "[o]verall [she] sent a very complex message to the CSE that at times focused on ensuring that [D.P.] had access to intellectually stimulating curriculum that was at or above grade level, yet at the same time acknowledging that the student has severe deficits in attention, executive function, and metacognitive control and would do better with functional activities like developing a flyer in or using a tape measure to learn fractions, which are not grade-level activities." (*Id.*)

D.P. did not require 12-month services in order to prevent substantial regression was reasonable and that D.P. was not denied a FAPE on that basis.  (*Id.* at 21.)[15]

In conclusion, SRO I explained that because it

> found that the IHO's determinations that the student was denied a FAPE for the 2018-19 and 2019-20 school years were based on faulty premises, the IHO's decision must be overturned and the matter must be remanded for reconsideration by the IHO . . . .  In addition, having determined that the [D]istrict did not deny the student a FAPE by not recommending 12-month services for the 2018-19 or 2019-20 school years, the IHO need not further address the merits of the parent's claims related to 12-month services.  The IHO must allow the parties a further opportunity to be heard on which information was precisely before the CSE and avoid retrospective analysis of the student's IEPs in light of the rule requiring a prospective analysis of a student's IEP . . . .

(*Id.*; *see* Ds' 56.1 Stmt. ¶ 61.)

### 4.    Second Impartial Hearing Officer Decision

Because IHO I was unavailable, IHO Jeanne M. Keefe ("IHO II") was appointed on September 23, 2021, to consider the matter on remand.  (Findings of Fact and Decision on Remand of IHO Jeanne M. Keefe, dated May 6, 2022 ("IHO II Decision") at 3, 3 n.1, 32; *see* Ds' 56.1 Stmt. ¶ 62.)  IHO II issued her Findings of Fact and Order on Remand on May 6, 2022, confining her findings "to the narrow scope of the remand, based on the transcripts, evidence and testimony entered into the record of the underlying hearing," noting that "[t]he parties agreed that the record did not require any additional testimony or evidence."  (IHO II Decision at 4-5.)

In a 32-page, double-spaced decision, she: (1) credited the testimony of District witnesses and the evidence entered regarding the 2017-2018 school year and the CSE meetings for D.P.'s 2018-2019 IEPs, and determined that the CSE at the May 31 and June 7, 2018 meetings had

---

[15] Separately, SRO I determined that IHO I correctly found that D.P. did not qualify for 12-month services during the summer of 2018 and denied Plaintiff's cross appeal on that issue. (SRO I Decision at 13-14.)

sufficient information to develop an IEP for D.P. for the 2018-2019 school year, which provided

him with a FAPE and was reasonably calculated to confer an educational benefit to him and

allow him to make progress in light of his circumstances, (IHO II Decision at 25; *see id.* at 20-

21); (2) found that review of the 2019-2020 IEP demonstrated that many of its proposed

modifications and accommodations were similar to those recommended by Dr. Brown, and in

any event, the District was free to disagree with Dr. Brown's recommendations, (*id.* at 27-28);

(3) concluded that the information available to the District – including an OT evaluation it

conducted and the prior recommendations of its speech therapist – indicated that D.P. did not

require OT or speech language therapy, (*id.* at 30-31)[16]; and (4) determined that the CSE at its

meetings on May 28, 2019 and June 19, 2019 had sufficient information to develop D.P.'s IEP

for the 2019-2020 school year and that the goals, program, and accommodations contained

therein provided him with FAPE, (*id.* at 31).

### 5.    Second State Review Officer Decision

On June 15, 2022, Plaintiff appealed IHO II's decision to the Office of State Review.

(Ds' 56.1 Stmt. ¶ 66.)  She argued that IHO II: (1) incorrectly found that the District offered D.P.

a FAPE for the 2018-2019 and 2019-2020 school years; (2) misinterpreted and misused the

available testimony and documentary evidence in making those findings; (3) misapplied the law

when determining that the June 2019 CSE was not required to review and discuss Dr. Brown's

evaluation, while also erroneously determining that the June 2019 CSE incorporated many of Dr.

Brown's recommendations, and (4) failed to consider the appropriateness of the PALS program

---

[16] IHO II also noted that the record contained no specific recommendations for speech language therapy from either Dr. Brown or Carmel Academy personnel, (IHO II Decision at 31), but that Dr. Brown did recommend that D.P. receive OT services, contrary to the findings made by the District's Occupational Therapist based on his evaluation of D.P. in June 2019, (*id.* at 19, 31).

at Carmel Academy, such that tuition reimbursement for the 2018-2019 and 2019-2020 school years was improperly denied. (*See* Decision of a State Review Officer No. 22-077, dated Aug. 22, 2022 ("SRO II Decision") at 7-8, 28.)

The second SRO ("SRO II") issued a 28-page, single-spaced decision denying Plaintiff's appeal in its entirety. (*See generally id.*; Ds' 56.1 Stmt. ¶ 67.) As to Plaintiff's first argument, SRO II found that IHO II correctly concluded that the District offered D.P. a FAPE for the 2018-2019 school year even though D.P. "was not making linear progress throughout the 2017-18 school year," because the record demonstrated that the CSE reviewed extensive information concerning D.P.'s needs, accurately described his present levels of performance in the June 2018 IEP, formulated annual goals addressing his needs, and offered him placement in general education classes with the support of ICT services and a resource room, a program reasonably calculated to provide him with a FAPE based on the available information. (SRO II Decision at 19-20.)

As to the 2019-2020 school year, SRO II conducted a thorough review of the information available to the June 2019 CSE and rejected Plaintiff's argument that the District failed to develop an appropriate IEP because it did not utilize all of Dr. Brown's recommendations. (*Id.* at 21.) In so doing, SRO II determined that Dr. Brown's evaluation was appropriately considered, comported with much of what the District already knew about D.P.'s capabilities and psychological profile, and that while the June 2019 CSE did not implement all of Dr. Brown's recommendations, it nevertheless made several changes to D.P.'s IEP for the 2018-2019 school year, which mirrored certain recommendations called for by Dr. Brown, including changes to recommended class size, supplementary aids and services, programming modifications and accommodations, and the use of assistive technology. (*See id.* at 24.)

Finally, SRO II reviewed the information available to the June 2019 CSE concerning speech-language therapy and OT, including Dr. Brown's evaluation and reports from Carmel Academy personnel, and determined that "there is not enough support in the hearing record to depart from [IHO II's] finding that the June 2019 CSE offered [D.P.] a program that was reasonably calculated to provide [him] with an educational benefit without including a recommendation for OT or speech-language therapy." (*Id.* at 28.)

### 6.      The Instant Action

Plaintiff filed her initial Complaint on December 23, 2022, (*see* ECF No. 9), and her First Amended Complaint ("FAC") on February 23, 2023, (*see* ECF No. 28). The FAC seeks (1) a declaratory judgment in Plaintiff's favor finding that Defendants violated D.P.'s rights; and (2) an order finding that the District failed to offer D.P. a FAPE for the 2018-2019 and 2019-2020 school years and awarding reimbursement of tuition for those school years. (*Id.* at 36.)

## II.   LEGAL STANDARDS

### A.   Summary Judgment Standard for IDEA

Motions for summary judgment customarily resolve IDEA actions in federal court. *See Antonaccio ex rel. Alex v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003). Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. *See id.* Rather, as noted, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009). In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is

appropriate." 20 U.S.C. § 1415(i)(2)(C); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016). The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129; *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of the City of N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of

the state authorities" – that is, the SRO's decision.  *A.C.*, 553 F.3d at 171.  Reviewing courts

should also be mindful that they are not to "substitute their own notions of sound educational

policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.

Accordingly, "a court must defer to the SRO's decision on matters requiring educational

expertise unless it concludes that the decision was inadequately reasoned," *R.E. v. N.Y. City*

*Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations

regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to

"the application of expertise and the exercise of judgment by school authorities" is appropriate

where they "offer a cogent and responsive explanation for their decisions."  *Endrew F. ex rel.*

*Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017).

### B.  <u>Provision of a FAPE and Unilateral Placement in Private Schools</u>

"The IDEA requires States receiving federal funds to provide 'all children with

disabilities' with a FAPE," which includes "'special education and related services' tailored to

meet the unique needs of a particular child."  *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735,

741 (2d Cir. 2018) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)).  Related

services include "transportation, and such developmental, corrective, and other supportive

services . . . as may be required to assist a child with a disability to benefit from special

education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled

children.'"  *Mr. P*, 885 F.3d at 741 (quoting *Endrew F.*, 137 S. Ct. at 994).  The IEP must be

developed annually by "[a] school official qualified in special education, the child's teacher, the

child's parents, and, where appropriate, the child."  *Walczak*, 142 F.3d at 122.  "A school district

meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with

the IDEA's procedural and substantive requirements." *N.B. v. N.Y. City Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'"  *Mr. P*, 885 F.3d at 748 (quoting *Endrew F.*, 137 S. Ct. at 1001).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress."  *N.B.*, 711 F. App'x at 32.  But "[w]hat the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132.

In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment," *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)), known as the "LRE."  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).  "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers."  *Id.* at 161; *see* 34 C.F.R. § 300.116 ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled.").  To determine whether a student's placement is the LRE, courts consider (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved

satisfactorily for a given child," and (2) "if not, then whether the school has mainstreamed the child to the maximum extent appropriate." *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120 (2d Cir. 2008).

"New York's regulations implementing the goals of the IDEA 'appear to track the IDEA closely.'" *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b.  Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student."  N.Y. Educ. Law § 4404(1); *see also* 20 U.S.C. § 1415(b)(6)(A) (same).  Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2).  Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision.  *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a school district fails to offer a FAPE, parents may unilaterally enroll their child in private school and seek tuition reimbursement." *Jusino v. N.Y. City Dep't of Educ.*, 700 F. App'x 25, 27 (2d Cir. 2017) (summary order); *see Bd. of Educ. of Poughkeepsie City Sch. Dist. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) ("If a state receiving IDEA funding fails to give a disabled child a FAPE . . . the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state."). "Reimbursement is granted only when (1) the proposed IEP failed to provide the student with an appropriate public education; (2) the parent's private placement was appropriate to the child's needs; and (3) equitable considerations support the parent's claim." *Jusino*, 700 F. App'x at 27;

*see R.C. v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 15-CV-5848, 2016 WL

5477747, at *10 (S.D.N.Y. Sept. 29, 2016) ("Parents who seek such reimbursement must satisfy

the three-pronged *Burlington/Carter* test . . . ."). Under New York law, the school district "bears

the burden of establishing the validity of the IEP, while the parents bear the burden of

establishing the appropriateness of the private placement." *T.K. v. N.Y. City Dep't of Educ.*, 810

F.3d 869, 875 (2d Cir. 2016).

## III.  DISCUSSION

### A.  The 2018-2019 School Year

Plaintiff argues that SRO II[17] (1) erroneously determined that the proposed June 2018

IEP was appropriate based on inflated and inaccurate progress reports from the 2017-2018

---

[17] Throughout Plaintiff's papers she directs the bulk of her arguments at both SRO II and IHO II, but for purposes of this decision, the Court will focus its analysis on SRO II's decision, as that is the final decision of the state authorities on appeal and it does not conflict with any of IHO II's determinations. *See B.D. v. Eldred Cent. Sch. Dist.*, 661 F. Supp. 3d 299, 312 (S.D.N.Y. 2023) ("Reviewing courts defer to the final decision of the state authorities, that is, the SRO's decision.").

Additionally, Plaintiff contends in conclusory fashion that SRO I's decision to vacate and remand IHO I's decision "was arbitrary, an abuse of discretion, and unsupported by the record," (P's Mem. at 8), that "SRO I should not have remanded IHO I's decision," (*id.*), and that "SRO I inappropriately remanded the matter to consider the appropriateness of the 2019-20 recommendations absent [speech/language and OT] services," (*id.* at 26). But Plaintiff has developed no argument in support of these claims, let alone demonstrated by a preponderance of the evidence that SRO I's decision to vacate and remand was in error. "Accordingly, the Court will not address any of [Plaintiff's] undeveloped legal assertions." *Spectrum Ne., LLC v. City of Rochester*, No. 21-CV-6453, 2022 WL 787964, at *4 (W.D.N.Y. Mar. 15, 2022) ("It is not the Court's responsibility to develop [a litigant's] scattershot assertions into discernible legal arguments."); *see Dahn v. Comm'r of Soc. Sec.*, No. 18-CV-1507, 2020 WL 5554510, at *2 (W.D.N.Y. Sept. 17, 2020) ("Because it is not the Court's responsibility to develop arguments on a party's behalf, the Court declines to address any such conclusory claims, and instead confines its analysis to those arguments that [Plaintiff] has meaningfully briefed."). Insofar as Plaintiff's motion can be read to challenge any other aspects of SRO I's decision – which largely appears to be coextensive with SRO II's decision – such arguments will be analyzed in the context of SRO II's decision.

school year which were belied by D.P.'s declining grades; and (2) incorrectly concluded that the CSE had sufficient evaluative information to support its recommendations for the 2018-2019 school year, resulting in D.P. being denied a FAPE for that year. (*See* ECF No. 61 ("P's Mem.") at 10-25.) Defendants, in turn, contend that SRO II correctly determined that D.P. was provided a FAPE for the 2018-2019 school year in a well-reasoned and detailed decision, such that Plaintiff is not entitled to tuition reimbursement for that school year. (*See* ECF No. 58 ("Ds' Mem.") at 6-15.)

### 1.   D.P.'s 2017-2018 Grades

Plaintiff maintains that while SRO II acknowledged that D.P.'s grades declined in three of his four core academic classes during the 2017-2018 school year, (*see* P's Mem. at 11; SRO II Decision at 11), SRO II nevertheless "failed to appropriately consider the impact of declining grades," (P's Mem. at 11), for several reasons.

First, Plaintiff argues that SRO II "ignored testimony and evidence that indicated that D.P.'s grades during the 2017-2018 [school year] should be reviewed with caution." (*Id.* at 12.) But her primary basis for such caution – that D.P. was purportedly "allowed to retake quizzes multiple times a year just to achieve a passing grade," (*id.*) – is not borne out by the record. Instead, the record reflects that all students in sixth grade math were allowed to correct mistakes on tests and quizzes for partial credit, (IHO Ex. IV ¶ 16), and the record contains only one such quiz on which D.P. made such corrections, (*see* P's Ex. Z; Tr. at 484:17-487:15).[18]

D.P.'s correction of a quiz for partial credit does not suggest that SRO II failed to consider D.P.'s grades during the 2017-2018 school year with an appropriate amount of caution,

---

[18] Plaintiff appears to have made an identical argument before IHO II, who rejected it on similar grounds. (*See* IHO II Decision at 24.)

particularly as SRO II correctly recognized that although D.P. "received passing grades throughout the 2017-18 school year," his "grades in three of his four core academic classes declined as the year went on," (SRO II Decision at 11), such that he "was not making linear progress," (*id.* at 19).[19]  Plainly, SRO II did not, as Plaintiff suggests, "inappropriately rel[y] on D.P.'s grades to support that D.P. made progress during the 2017-2018 school year," (P's Mem. at 12), but instead accurately represented the nature of D.P.'s inconsistent grades and treated them as one piece of the evaluative evidence in the record, all of which he considered in the aggregate when reaching his well-reasoned decision, (*see* SRO II Decision at 11-20).  SRO II was correct in concluding that declining grades did not mean that D.P. was not learning or making educational progress.  Grades are but one part of the picture.  Good grades in a modified curriculum do not necessarily equate to educational progress, *R.N. v. Bd. of Educ. for Iroquois Cent. Sch. Dist.*, No. 14-CV-211, 2016 WL 11607329, at *19 (W.D.N.Y. Nov. 15, 2016), *report and recommendation adopted*, 2019 WL 2170758 (W.D.N.Y. May 20, 2019), *aff'd sub nom. A.N. v. Bd. of Educ. for Iroquois Cent. Sch. Dist.*, 801 F. App'x 35 (2d Cir. 2020), and "failing grades are not dispositive," *Sherman v. Mamaroneck Union Free Sch. Dist.*, 340 F.3d 87, 93 (2d Cir. 2003).  Rather, "grades must be viewed in light of the evidence as a whole," *id.*, which is what SRO II did.  *See M.N. v. Katonah-Lewisboro Sch. Dist.*, No. 14-CV-3485, 2016 WL 4939559, at *11 (S.D.N.Y. Sept. 14, 2016) (noting that passing grades "are [a] generally accepted indicator[] of satisfactory progress" and upholding SRO's determination that student was making progress where "it is clear from the face of his well-reasoned decision that the SRO considered a variety of measures, including . . . grades and testing scores").

---

[19] That a student's progress is not linear does not mean it is not meaningful progress.  *See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1123 (9th Cir. 2011) ("C.P. didn't progress at a constant, linear rate in all areas.  But he did progress.").

Second, Plaintiff argues that SRO II's determination that D.P. made progress on several of his annual goals, (*see* SRO II Decision at 11-12), is not sufficiently well-reasoned because the goals were not the result of adherence to "New York's Best Practices for creating, monitoring, and reporting goal progress and regression," the District failed to collect objective data to determine whether D.P. was making progress towards his goals, and the District failed to make goal progress data available for her and the CSE to determine whether appropriate progress was being made, (P's Mem. at 12-13). Plaintiff also makes much of a purported lack of commentary on D.P.'s progress report codes, (*id.* at 13), and maintains that D.P.'s "progress reports are inconsistent," (*id.* at 14).

The Court disagrees. Most of these arguments "are either conclusory or coterminous with [Plaintiff's] other arguments." *K.L. v. N.Y. City Dep't of Educ.*, 530 F. App'x 81, 85 (2d Cir. 2013) (summary order). Indeed, Plaintiff does not explain what "New York's Best Practices" are, let alone how the District failed to adhere to them; she does not explain what objective measures of progress toward D.P.'s goals should have been used; and she does not identify what specific data was unavailable to either her or the CSE. To the contrary, the progress report on which SRO II relied, (*see* SRO II Decision at 11-12 (citing Ds' Ex. 47)), provides progress updates for each goal on D.P.'s 2017-2018 IEP and, in many instances includes comments providing context for the observed progress (or lack thereof), (*see* Ds' Ex. 47 at 2-6). Plaintiff's insinuation that it was inappropriate to report progress using qualitative rather than quantitative language, (*see* P's Mem. at 13-14), is without merit. "Educational progress can be measured based on qualitative data as well as quantitative data." *Parenteau v. Prescott Unified Sch. Dist.*, No. 07-CV-8072, 2008 WL 5214997, at *9 (D. Ariz. Dec. 11, 2008). The use of qualitative descriptors in D.P.'s progress report does not mean that the corresponding IEP

goals were not measurable or otherwise inaccurate.  To the contrary, every goal in the progress report includes the requisite evaluative criteria and is measurable, as required by New York state regulations, *see M.H.*, 685 F.3d at 249, and Plaintiff does not identify any specific inaccuracies in how D.P.'s progress toward his goals was measured, (*see* P's Mem. at 13-14; Ds' Ex. 47). The CSE had ample quantitative evaluations before it, and Plaintiff does not explain what else, apart from D.P's teachers' observations, ought to have been included.  *See D. L. by & through J.L. v. Clear Creek Indep. Sch. Dist.*, 695 F. App'x 733, 737 (5th Cir. 2017), *as revised* (July 31, 2017) ("teacher observations . . . are especially instructive as they spend more time with students than do outside evaluators").

Finally, Plaintiff maintains that certain documentary evidence and testimony provided by D.P.'s ELA teacher Ms. Markey-Jones and his math teacher Ms. DeGregorio was "inflated" or otherwise contradictory and "ignored" by SRO II.  (*See* P's Mem. at 14-16.)  But contrary to Plaintiff's claims, SRO II analyzed the teacher reports provided by Markey-Jones in great detail and acknowledged the reading and writing deficits she identified, (*see* SRO II decision at 16-18), and also recognized the reported inconsistencies in D.P.'s math skills, (*id.* at 18).  As such, there is no indication that the SRO's conclusions as to their testimony were not grounded in a thorough and careful analysis, or otherwise not supported by a preponderance of the available evidence. *See B.P. v. N.Y. City Dep't of Educ.*, No. 14-CV-1822, 2014 WL 6808130, at *10 (S.D.N.Y. Dec. 3, 2014).

### 2.    Sufficiency of Evaluative Material

Plaintiff also contends that SRO II "ignore[d] the overwhelming evidence that the [D]istrict conducted evaluations [that] failed to assess D.P. in all areas of his suspected disability and that the [D]istrict did not conduct sufficient evaluations prior to the 2018-2019 [school year]

to identify his specific learning needs as necessary or as needed to recommend appropriate special education programs and services for D.P." (P's Mem. at 17.)  In so arguing, she points to Dr. Brown's "more comprehensive evaluation," (*id.* at 18) and claims that SRO II "did not carefully review the evaluations [available at the May and June 2018 CSE meetings] as part of their determination," (*id.*), ignoring certain "inadequacies and inconsistencies" in the assessments administered to D.P. and the teacher reports relied upon during the May and June 2018 CSEs, (*id.* at 21).

These arguments are unavailing.  First, "[t]he IDEA does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP."  *Cruz v. Banks*, No. 22-CV-9220, 2024 WL 1309419, at *8 (S.D.N.Y. Mar. 27, 2024).  Nevertheless, as SRO II established in detail, several tests and assessments were before the May and June 2018 CSEs, including:  a January 11, 2018 Sensory Profile School Companion, a January 10, 2018 Beery-Buktenica Developmental Test of Visual-Motor Integration, Sixth Edition (VMI-6), a January 10, 2018 Bruininks-Oseretsky Test of Motor Proficiency, Second Edition (BOT-2), a December 1, 2017 Wechsler Individual Achievement Test, Third Edition(WIAT-III), an April 13, 2016 Woodcock-Johnson IV Tests of Cognitive Abilities (WJ-IV COG), an April 13, 2016 Woodcock-Johnson-IV Tests of Achievement (WJ-IV ACH), a March 22, 2016 Test of Pragmatic Language, Second Edition (TOPL-2), a March 10, 2016 Goldman Fristoe Test of Articulation, Third Edition (GFTA-3), and a March 2, 2016 Clinical Evaluation of Language Fundamentals, Fifth Edition (CELF-5).  (SRO II Decision at 13.)  SRO II analyzed the import of several of these tests and assessments in detail, (*see, e.g.*, *id.* at 13-15 (reviewing conclusions drawn from D.P.'s GFTA-3 and TOPL-2 results); *id.* at 15 (reviewing key takeaways from D.P.'s performance on the Woodcock-Johnson IV Tests of Achievement)), ultimately concluding

that "[t]he resultant June 2018 IEP reflected the scores from the evaluations and reports reviewed

by the CSE," (*id.* at 18).  As such, SRO II properly determined that D.P. "had . . . been subject to

relevant evaluations" and his "finding that the CSE relied on sufficient evaluative data in

creating [D.P.'s] IEP is supported by the record below."  *D.J. v. N.Y. City Dep't of Educ.*, No.

12-CV-7009, 2013 WL 4400689, at *4 (S.D.N.Y. Aug. 15, 2013); *see L.B. v. N.Y. City Dep't of

Educ.*, No. 15-CV-3176, 2016 WL 5404654, at *11 (S.D.N.Y. Sept. 27, 2016) (rejecting

argument that "CSE should have ordered additional evaluations or testing" where the record

demonstrated that "the CSE had the benefit of wide-ranging progress reports, test results, teacher

observations, and social work reports from the approximately eight months preceding the IEP as

well as a psycho-educational evaluation from the previous school year," such that "no additional

evaluations or tests were necessary to render the IEP development process procedurally

compliant.").[20]

---

[20] Moreover, Plaintiff does not identify any other additional evaluations that should have
been done before the 2018 CSE meetings, except for an updated speech-language evaluation.
(P's Mem. at 20.)  A March 2016 speech-language evaluation concluded that D.P. no longer
needed direct SLT, and the 2016-2017 IEP provided for consultation between D.P.'s teachers
and the speech-language therapist instead.  (*See* Tr. 167:21-168:2; Ds' Ex. 5.)  Plaintiff does not
point to any regression or other reason why another evaluation would have been necessary.
Further, while it is the District's responsibility to ensure that it has sufficient reports and
assessments to create an appropriate IEP, *S.B. v. N.Y. City Dep't of Educ.*, No. 15-CV-1869,
2017 WL 4326502, at *10 (E.D.N.Y. Sept. 28, 2017), it is noteworthy that before the June 2019
CSE meeting, Plaintiff – a very involved and informed parent – requested an assistive
technology assessment, an OT evaluation, a writing evaluation and a sensory profile, all of which
were conducted, (*see* IHO II Decision at 9), but did not request a speech-language evaluation.
Moreover, although the sufficiency of an IEP is to be judged based on the information available
at the time, *see R.E.*, 694 F.3d at 186 ("[T]he IEP must be evaluated prospectively as of the time
of its drafting and therefore . . . retrospective testimony . . . may not be considered"), that Dr.
Brown's January 2019 evaluation did not include a recommendation for SLT, (*see* IHO II
Decision at 18 n.17), supports the conclusion that an updated speech-language assessment, in
addition to all the other evaluations available to the CSE, (*see id.* at 22-24), was not necessary for
the May and June 2018 CSE meetings.  *See C.M. v. N.Y. City Dep't of Educ.*, No. 15-CV-6275,
2017 WL 607579, at *15 (S.D.N.Y. Feb. 14, 2017) ("If the CSE determines that no additional

Second, as SRO II explained, Dr. Brown's evaluation was only available in advance of the 2019-2020 CSEs, as it was completed in January 2019 – well after the CSE met in June 2018. (SRO II Decision at 7, 22; *see id.* at 12 (noting that "a major reason for the remand" to IHO II "was IHO I's improper reliance on [Dr. Brown's] evaluation in considering the issue of FAPE for the 2018-19 school year.").)  SRO II further stressed that "[t]o the extent that the parent continues to argue that [Dr. Brown's] evaluation can be used to challenge the recommendations for the 2018-19 school year . . . this argument was addressed in the prior appeal and that State-level administrative determination is the law of the case . . . and . . . cannot be revisited."  (SRO II Decision at 12.)  These findings are well reasoned and merit deference.  At bottom, the sufficiency of the evaluative material available to the CSE prior to the 2018-2019 school year cannot be undercut by Dr. Brown's evaluation "for the simple reason that [her] evaluation had not been completed or rendered by the time the [2018-2019] IEP was finalized."  *S.W. v. N.Y. City Dep't of Educ.*, 92 F. Supp. 3d 143, 158 (S.D.N.Y. 2015); *see D.A.B. v. N.Y. City Dep't of Educ.*, 973 F. Supp. 2d 344, 361-62 (S.D.N.Y. 2013) (finding that substantively adequate IEP cannot be rendered inadequate by expert report that was not submitted to CSE that developed IEP); *C.L.K. v. Arlington Sch. Dist.*, No. 12-CV-7834, 2013 WL 6818376, at *13 (S.D.N.Y. Dec. 23, 2013) ("[A] substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE.").

Finally, Plaintiff maintains that there were "inadequacies and inconsistencies" in the assessments available to the CSE and that the testimony of certain District witnesses was

---

data are needed to determine the child's educational needs, the district is not required to conduct such an assessment unless requested by the child's parents.") (citing 20 U.S.C. § 1414(c)(4) and 8 N.Y.C.R.R. § 200.4(b)(5)(iv)).

inadequate, given the discrepancies between D.P.'s Lexile and Aimsweb scores.  (*See* P's Mem. at 21-23.)  As a threshold matter, much of this argument is conclusory and coterminous with Plaintiff's argument concerning inflated grades and progress reports, which I have already rejected.  *See R.B. v. N.Y. City Dep't of Educ.*, 15 F. Supp. 3d 421, 429 (S.D.N.Y. 2014) (rejecting "[t]he bulk of Plaintiffs' arguments regarding the inadequacy of the SRO decision, [which] are either conclusory or coterminous with their other arguments.").  In any event, and as SRO II explained, the May and June 2018 CSEs had access to D.P.'s Aimsweb scores as to math and only had access to D.P.'s Lexile scores in the Read 180 program – not any Aimsweb reading scores, (SRO II Decision at 13) – as well as the information contained in Markey-Jones's teacher reports, (*see id.* at 16-17), and the resulting June 2018 IEP accurately reflected D.P.'s reading and writing abilities as shown in those materials, (*id.* at 18).  As such, the District appears to have "had extensive documentation and verbal input that CSE members used to formulate [D.P.'s] IEP, which provided [it] with . . . current information to assess accurately [D.P.'s] skill levels."  *Cruz*, 2024 WL 1309419, at *8.  The absence of Aimsweb results from that collection of evaluative information does not militate against the SRO's finding that the information was sufficient, which warrants deference, particularly as "[t]he IDEA does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP."  *Id.*; *see D.B. v. N.Y. City Dep't of Educ.*, 966 F. Supp. 2d 315, 331 (S.D.N.Y. 2014) (finding that district's failure to obtain an updated evaluation did not amount to denial of FAPE where CSE had other "sufficient and accurate information to understand the [s]tudent's present levels of performance."); *see also M.B. v. N.Y. City Dep't of Educ.*, No. 14-CV-3455, 2017 WL 384352, at *5 (S.D.N.Y. Jan. 25, 2017) ("[A] CSE is not required to review every single item of data available."); *cf. J.S. v. N.Y. City Dep't of Educ.*, 104 F. Supp. 3d 392, 402 (S.D.N.Y. 2015) (that

the SRO "did not explicitly address every witness's testimony does not undermine the Court's

conclusion that [the SRO's] decision was generally well-reasoned and persuasive"), *aff'd*, 648 F.

App'x 96 (2d Cir. 2016).

As SRO II explained in the comprehensive concluding paragraph of his analysis as to the

provision of FAPE for the 2018-2019 school year,

> although the student was not making linear progress throughout the 2017-18
> school year leading up to the recommended programming for the 2018-19 school
> year, the hearing record supports finding that the June 2018 CSE reviewed
> extensive information regarding the student's needs, accurately described his
> present levels of performance in the June 2018 IEP, formulated annual goals to
> address his needs, and offered placement in general education class with the
> support of ICT services and a resource room.  Overall, based on the information
> available to the June 2018 CSE, the recommended program was reasonably
> calculated to have provided the student with a FAPE in the LRE.

(SRO II Decision at 19-20.)  Plaintiff's arguments as to D.P.'s 2017-2018 grades and progress

reports and the sufficiency of the available evaluative information do not militate against a

finding that this conclusion is "thorough and well-reasoned, and supported by more than a

preponderance of the evidence," such that it is owed deference.  *Mason v. Carranza*, No. 20-CV-

4010, 2023 WL 6201407, at *8 (E.D.N.Y. Sept. 22, 2023); *see J.R. v. Bd. of Educ. for the

Iroquois Cent. Sch. Dist.*, No. 18-CV-859, 2020 WL 10817806, at *15 (W.D.N.Y. Nov. 24,

2020) (upholding SRO decision where it was "well-reasoned and, at a minimum, supported by a

preponderance of the evidence.").[21]

---

[21] Indeed, Plaintiff has identified no case law to the contrary.  Most of the legal authority
referenced in this section of her brief is little more than boilerplate, setting out the relevant legal
standards under state and federal law.  (*See, e.g.*, P's Mem. at 16-18, 24.)  While Plaintiff does
cite to *F.O. v. N.Y. City Dep't of Educ.*, 976 F. Supp. 2d 499, 514-15 (S.D.N.Y. 2013), for the
proposition that IHO II and SRO II's "failures to grapple with any conflicting evidence
regarding . . . the assessments used to determine D.P.s' [*sic*] then-current levels of performance"
means that their "rushed conclusion is wholly unworthy of . . . deference," (P's Mem. at 22), the
court in *F.O.* found that the SRO there "considered only the testimony of [the District's]

**B.**     **The 2019-2020 School Year**

Plaintiff challenges the adequacy of the 2019-2020 IEP, arguing that (1) SRO II incorrectly concluded that the CSE considered sufficient evaluative information to support its recommendations and (2) IHO II erroneously determined that the CSE's June 2019 recommendations constituted the least restrictive environment.  (*See* P's Mem. at 26-33.)

**1.**     **Sufficiency of Evaluative Material**

First, Plaintiff argues that SRO II ignored the District's failure to evaluate D.P. in all areas of suspected disability, including speech and language and OT.  (*See id.* at 27-28.)  In particular, Plaintiff claims that the District failed to complete a speech and language evaluation in advance of the June 2019 CSE meeting.  (*Id.* at 27.)

These arguments are not borne out by the record.  SRO II thoroughly analyzed all the evidence available to the CSE concerning speech and language and OT, including test results from a June 18, 2019 OT evaluation conducted by Pellegrino – who participated in the June 2019 CSE meeting – which concluded that D.P. did not have any fine motor needs and had legible handwriting and adequate typing skills.  (SRO II Decision at 25.)  SRO II also noted that the CSE considered the observations and information provided by D.P.'s occupational therapist at Carmel Academy, who assumed that D.P. would continue with OT services for the 2019-2020 school year, but whose report nevertheless did not include a specific recommendation for the

witnesses" and "failed to analyze conflicting testimony from any of the Parents' witnesses," issuing an "inadequately reasoned" decision that rested largely on "inadmissible retrospective testimony," *F.O.*, 976 F. Supp. 2d at 514, 517-18, circumstances which do not appear on the record before me.  As such, none of Plaintiff's arguments here undermine the Court's conclusion that SRO II's decision was well-reasoned, thorough, persuasive, and deserving of deference, for the reasons discussed above.  *See J.F. v. N.Y. City Dept. of Educ.*, No. 12-CV-2184, 2012 WL 5984915, at *6 (S.D.N.Y Nov. 27, 2012) ("The SRO is required to render a carefully considered opinion; not a perfect one" and "[t]o refuse to defer to the SRO on the basis of [insubstantial] errors would be effectively to eliminate deference to the SRO altogether").

continuation of such services.  (*Id.* at 26.)  As to speech language services, SRO II explained that

the most recent speech-language therapy progress report available to the CSE was produced by

Carmel Academy and dated March 11, 2019, and did not include a recommendation for speech

language services.  (*Id.* at 26-27.)  SRO II observed that IHO II correctly noted that although Dr.

Brown recommended occupational therapy, she did not recommend speech language therapy.

(*See id.* at 27-28.)

Based on this information, SRO II concluded that there was not enough support in the

record to depart from IHO II's finding that the June 2019 CSE offered D.P. a FAPE even without

including recommendations for speech and language or OT services.  (*Id.* at 28.)  The Court

defers to this determination, given SRO II's well-reasoned analysis of the relevant evaluative

material to which the CSE had access.  *See F.B. v. N.Y. City Dep't of Educ.*, 923 F. Supp. 2d 570,

581 (S.D.N.Y. 2013) (deferring to SRO where "[t]he SRO rendered a thorough analysis of the

record and persuasively explained why the evaluative data which the CSE had access to, and

reviewed, was a sufficient basis on which to base [the student's] IEP."); *J.F. v. N.Y. City Dept. of

Educ.*, No. 12-CV-2184, 2012 WL 5984915, at *7 (S.D.N.Y Nov. 27, 2012) (upholding SRO's

determination that reports available to CSE were "sufficiently comprehensive to identify and

address . . . the student's special education and related services needs" even in the absence of a

"more contemporary, full psychological evaluation."); *see also Mackey v. Bd. of Educ. for

Arlington Cent. Sch. Dist.*, 373 F. Supp. 2d 292, 299 (S.D.N.Y. 2005) (The "IDEA does not

compel a school district to perform every sort of test that would arguably be helpful before

devising an IEP for a student.").

Second, Plaintiff argues that SRO II erroneously concluded that the CSE appropriately

considered Dr. Brown's evaluation when "[t]he evidence and testimony clearly demonstrate that

the June 2019 [CSE] did not review or consider Dr. Brown's report and did not adopt any of her

recommendations."  (P's Mem. at 28; *see id.* at 29-31.)  But, as SRO II noted, Plaintiff

"continues to frame her arguments as a failure to follow [Dr. Brown's] recommendations," and

she "continues to argue that . . . the [D]istrict did not utilize [Dr. Brown's] recommendations,"

even though those arguments had already been addressed by SRO I.  (SRO II Decision at 21.)

Nevertheless, in an abundance of caution, SRO II conducted a full review of the information

available to the June 2019 CSE, including Dr. Brown's report and recommendations.  (*Id.*)[22]  In

so doing, he detailed her findings as to D.P.'s neurological profile and learning deficits, (*id.* at

22), identified the discrete academic recommendations and strategies called for in her report, (*id.*

at 22-23), and analyzed the extent to which her findings were echoed by the June 2019 IEP, as

well as the extent to which several recommendations made by the June 2019 CSE comported

with those made by Dr. Brown, (*see, e.g.*, *id.* at 24 (CSE recommended 5:1 special class for

reading, 15:1 special classes for math, science social studies, and ELA, and 5:1 resource room

program and Dr. Brown recommended a "small class"); *id.* (listing supplementary aids, services,

and program modifications that mirrored those recommended by Dr. Brown, including additional

time for assignments, refocusing and redirection during instruction and for assignments, and the

use of assistive technology).

        Plaintiff notes that Dr. Brown's report was not listed as one of the evaluations considered

during the June 2019 meeting, (P's Mem. at 29), but this was – as the CSE chair testified, (Tr.

248:3-8) – clearly an oversight.  As SRO II explained, Dr. Brown herself attended that meeting

and reviewed the content of her report with the CSE.  (*See* SRO II Decision at 22; IHO Ex. I ¶¶

---

        [22] SRO II also acknowledged the concerns SRO I raised as to Dr. Brown's report –
namely, its suggestion that "almost no one can educate [D.P.]," which SRO I considered to be
unrealistic.  (SRO II Decision at 20.)

60-61; IHO Ex. II ¶¶ 14-20.)  That it did not adopt every suggestion she made hardly suggests

that it did not listen to her input.  *See Mr. P.*, 885 F.3d at 753 ("While the IDEA required the

District to consider this neuropsychological report, the District was not required to implement

Dr. [Brown's] suggestions."); *S.W. v. New York Dep't of Educ.*, 92 F. Supp. 3d 143, 158

(S.D.N.Y. 2015) ("Consideration does not require substantive discussion, that every member of

the CSE read the document, or that the CSE accord the private evaluation any particular

weight.").

Plaintiff's arguments to the contrary hinge on the similarities between the June 2019 IEP

and the May 2019 IEP, which she maintains suggest that Dr. Brown's evaluation was not

appropriately considered.  (*See* P's Opp. at 29.)  But the record supports the opposite conclusion,

given the extent to which Dr. Brown's evaluation mirrored what the District already knew about

D.P.'s learning deficits, (*see* SRO II Decision at 22), and the extent to which the CSE's

recommendations already echoed several of those made by Dr. Brown, (*see id.* at 22-25).  The

similarities between the May and June 2019 IEPs reflect, as found by IHO II (who plainly

credited the District's witnesses), that Dr. Brown's report did not raise any issues requiring

revision of the May 2019 IEP.  (IHO II Decision at 28.)  *See Brennan v. Reg'l Sch. Dist. No. Bd.*

*of Educ.*, 531 F. Supp. 2d 245, 274 (D. Conn. 2008) ("Nothing in IDEA requires the district to

change its initial views of what is appropriate after it reviews new evaluation data").  As such,

SRO II's rejection of Plaintiff's insistence that Dr. Brown's evaluation was not considered by the

June 2019 CSE is supported by the evidence.  *See E.S. ex rel. B.S. v. Katonah-Lewisboro Sch.*

*Dist.*, 742 F. Supp. 2d 417, 435 (S.D.N.Y. 2010) ("[T]he SRO decision . . . was a fair and

objective review of the evidence" when "[t]he SRO paid careful attention to the student's

evaluations, the parents' comments, the recommendations of the parents' experts, and how the

IEPs were developed."); *C.M. v. Mount Vernon City Sch. Dist.*, No. 18-CV-4409, 2020 WL

3833426, at *25 (S.D.N.Y. July 8, 2020) (SRO's decision was entitled to deference where "[t]he

SRO did grapple with . . . evidence and testimony from the Parents, their expert, and the [out-of-

district placement] teachers.").

      Moreover, even if the SRO had not so thoroughly reviewed the evidence concerning the

consideration of Dr. Brown's evaluation and the extent to which many of her recommendations

were already reflected in the IEP, there is no requirement that, in determining whether D.P. was

offered a FAPE, he afford her views any more weight than that afforded to the District's fact

witnesses.  *See C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-CV-9950, 2018 WL 1627262, at *23-

24 (S.D.N.Y. Mar. 30, 2018) ("[T]he SRO was not required to accept [the expert's] testimony

merely because he was an 'expert'" and "[a]bsent any further explanation from Plaintiff about

how [the expert's] testimony undermined the other evidence cited by the SRO, or any caselaw

suggesting that his expert status alone should be given more weight, the Court agrees with the

SRO's well-reasoned decision.").  To the extent Plaintiff argues that Dr. Brown's evaluation was

in conflict with the goals and recommendations selected by the June 2019 CSE, "the mere fact

that a separately hired expert has recommended different programming does nothing to change

the deference to the district and its trained educators."  *J.E. & C.E. v. Chappaqua Cent. Sch.*

*Dist.*, No. 14-CV-3295, 2016 WL 3636677, at *16 (S.D.N.Y. June 28, 2016); *see MN ex rel. EN*

*v. Katonah Lewisboro Sch. Dist.*, No. 19-CV-6793, 2020 WL 7496435, at *14 (S.D.N.Y. Dec.

21, 2020) (same) (collecting cases); *Y.N. v. Bd. of Educ. of Harrison Cent. Sch. Dist.*, No. 17-

CV-4356, 2018 WL 4609117, at *20 (S.D.N.Y. Sept. 25, 2018) ("The Court may not choose to

adopt [the expert's] views instead of the CSE's and therefore overturn the decision of the SRO,

which was the same as that of the IHO on this issue.").

Finally, Plaintiff argues that SRO II failed to consider the cumulative impact of these alleged "errors."  (*See* P's Mem. at 27, 30.)  But SRO II correctly cited relevant Second Circuit case law explaining that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not," and that "not all procedural errors render an IEP inadequate under the IDEA," (SRO II Opinion at 8-9), and then correctly concluded that the issues identified by Plaintiff were not procedural violations, as described above.  "Since the SRO correctly concluded that there were no procedural violations, it was hardly error not to consider those issue cumulatively," as "[i]t is only the failure to consider *violations* cumulatively that constitutes a denial of a FAPE."  *M.E. v. N.Y. City Dep't of Educ.*, No. 22-CV-9642, 2024 WL 1514299, at *11 (S.D.N.Y. Apr. 4, 2024) (emphasis in original); *see also S.B. v. N.Y. City Dep't of Educ.*, 174 F. Supp. 3d 798, 805 (S.D.N.Y. 2016) ("Courts routinely reject attempts to stack alleged procedural errors" into a finding of denial of a FAPE) (collecting cases).

### 2.    Least Restrictive Environment

Finally, Plaintiff argues that SRO II and IHO II inappropriately determined that the June 2019 CSE's programming recommendations placed D.P. in the least restrictive environment. (*See* P's Mem. at 31-33.)[23]

---

[23] Although Plaintiff does not explain exactly what environment she believes would have been appropriate, at Carmel, D.P. was in 4:1 classes for ELA and math, and in co-taught classes (apparently like ICT) for science and social studies.  (*See* IHO Ex VII ¶ 6; IHO Ex. VIII ¶¶ 6-7; IHO Ex. IX ¶¶ 7-9.)  The CSE recommended for 2019-2020 that D.P. be in a 15:1 special class for those four subjects and a 4:1 special class for reading.  The Carmel program was in some respects more restrictive than what the CSE recommended, in that D.P. was in a smaller class for ELA and math, and less restrictive in other respects, in that he was in a co-taught class for science and social studies.  The program recommended by the CSE is arguably in the middle, so it is not clear that it is even fairly characterized as more restrictive, but the Court assumes for purposes of this discussion that it was.

As IHO II explained, "[a]n LRE is one that, to the greatest extent possible . . . satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." (IHO II Decision at 28-29.)[24] IHO II also laid out the correct legal framework for determining whether a student has been placed in the LRE:

> The Second Circuit uses a two-pronged test to determine whether a school district has met the LRE mandate. First the Court inquires whether the student can be satisfactorily educated in the regular classroom using supplemental aids and services. The Court considers (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students. If the program in question does recommend the student be placed into a special education class or classes, the Court then considers whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate.

(IHO II Decision at 29 (citing *Newington*, 546 F.3d at 119-120).)

Applying that standard, IHO II rejected Plaintiff's argument that the special classes recommended in the 2019-2020 IEP were overly restrictive, as Plaintiff had previously "objected to [D.P.] being placed in a full slate of ICT classes for 2018-2019 because it was not supportive enough and . . . enrolled [him] in Carmel," and Carmel Academy learning specialist Dori Levy said at the June 2019 CSE meeting that she spent more time providing D.P. with 1:1 assistance than any other student in the PALS program, working with him 8 times a week during academic periods, once a week for a homework elective, and in a study skills group which amounted to 1.5

---

[24] Because SRO II did not address this issue in detail, I am entitled to defer to IHO II's decision. *See Jusino*, 700 F. App'x at 28 ("[T]he courts should defer to the IHO's analysis when considering an issue not reached by the . . . SRO."); *Z.C. v. N.Y. City Dep't of Educ.*, 222 F. Supp. 3d 326, 335 n.3 (S.D.N.Y. 2016) ("While the SRO's reasoning with respect to this point was perhaps not as well-developed as the IHO's, the Court is entitled to defer to the IHO's decision when the quality of its reasoning transcends the SRO's.").

to 4 hours per day, and that she often worked independently with D.P. and sometimes another student, with D.P. only joining the class for a portion of a given lesson.  (IHO II Decision at 30; *see* IHO Ex. XV ¶ 7.)  Further, in light of the small classes at Carmel, the CSE felt that placing D.P. in ICT classes would be too difficult an adjustment and that the special classes would make for an easier transition.  (IHO II Decision at 30.)  Given the intensive help D.P. needed even in the smaller, more individualized circumstances at Carmel, and the challenge involved in navigating the stark difference between that environment and larger ICT classes in the public school, IHO II determined that the program of all special classes recommended by the District was appropriate and in the LRE.  (*Id.*; *see* IHO Ex. I ¶ 57.)

The IHO's determination that the CSE had good reasons for recommending all special classes is supported by a preponderance of the evidence and merits deference.  The LRE requirement "is not absolute" and "does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 162 (2d Cir. 2014).  Rather, "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students."  *Newington*, 546 F.3d at 119.  The 2019-2020 IEP was a middle ground between the all-ICT program Plaintiff had found unsatisfactory, *see J.S. ex rel. Y.S. v. N. Colonie Cent. Sch. Dist.*, 586 F. Supp. 2d 74, 87 (N.D.N.Y. 2008) (noting, in rejecting LRE claim, efforts made by district to help student succeed in mainstream environment before recommending special class), and the highly individualized teaching D.P. had received at Carmel.  Simply put, "the law does not require the District to place [D.P.] in the best possible environment – it merely requires the District to make a recommendation that is

reasonably calculated to enable [D.P.] to receive educational benefits in the LRE," *R.C.*, 2016 WL 5477747, at *12, and it did so here.

###### C.   Reimbursement for Private Placement

Because the SRO correctly determined that D.P. was offered a FAPE for the 2018-2019 and 2019-2020 school years, I "need not decide whether his unilateral placement at [Carmel Academy] was appropriate, or whether equitable considerations favor Plaintiff['s] request for tuition reimbursement." *E.L. v. Bedford Cent. Sch. Dist.*, No. 18-CV-3062, 2022 WL 3667189, at *20 (S.D.N.Y. Aug. 25, 2022); *see J.B. v. N.Y. City Dep't of Educ.*, 242 F. Supp. 3d 186, 199-200 (E.D.N.Y. 2017) (unnecessary to reach second and third prongs of reimbursement test where record amply supported SRO's decision that IEP reasonably calculated to provide a FAPE).

Accordingly, Plaintiff's cross-motion seeking tuition reimbursement for the 2018-2019 and 2019-2020 school years is denied.

## IV.   <u>CONCLUSION</u>

Because SRO II appropriately found that the District offered D.P. a FAPE for the 2018-2018 and 2019-2020 school years, Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 56, 57), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  April 29, 2024
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.